**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASCENDIUM EDUCATION SOLUTIONS, INC., | ) ) ) | |
| Plaintiff, | ) | Case No. 1:19-cv-03831-CJN |
| v. | ) ) | |
| BETSY DEVOS, Secretary of Education, et al., | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.    ASCENDIUM MAY NOT CHALLENGE THE RULE'S LIMITATION ON "STANDARD DEFAULT" COLLECTION FEES ........................................ 2

    A.  Ascendium lacks standing to challenge the Rule's limitation on "standard default" collection fees. ...................................................................... 2

    B.  Ascendium has waived its challenge to the Rule's limitation on "standard default" collection fees. ...................................................................... 4

II.    THE RULE DOES NOT EXCEED THE SECRETARY'S STATUTORY AUTHORITY ........................................................................................... 6

    A.  Congress Tied the Availability of the "Rehabilitation Fee" to the Existence of Collection Costs ................................................................................... 7

    B.  Guaranty Agencies Do Not Incur Collection Costs for Borrowers Subject to the Rule. ...................................................................................... 11

III.    THE RULE IS NOT ARBITRARY OR CAPRICIOUS ..................................... 20

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*American Bankers Association v. SEC,*
    804 F.2d 739 (D.C. Cir. 1986) .......................................................................... 10, 11

*Beaston v. Farmers' Bank of Del.,*
    37 U.S. 102 (1838) ................................................................................................. 17

*Bible v. United Student Aid Funds,*
    799 F.3d 633 (7th Cir. 2015) ........................................................................... 12, 13

*Black v. Educ. Credit Mgmt. Co.,*
    459 F.3d 796 (7th Cir. 2006) ................................................................................. 18

*Chevron v. Nat. Resources Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................................................................ 12

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .................................................................................................. 3

*Davis v. Federal Election Comm'n,*
    554 U.S. 724 (2008) .................................................................................................. 3

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................................................ 8, 11

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) ............................................................................................. 9

*John Doe Co. No. 1 v. Consumer Fin. Prot. Bureau,*
    195 F. Supp. 3d 9 (D.D.C. 2016) ............................................................................ 8

*Kingdomware Technologies, Inc. v. United States,*
    136 S. Ct. 1969 (2016) ........................................................................................... 10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................. 3, 4

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Inc. Co.,*
    463 U.S. 29 (1983) .................................................................................................. 22

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*
    606 F.3d 1058 (9th Cir. 2010) ................................................................................. 4

*Ohio Student Loan Com'n v. Cavazos*,
   900 F.2d 894 (6th Cir. 1990) .................................................. 21

*Rodriguez v. United States*,
   480 U.S. 522 (1987) .............................................................. 10

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) .............................................................. 9

*Seed v. Pruitt*,
   246 F. Supp. 3d 251 (D.D.C. 2017) ...................................... 4

*Sturgeon v. Frost*,
   139 S. Ct. 1066 (2019) .......................................................... 10

*Yazoo & M.V.R. Co. v. Thomas*,
   132 U.S. 174 (1889) .............................................................. 10

**STATUTES**

20 U.S.C. § 1072b ................................................................... 12, 18

20 U.S.C. § 1078-6 .................................................................. 8, 10

20 U.S.C. § 1085 ..................................................................... 20

20 U.S.C. § 1091a ................................................................... 5, 12

**REGULATIONS**

34 C.F.R. § 30.60 .................................................................... 19, 20

34 C.F.R. § 682.406 ................................................................ 14

34 C.F.R. § 682.410 ................................................................ *passim*

34 C.F.R. § 682.411 ................................................................ 18, 19

**RULES**

Fed. R. Civ. P. 12 ................................................................... 22

**OTHER AUTHORITIES**

A. Scalia & B. Garner,
   Reading Law: The Interpretation of Legal Texts 220 (2012) ...................... 9

## INTRODUCTION

Ascendium has identified only two ways in which it claims to incur collection costs when borrowers enter into and abide by rehabilitation or repayment agreements within 60 days of default: by sending the Initial Notice of Default, and by entering into and administering the rehabilitation or repayment agreement. Neither is a form of "collection activity" within the meaning of long-standing regulations that Ascendium does not challenge here, which define a set of coercive activities aimed at compelling payment on the debt and which categorically prohibit those activities by guaranty agencies within 60 days of default. Guaranty agencies thus cannot, as a matter of pre-existing regulation, incur any collection costs for any borrower subject to the Rule Ascendium challenges here. The Secretary permissibly determined that it is not "reasonable" to charge collection costs that cannot exist; nor may guaranty agencies impose a fee intended to "defray" collection costs on borrowers who categorically require no such costs.

Ascendium's arguments to the contrary are not persuasive. In the case of what it dubs the "rehabilitation fee," it invites this Court to read Congress's stated purpose for allowing the fee, of defraying the guaranty agency's collection costs, out of the statute entirely. And for all borrowers covered by the Rule, Ascendium asks this Court to ignore the longstanding regulatory structure governing guaranty-agency collection efforts in favor of its own freelanced definition of "collection activities" that appears for the first time in its brief. Neither position is tenable in light of the broader statutory and regulatory context; in any case, Ascendium's challenge could only succeed if it could show that its interpretations are not merely permissible, but also unambiguously necessary. It cannot, and does not, meet that burden.

Ascendium's brief also confirms that it lacks standing to challenge the Rule's limitations on collection costs for borrowers who enter repayment rather than rehabilitation agreements.

1

Ascendium does not dispute that it currently does not charge collection costs to borrowers who enter repayment agreements within 60 days of default, and it does not allege any intention to do so. The "injury" it claims to its abstract legal right to charge such costs, without any concrete plans ever to do so, is a textbook case of the kind of purely speculative injury that courts have consistently held cannot establish standing.

Ascendium's comments during the rulemaking process reflected its collection-costs practices: Its comments argued that "rehabilitation fees" may not be limited but explained that guaranty agencies commonly waive "standard default collection fees." That comment did not fairly alert the Secretary to Ascendium's argument in this case that there can never be any exceptions to the mandatory imposition of "standard default collection fees" in all cases, as the Rule's response to Ascendium's comment confirms.

Finally, Ascendium cannot show that the Rule is arbitrary and capricious. Its brief raises a series of policy disputes with the Rule, providing many of the details for the first time, but the Secretary fully considered and rejected Ascendium's concerns. Whatever the ultimate policy merits of that decision, it is precisely the sort of reasoned decisionmaking that Congress left to the Secretary's judgment.

## ARGUMENT

### I.     ASCENDIUM MAY NOT CHALLENGE THE RULE'S LIMITATION ON "STANDARD DEFAULT" COLLECTION FEES

#### A. Ascendium lacks standing to challenge the Rule's limitation on "standard default" collection fees.

In their opening brief, Defendants explained that Ascendium lacks standing to seek to enjoin the Rule as it applies to "standard collection fees" because it admits that it does not charge such fees to borrowers who are subject to the Rule, and it never alleges any future intention to do

so. Thus, Ascendium has suffered no actual or imminent injury as a result of the Rule as it applies to standard collection fees. Defs.' Mot. to Dismiss at 12–14 ("Defs.' Mot.").

Ascendium's primary argument in response is that its injury is in not being able to change its mind and choose to exercise its alleged right to charge these fees in the future. Ascendium fully admits that it does not currently charge these fees and expresses no intention to do so in the future. Pl.'s Opp. to Def's Mot. to Dismiss & Mot. for Summ. J., ECF 12, at 35 ("Pl.'s Mot."). The best it can say is that it has not "made a company-wide, permanent decision to never collect those statutorily permissible Standard Default Collection Fees." *Id.* But losing the right to someday consider charging these fees to borrowers who enter repayment agreements within 60 days of default—without any particular intention ever to do so—is not a sufficient injury to establish standing. "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564. Ascendium does not even allege "some day" plans to charge "standard collection fees" to borrowers subject to the Rule; rather, the best it can muster (in its brief rather than in the complaint) is that it would like the *option*, some day, to do so. Pl.'s Mot. at 35. That is far from enough for standing.

Ascendium secondarily argues that it does not have to have standing to challenge the Rule as it applies to "standard collection fees" because its claims are simply that the Rule exceeds the Department's statutory authority and is arbitrary and capricious. Pl.'s Mot. at 36. However, a plaintiff must not only demonstrate standing "for each claim he seeks to press," but "'for each form of relief' that is sought." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Ascendium has consistently distinguished in this case between what it calls "standard default collection fees" and "the

rehabilitation fee." *See, e.g.*, Compl. ¶¶ 3, 4, 61; *see also generally* Pl.'s Mot., ECF 12. In keeping with that distinction, it seeks two distinct forms of injunctive relief: one injunction to bar Defendants from "taking any action whatsoever to prevent guarantors from assessing standard collection fees," and another enjoining Defendants from "taking any action whatsoever to prevent guarantors assessing a rehabilitation fee," for borrowers covered by the Rule. Compl. ¶ 67(e), (f). Likewise, its "Proposed Order" would separately enjoin the Rule's application "to prevent guarantors from assessing to defaulted borrowers standard collection fees" and "to prevent guarantors from assessing the rehabilitation fee." Proposed Order, ECF 12 at 55. Ascendium's effort to invoke the Court's injunctive power is more than merely an "argument supporting [its] claims." Pl.'s Mot. at 36. To have standing to seek the relief it requests, Ascendium must demonstrate that it has suffered a concrete and imminent injury from the Rule's limitations on "standard collection fees," which it has failed to do. *See, e.g.*, *Lujan*, 504 U.S. 561.

## B. Ascendium has waived its challenge to the Rule's limitation on "standard default" collection fees.

Defendants further argued in their opening brief that, consistent with Ascendium's not charging "standard collection fees" to borrowers who are subject to the Rule, Ascendium did not object in its written comments to the proposed rule's limitation on the collection of these fees and therefore waived its ability to do so here. Defs.' Mot. at 14–16. In response, Ascendium acknowledges that the doctrine of issue exhaustion requires a plaintiff to "raise an issue with sufficient clarity to allow the decision maker to understand and rule on the issue raised." Pl.'s Mot. at 37 (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010) (internal citation and quotation marks omitted)). And it agrees that there are no "magic words" to preserve an issue for judicial review. *Id.* (quoting *Seed v. Pruitt*, 246 F. Supp. 3d 251, 255–56 (D.D.C. 2017)). But Ascendium's effort to demonstrate that it preserved its distinct

challenge to the Rule's limitation on "standard collection fees" depends on "magic words" included in the cover letter to its comments, at the expense of the overall thrust of Ascendium's comments, which clearly focused on the Rule's impact on guarantors' ability to charge a rehabilitation fee.

Defendants acknowledged in their opening brief that Ascendium said in its cover letter to its comments that Section 484A(b) of the Higher Education Act of 1965, as amended (HEA), 20 U.S.C. § 1091a(b), provides that a defaulted borrower must pay reasonable collection costs. Defs.' Mot. at 15–16. But the actual comments attached to the cover letter are all about the proposed rule's application to the rehabilitation fee. To the extent the comments mention the per-payment collection fees, it is to draw a distinction from rehabilitation fees. For instance, the comments theorize that Congress provided for a separate rehabilitation fee because a per-payment fee would be insufficient due to the potentially small amounts of monthly payments under rehabilitation. AR 572–73. Absent from the comments is any argument that prohibiting guaranty agencies from charging collection costs to borrowers who, within 60 days of receiving notice of default, enter into an acceptable repayment agreement, as opposed to a rehabilitation fee, is unlawful, as Ascendium now argues in this lawsuit.

Similarly, Ascendium claims that the Final Rule in fact responded to its newly minted challenge to the limitation on "standard collection fees," thus excusing Ascendium's failure to develop that argument. Pl.'s Mot. at 39–40. But that argument once again relies on highlighting "magic words" in the Rule's response to comments while neglecting their context. The Rule notes that one commenter (clearly Ascendium, although the Rule does not identify it by name) "asserted that section 484A(b) of the HEA [20 U.S.C. § 1091a(b)] provides that a defaulted borrower must pay reasonable collection costs and that there are no exceptions under which the borrower is not

required to pay such costs." 84 Fed. Reg. at 49876; AR 663. But that single mention of § 1091a(b) comes sandwiched between two references to "the rehabilitation fee," making it clear in context that it is part of the Rule's response to the comment's argument that that provision made *rehabilitation fees* mandatory.

The rest of the Rule's discussion of Ascendium's comment confirms that neither the Secretary nor Ascendium understood its comments to mean that collection costs are mandatory in every case outside the context of rehabilitation fees: "This commenter also drew a distinction between a defaulted borrower entering into an 'acceptable repayment plan' and a defaulted borrower entering into a Rehabilitation Agreement," and "noted that it is common practice for guarantors to dispense with per-payment collection fees when borrowers enter an acceptable repayment plan within 60 days of receiving a default notice, even though they are required to do so." 84 Fed. Reg. at 49877; AR 664. The Rule's response to the comment likewise focused on "rehabilitation fees": "A guaranty agency is permitted to charge the borrower for the reasonable collection costs it incurs in collecting on loans," but "[i]t is not reasonable for the guaranty agency to charge collection costs for collection activities it does not need to take because the borrower entered into and met the requirements of a loan rehabilitation agreement." *Id.*

Notwithstanding a fleeting reference to the statutory provision that forms the basis of its current argument about "standard collection fees," Ascendium's comment, read as a whole, failed to alert the Secretary to the position it now takes, or to preserve that argument for judicial review. The Rule's discussion of Ascendium's comment confirms that conclusion.

## II.     THE RULE DOES NOT EXCEED THE SECRETARY'S STATUTORY AUTHORITY

Despite the tangle of statutory and regulatory provisions at issue in this case, the ultimate legal questions it presents are simple. First, given that Congress authorized guaranty agencies to

collect "rehabilitation fees" "in order to defray collection costs," could the Secretary permissibly restrict those fees in cases where there are no collection costs to defray? And second, do guaranty agencies engage in "collection activities" when they send the Initial Notice of Default to a borrower or enter into a repayment or rehabilitation agreement with a borrower within 60 days of default?

As discussed in Defendants' opening brief, the answer to each question turns on the interpretation of ambiguous statutory phrases within the Secretary's regulatory jurisdiction. The Secretary thus permissibly determined that guaranty agencies may not charge collection costs to borrowers when they do not engage in collection activities. And the Secretary also permissibly determined that "collection activities" within the meaning of the HEA and its implementing regulations refers to certain coercive activities to compel payment of a debt—activities that guaranty agencies never undertake for borrowers who enter into repayment or rehabilitation agreements within 60 days of default. Defs.' Mot. at 16–21. Ascendium's arguments to the contrary are unpersuasive.

### A. Congress Tied the Availability of the "Rehabilitation Fee" to the Existence of Collection Costs.

Ascendium opens its statutory analysis with the striking claim that "Congress has spoken clearly on this issue and did not make the Rehabilitation Completion Fee contingent on the existence of collection costs." Pl.'s Mot. at 13. In other words, despite the statutory instruction that "rehabilitation fees" exist "in order to defray collection costs," Congress *unambiguously* intended to require borrowers to pay those fees even when there are no collection costs to defray. That argument violates the most basic tenets of statutory construction, and the Court should reject it.

Ascendium freely admits that its argument requires reading the phrase "in order to defray collection costs" out of the statute, in defiance of what Ascendium itself calls the "cardinal rule of

construction" that statutory text "should be construed to avoid redundancy and so that no part is rendered superfluous." Pl.'s Mot. at 26 (quoting *John Doe Co. No. 1 v. Consumer Fin. Prot. Bureau*, 195 F. Supp. 3d 9, 19–20 (D.D.C. 2016)). Ascendium reads these words out of the statute by labeling Congress's reference to defraying collection costs a "prefatory clause" that merely "announces an objective" and does not "limit or expand the meaning of the operative clause." Pl.'s Mot. at 14. Moreover, Ascendium claims that "the sole purpose of a prefatory clause is to provide a 'clarifying function' if 'ambiguity exists in the operative clause.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008)).

To understand the absurdity of Ascendium's argument, it is helpful to set out the pertinent language of the statute. 20 U.S.C. § 1078-6(a)(1)(D)(i)(II) says that with respect to a loan in the rehabilitation program, a guaranty agency

> "may, in the case of a sale made on or after July 1, 2014, in order to defray collection costs-
>
> (aa) charge to the borrower an amount not to exceed 16 percent of the outstanding principal and interest at the time of the loan sale; and
>
> (bb) retain such amount from the proceeds of the loan sale

The words "in order to defray collection costs" immediately precede the amount the guaranty agency may charge (the operative clause) and obviously have meaning. They are not contained in some far-removed introductory clause to the statute, or in a "wherefore" clause that discusses the statute's objectives. Ascendium's case for ignoring that clause is also circular: It starts from the premise that the so-called "operative clause" is unambiguous, which makes the "prefatory clause" irrelevant to interpreting it—but the "operative clause" is only unambiguous because Ascendium reads it in isolation from the so-called "prefatory clause." *See* Pl.'s Mot. at 13–14.

8

Ascendium's argument is also incompatible with the principle of statutory construction that "[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole." *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). To illustrate the point, consider a city ordinance providing that "in order to cover the costs of corkage, restaurants may add a $25 fee to each receipt." Read as a whole, that provision clearly applies only to diners who bring their own bottle of wine—or so, at least, city regulators could reasonably conclude. Read without what Ascendium is labeling the "prefatory clause," however, the provision instead applies indiscriminately to all diners. But the cunning restaurateur, like Ascendium, may not fundamentally change the meaning of the law by ignoring its stated purpose.

Ascendium's argument, moreover, produces the puzzling result that the "holistic endeavor" of statutory construction must "determine[] meaning by looking not to isolated words, but to text in context, along with purpose and history," *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (internal citation and quotation marks omitted)—except when Congress directly states its purpose, in which case courts must ignore that factor. No surprise, the Supreme Court has expressly rejected that very argument. *Id.* at 2127 ("Gundy urges us to ignore SORNA's statement of purpose because it is 'located in the Act's preface' rather than 'tied' specifically to [the operative clause]. . . . But the placement of such a statement within a statute makes no difference."). "Wherever it resides," a statement of purpose is "'an appropriate guide' to the 'meaning of the [statute's] operative provisions." *Id.* (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012)). Here, the statement of purpose "resides" immediately before the operative clause, making it especially pertinent.

The cases Ascendium cites do not compel a different conclusion. *See* Pl.'s Mot. at 14. Instead, they reflect the uncontroversial point that a statute's purpose, even if expressly stated, is

not necessarily the be-all and end-all of statutory construction. "[N]o legislation pursues its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987), and a statute's general purpose does not necessarily control the interpretation of its specific provisions. Defendants fully agree with that principle. The point is not that "purpose" necessarily trumps "operative provisions" in the abstract, but rather that Congress's stated purpose may validly inform a statutory command, as well as an agency's interpretation of a statutory provision.

Thus, in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1977–78 (2016), the Supreme Court held that a "prefatory clause" stating the purpose of a veterans-preference provision in a government-contracting statute did not negate the mandatory effect of that provision, which required that contracts "shall" be awarded according to its terms. *Kingdomware*, 136 S. Ct. at 1977–78. In contrast, the statutory provision at issue here does not use the mandatory word "shall" but rather uses the word "may." 20 U.S.C. § 1078-6(a)(1)(D)(i)(II). There is thus no conflict between the "prefatory clause" and the operative clause to prevent giving meaning to the phrase "in order to defray collection costs." *See Kingdonware*, 136 S. Ct. at 1977 (emphasizing the difference between "shall" and "may"); *see also, e.g.*, *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) ("statements of purpose . . . cannot override a statute's operative language") (internal quotation marks omitted).

Ascendium's other cases are even further afield from the question before this Court. In *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889), the Court explained that a statutory preamble that was "no part of the act" cannot alter the meaning of unambiguous words of the act. *American Bankers Association v. SEC*, 804 F.2d 739, 753 (D.C. Cir. 1986), considered a provision of the Securities Exchange Act of 1934 stating that the Act's definitions applied "unless the context otherwise requires." Far from dismissing that clause as "prefatory" and thus somehow irrelevant

to the interpretive question before it, however, the court instead interpreted the word "context" in that provision to mean the textual context of the Act itself, rather than "out-of-Act market or regulatory circumstances." *Id.*

Finally, in *District of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008), the Supreme Court considered the meaning of the Second Amendment. The Court explained that the Amendment's "prefatory" opening clause "does not limit the latter [operative clause] grammatically, but rather announces a purpose." *Heller*, 554 U.S. at 577. But the Court did not treat that conclusion as a reason to ignore the "prefatory clause" or disregard its implications for the "operative clause"; to the contrary, it went on to consider whether its "reading of the operative clause is consistent with the announced purpose," and held that "[i]t fits perfectly." *Id.* at 577, 598. *See also id.* at 577 ("Logic demands that there be a link between the stated purpose and the command.").

Congress did not unambiguously intend for its statement of purpose in creating the "rehabilitation fee" to be treated as irrelevant surplusage, and nothing in the statutory text or the relevant precedents required the Secretary to do so.

### B.  Guaranty Agencies Do Not Incur Collection Costs for Borrowers Subject to the Rule.

Ascendium claims that "guarantors incur collection costs in every default, including when a borrower enters a rehabilitation agreement within the initial default period." Pl.'s Mot. at 15. It argues primarily that sending the Initial Notice of Default, and entering into and administering repayment and rehabilitation agreements, are "collection activities" for which it is entitled to recover collection costs. Pl.'s Mot. at 17-18, 23. The Secretary permissibly determined that neither activity qualifies.

Ascendium's position turns on the statutory definition of "default collection activities" to mean "activities of a guaranty agency that are directly related to the collection of the loan on which

a default claim has been paid to the participating lender, including the due diligence activities required pursuant to regulations of the Secretary." 20 U.S.C. § 1072b(d)(3)(A). The Act thus expressly delegates to the Secretary the authority to define "default collection activities," and Congress' decision to leave the term "reasonable collection costs" undefined in § 1091a(b)(1) likewise "explicitly left a gap for the agency to fill." *Bible v. United Student Aid Funds*, 799 F.3d 633, 650 (7th Cir. 2015) (quoting *Chevron*, 467 U.S. at 843). Ascendium claims that § 1091a(b)(1)'s requirement that collection costs (a term Ascendium concedes is undefined, Pl.'s Mot. at 16) be "reasonable" does not apply to the rehabilitation fee because Congress set a fixed allowable percentage for that fee. *Id*. at 15. But loan rehabilitation is merely one form of repayment agreement, *see* Defs.' Mot. at 5, and the fact that Congress capped the rehabilitation fee at 16 percent of the outstanding principal and interest at the time of the loan sale does not make Congress's direction that borrowers pay "reasonable collection costs" inapplicable to rehabilitation fees.

Ascendium also argues that § 1091a(b)(1) is unambiguous because it says that borrowers "shall" pay reasonable collection costs. Pl.'s Mot. at 30. But that mandate does not mean that Congress specified what "reasonable collection costs" would be. Ascendium claims that "'[z]ero' is not 'reasonable' where Congress says 'shall,'" *id*., but zero *is* reasonable when there are no collection costs, and nothing in the statute is to the contrary.

The pre-existing regulations codify the Secretary's understanding of "collection activities" on a student loan as coercive activities aimed at compelling payment, including wage garnishment, administrative offset, and civil litigation. *See* 34 C.F.R. § 682.410(b)(6). Those activities "directly relate[]" to the collection of the loan, because they result in payment without requiring intermediate steps or the cooperation of the borrower. Those regulations long pre-date this case, and Ascendium

does not challenge them. Ascendium does not and cannot claim that sending the Initial Notice of Default or entering a rehabilitation or repayment agreement is one of the "collection activities" described in the regulations. The regulations require the guaranty agency to inform the borrower "that if he or she does not make repayment arrangements acceptable to the agency, the agency will promptly initiate procedures to collect the debt," such as garnishing the borrower's wages, filing a civil suit, or taking the borrower's income tax refunds. 34 C.F.R. § 682.410(b)(6)(ii). The regulations further prohibit the guaranty agency from undertaking any of those activities until at least 60 days after the Initial Notice of Default. *Id.* § 682.410(b)(5)(i)-(ii), (b)(6)(iii)-(viii), (b)(9)(i); *Bible*, 799 F.3d at 647. And the regulations say that the guaranty agency shall provide the borrower with the Initial Notice of Default and an opportunity to enter into a repayment agreement on terms satisfactory to the agency, among other things, "before it . . . assesses collection costs against a borrower." 34 C.F.R. § 682.410(b)(5)(ii). Ascendium argues this provision just addresses *when* collection costs may be assessed, not *whether* they may be assessed. Pl.'s Mot. at 27-28. But the regulations clearly prohibit collection activities from occurring, and collection costs from accruing, during this initial time period. If the borrower enters a repayment or rehabilitation agreement within that period, collection activities never commence, and collection costs never arise. Ascendium also tries to dismiss § 682.410(b)(6)(ii) as a "regulated script a guarantor must use to adequately inform a borrower what legal procedures might be deployed in the future to collect a debt," but that ignores the regulations' substantive limitations on guaranty agencies' actions. Pl.'s Mot. at 19.

Ascendium argues that the Initial Notice of Default qualifies as a "collection activity" under the statute, as being "directly related to the collection of the loan." Pl.'s Mot. at 18. According to Ascendium, that initial contact "demands payment, warns of escalating activity, and

offers ways to remove a default," which is good enough under Ascendium's interpretation of the phrase "directly related to collection" to mean "substantively geared towards incentivizing payment on the defaulted loan." Pl.'s Mot. 18. But Ascendium offers no support for its idiosyncratic reading of the statute, let alone any basis to think that it is the only possible valid interpretation. Without that showing, Ascendium's statutory argument fails.

Ascendium tries to assign talismanic significance to the term "due diligence," asserting that Defendants' argument "ignore[s] that sending this initial notice is identified by their due diligence regulations—and by incorporation, Congress—as a default collection activity." Pl.'s Mot. at 18. In other words, even though the Initial Notice of Default is not a "collection activity" as defined by the regulations, it nevertheless counts, per Ascendium, because the regulations define it as a "due diligence activity," and Congress defined "collection activities" to include *all* due diligence activities. *See also id.* at 17. The regulations do not, however, define the Initial Notice of Default as a "due diligence activity." Rather, the regulations say that guaranty agencies must "exercise[] due diligence *in collection of the loan* in accordance with § 682.410(b)(6)." 34 C.F.R. § 682.406(a)(11) (emphasis added). That provision requires the exercise of due diligence in conducting the collection activities described in § 682.410(b)(6), but that does not mean that every activity listed in that provision is a collection activity, or a "due diligence activity." And the limits on when collection activities may begin discussed above are obviously part of § 682.410(b)(6).

Ascendium also argues that the Rule itself admits that there are collection costs during the 60-day grace period, but provides that they may not be charged. Pl.'s Mot. at 25–26. The problem with this argument is that it rests on a wholly unnatural reading of the Rule's text. The Rule simply provides that guarantors may charge collection fees, except in cases that involve no collection costs, in which case they may not. Nothing about the structure of the Rule in any way implies an

admission that there are collection costs in all cases. To return to the corkage fee example: If the city ordinance were to read "restaurants may add a $25 corkage fee to each receipt, except when diners order their meals to-go, in which case no corkage fee may be charged," no competent English speaker would think that ordinance's phrasing somehow implies that take-out diners create corkage costs which they escape without paying. Just so with the Rule.

Ascendium also argues that the Department is not entitled to deference in interpreting the HEA or its regulations because it failed to acknowledge an alleged departure from previous interpretations. *See* Pl.'s Mot. at 11, 26. This contention is meritless. Prior to the Rule, the Department interpreted the statute and regulations not to permit guaranty agencies to charge collection costs to defaulted borrowers who timely entered into, and complied with, rehabilitation or repayment agreements because the regulations did not allow guaranty agencies to engage in collection activities against such borrowers. The Department articulated that interpretation in the amicus brief it filed in *Bible* and in a Dear Colleague Letter, the *Bible* court upheld it, and the Department codified that interpretation in the Rule. *See* Defs.' Mot. at 6–9. While the Department withdrew the Dear Colleague Letter to allow for public comment on its interpretation, 84 Fed. Reg. at 49877; AR 664, its interpretation has not changed.

Ascendium cites Office of Management and Budget (OMB) circulars, plus a letter to the Department from a law firm on behalf of the guaranty agency defendant in the *Bible* case, to support its claim that the Department previously allowed guaranty agencies to charge "rehabilitation fees" to borrowers who entered rehabilitation agreements within 60 days of default. *See* Pl.'s Mot. at 26–27. The OMB circulars, however, clearly state that collection charges may *not* be assessed to borrowers "who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency

has paid a default claim and will report default status on the loan to national credit bureaus . . . (34 CFR section 682.410(b)(5)(ii)).” *See, e.g.*, AR262.[1] The circulars also state that “HEA Section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency.” *Id.* And the law firm letter acknowledges that the issue presented in *Bible*, and resolved in the Rule, “is one of apparent first impression in terms of express or formal stated Departmental policy. We are aware of no Department of Education ruling, interpretation, Dear Colleague Letter, testimony, or other written pronouncement or stated position on the specific issue presented here.” AR 213.

Aside from sending the Initial Notice of Default and the activities necessary to enter and administer repayment or rehabilitation agreements, Ascendium identifies no specific “default collection activities” that a guaranty agency needs to do for borrowers subject to the Rule. To be sure, Ascendium refers to a host of other activities that guaranty agencies sometimes undertake in the course of their duties. But those costs do not apply to the subset of borrowers who are subject to the Rule. For example, Ascendium lists the cost of “attempts to locate borrowers through skip tracing” and “obtaining from credit reporting agencies information that may assist them in locating borrowers.” Pl.’s Mot. at 20. Ascendium does not argue that those costs arise for borrowers who resolve their default through a repayment or rehabilitation agreement within 60 days. Likewise, the need to send “a final demand letter if the borrower doesn’t respond” is not a concern for borrowers subject to the Rule. *Id.* at 22. Similarly, Ascendium identifies the costs of facilitating borrowers’ challenges to their default status, which employs procedures modelled on those used to collect loans through administrative offset against the borrower’s state and federal tax refund.

---

[1] The final four Circulars, from 2012 to 2015, say that a guaranty agency may choose not to charge collection charges to these borrowers. AR 288, 292, 295, 299.

*Id.* at 22–23.[2] But Ascendium subsequently admits that a borrower who enters a rehabilitation agreement within 60 days has "chosen not to" pursue a challenge to the loan's default status. *Id.* at 29. The same reasoning applies to borrowers who instead pursue repayment agreements with their guaranty agencies.

Ascendium further argues that a guaranty agency "collects" on a loan, and incurs "reasonable collection costs," when it sells the loan to a Federal Family Education Loan (FFEL) Program lender or the federal government at the end of rehabilitation. *Id.* at 23. Whatever the precise scope of the term "collection" may be, it certainly does not include selling the right to collect payments on the debt to a third party rather than actually *collecting* those payments. *See, e.g.*, "Collect," Merriam-Webster.com ("to claim as due and receive payment for"); "Collect," Dictionary.com ("to receive or compel payment of"); *Beaston v. Farmers' Bank of Del.*, 37 U.S. 102 (1838) (discussing property "collected and paid over to satisfy the debt") (emphasis added)).

Ascendium also repeatedly points to its general overhead and administrative costs as collection costs guarantors may assess defaulted borrowers: "the use of external agencies, processing, system costs, letters, mailing letters, phone calls, administrative," Pl.'s Mot. at 20–21; "a broad range of activities, infrastructure, overhead," *id.* at 21; "overhead for employees who service loans,"; "mailing notices and maintaining telephone communication, as well as items that

---

[2] Although it is not entirely clear, Ascendium's brief seems to suggest that facilitating borrowers' challenges to their default status, which follows the procedures used for administrative offset, *see* 34 C.F.R. § 682.410(b)(5)(iii), is itself a form of administrative offset, and thus a collection activity: "Both records inspection and the administrative challenge procedures are included by the regulation administrative offset procedures to collect debt." Pl.'s Mot. at 23. If that is Ascendium's argument, it is wrong: Administrative offset is a form of collection activity, *see* 34 C.F.R. § 682.410(b)(6)(v), but facilitating a borrower's challenge to default status is not, even though it follows the procedures for administrative offset.

might be considered administrative,"; "letters, mailing letters, phone calls, [and] administrative tasks"; "a series of letters and phone calls"; and "infrastructure and other costs," *id.* at 22.

Defendants do not dispute that guaranty agencies are entitled to recover reasonable overhead costs attributable to their collection activities. *See, e.g.*, *Black v. Educ. Credit Mgmt. Co.*, 459 F.3d 796, 801 (7th Cir. 2006). Nor do Defendants require guaranty agencies to precisely account for the expense of each individual mailing or phone call for each individual borrower. *Id.* But that does not mean that *all* of a guaranty agency's administrative and overhead costs are, ipso facto, recoverable collection costs; the question, instead, is whether those costs are reasonably attributable to "collection activities." Ascendium's invocation of various statutory and regulatory provisions and statements in the Administrative Record to support its right to collect overhead costs therefore misses the point: Those sources support Ascendium's ability to collect overhead costs reasonably attributable to its collection activities, but none of them support Ascendium's apparent contention that engaging in administrative activities is, in and of itself, a form of "collection activity."

Thus, the analogy that Ascendium attempts to draw between "default collection activities" and "default aversion activities" is, at best, irrelevant, to the extent that it is intended to show that lenders as well as guaranty agencies incur administrative costs when engaging in "collection activities." *See* 20 U.S.C. § 1072b(d)(3)(B) ("default aversion activities"); 34 C.F.R. § 682.411 ("Lender due diligence in collecting guaranty agency loans."). Nothing in the statute or the lender due-diligence regulations supports the idea that all administrative overhead, of whatever source, is recoverable as "collection costs." To the contrary, the statute and regulations applicable to lenders quite strongly suggest that overhead is not recoverable merely because it relates in some way to obtaining payment on the loan: The routine administrative work and correspondence that lenders

18

engage in for borrowers who are not delinquent, such as sending routine monthly loan statements, does not count as "collection activity," even though it directly relates to the lender's receipt of payment on the loan. 34 C.F.R. § 682.411 (establishing "collection efforts" that lenders must undertake "[i]n the event of delinquency").

Ascendium similarly points to a regulation entitled "What costs does the Secretary impose on delinquent debtors?" Pl.'s Mot. at 21 (discussing 34 C.F.R. § 30.60(a)). That regulation is relevant to guaranty agencies because the costs of collection a borrower would face if their loan were held by the government set the upper limit on the "reasonable costs incurred by the agency in collecting a loan" that a guaranty agency may charge to a borrower. 34 C.F.R. § 682.410(b)(2)(i) (current rule); 84 Fed. Reg. at 49926; AR 713 (codifying cross-reference at 34 C.F.R. § 682.410(b)(2)(iii)). As Ascendium points out, the costs that the Secretary may charge for collections on loans held by the government include "[t]elephone and mailing costs," "[c]osts associated with computer operations and other costs associated with the maintenance of records," and "[s]alaries of employees performing Federal loan servicing and debt collection activities." 34 C.F.R. § 30.60. But all of those costs are chargeable only when they are "associated with the collection of a particular debt." *Id.*

Ascendium argues that section 30.60(a)'s reference to "[s]alaries of employees performing Federal loan servicing and debt collection activities" means that the Department has conceded that "servicing a defaulted loan is engaging in a collection activity." Pl.'s Mot. at 22. That is far more than the regulatory text can bear. To begin with, the language Plaintiff cites expressly *distinguishes* between "loan servicing" and "debt collection," which would be an odd means of equating those activities, particularly when no other provision of the regulations supports the equivalence that Ascendium posits. Second, the regulation allows costs for the salaries of such employees if those

costs are "associated with the collection of a particular debt." 34 C.F.R. § 30.60(a). In context, it is clear that the regulation simply recognizes that the same employees will often perform the routine administrative tasks associated with loan servicing as well as debt collection. Ascendium's contrary reading requires the assumption that the Department inadvertently folded the distinct category of loan servicing activities—which Congress expressly distinguished from loan "collection" in several parts of the HEA, *see, e.g.*, 20 U.S.C. § 1085(a)(4)(C), (m)(1)(A)—into the category of "collection activities" for which guaranty agencies may recover their costs, via a single reference in a regulation that does not even directly apply to guaranty agencies. In any case, Ascendium does not argue that it engages in "loan servicing" activities for borrowers subject to the Rule.

### III. THE RULE IS NOT ARBITRARY OR CAPRICIOUS

Ascendium's challenge to the Rule as arbitrary and capricious begins by recapitulating its statutory argument under a new heading: "the Department failed to consider that there *are* collection activities performed by guarantors each and every time a loan is in default." Pl.'s Mot. at 31. But the Rule did not "fail to consider" that argument; it considered and correctly rejected it. As the Rule explained, a guaranty agency "does not need to take" collection activities for borrowers who enter and abide by rehabilitation or repayment agreements within 60 days of default. 84 Fed. Reg. at 49877; AR 664. To reach that conclusion, the Rule interpreted the term "reasonable collection costs" contrary to Ascendium's liking. It was not arbitrary or capricious to do so: Repacking the conclusions of its statutory argument as facts that the Rule allegedly "ignored" does not make Ascendium's position any more persuasive.

Ascendium's next argument falls into the same trap of assuming its conclusion. According to Ascendium, the Rule failed to "properly balance[]" encouraging borrowers "to enter into satisfactory repayment plans" with "the policy behind allowing guarantors to recover costs for

their collection activities." Pl.'s Mot. at 31. Despite Ascendium's apparent confusion, the Rule did not conclude that offering encouragement to borrowers to promptly resolve their defaults was worth denying guaranty agencies the right to recoup their collection costs for those borrowers. The whole point of the Rule is that in such cases, there are no "costs for their collection activities" for guaranty agencies to recover.

Finally, Ascendium professes to have trouble "decipher[ing]" the Rule's response to its argument that rehabilitation fees "encourage[] guarantor excellence," whereas their absence "harms borrowers by creating disincentives for guarantors to service borrowers effectively." Pl.'s Mot. at 32. But that response is perfectly clear: "Collection costs are not intended to be a funding source for guaranty agencies or an incentive for them to offer statutorily required opportunities to borrowers." 84 Fed. Reg. at 49877; AR 664.

Despite Ascendium's parade of horribles about the "perverse incentive" the Rule will create for guaranty agencies to "game" the system and attempt to stonewall borrowers who seek to exercise their statutory right to pursue loan rehabilitation, there is no question that the Rule squarely addressed those concerns. *See* Pl.'s Mot. at 31–32. The Rule explained that guaranty agencies are "statutorily required" to offer loan rehabilitation as a condition of their participation in the FFEL program; the risk that they may shirk their obligations and attempt to prevent borrowers from exercising their statutory right to rehabilitate until more than 60 days have passed does not justify allowing them to charge collection fees without engaging in collection activities in an effort to encourage better customer service. 84 Fed. Reg. at 49877; AR 664. Guaranty agencies, after all, are nonprofit entities that partner with the Department to administer a governmental program. *See, e.g.*, *Ohio Student Loan Com'n v. Cavazos*, 900 F.2d 894, 899 (6th Cir. 1990) (the role of the guaranty agency is not to "mak[e] any sort of profit in its administration

21

of the program."). The Secretary thus reasonably concluded that guaranty agencies' statutory obligations provide sufficient incentive for them to carry out their duties in good faith. 84 Fed. Reg. 49877; AR 664. Nor does the Rule's failure to discuss specific alleged holes in the regulations which Ascendium has identified as gameable, *see* Pl.'s Mot. at 32—concerns that appear nowhere in Ascendium's comment, *see* AR 568–74—make the agency's "difference in view" so "implausible" as to amount to a failure of reasoned decisionmaking. *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Inc. Co.*, 463 U.S. 29, 43 (1983).

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the Department's opening brief, the Court should dismiss the Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, and deny Ascendium's motion for summary judgment

Dated: May 13, 2020                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cormac A. Early*
CORMAC A. EARLY
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 616-7420
cormac.a.early@usdoj.gov

*Counsel for Defendants*