**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ASCENDIUM EDUCATION SOLUTIONS, INC.,

Plaintiff,

v.

BETSY DEVOS, in her official capacity as
Secretary of the Department of Education,

and

THE DEPARTMENT OF EDUCATION,

Defendants.

Civil Action No. 19-CV-3831-CJN

**JOINT APPENDIX**

**BELL GIFTOS ST. JOHN LLC**
Kevin St. John, D.C. Bar No.473620
5325 Wall Street, Suite 2200
Madison, WI 53718-7980
Ph. 608-216-7990
Fax 608-216-7999
Email: kstjohn@bellgiftos.com

Attorney for Plaintiff
Ascendium Education Solutions, Inc.

**DEPARTMENT OF JUSTICE, CIVIL DIVISION**
Cormac A .Early
Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Ph: 202-616-7420
Email: cormac.a.early@usdoj.gov

Attorney for Defendants, Betsy DeVos and
the Department of Education

| Document Name | Certified Administrative Record Pages |
|---|---|
| Tr. of Deposition of Gary Hopkins (as U.S. Dep't of Education 30(b)(6) witness), *Educational Credit Management Corp.*, Case No. NS 00-0241-C-D/S (S.D. Ind.) (July 11, 2001)* | 000072-000075 |
| Tr. of deposition of Pamela Moran, in *Educational Credit Management v. Barnes*, Case No. NS 00-0241-C-D/S (S.D. Ind.) (July 12, 2001)* | 000104-000115 |
| Morgan Lewis White Paper (Feb. 25, 2015) | 000204-217 |
| Brief for the United States as *Amicus Curiae* in Support of the Appellant and Reversal in <u>Bible v. United Student Aid Funds.</u> No. 14-1806 (7th Cir.) (May 21, 2015)* | 000218; 000227-000231 |
| Annual OMB Circular Compliance Supplements (excerpts as they appear in Certified Administrative Record) (2004-2015) | 000260-000299 |
| Dear Colleague Letter GEN-15-14 (July 10, 2015) | 000300-000305 |
| Dear Colleague Letter GEN 17-02 (March 16, 2017) | 000306-000307 |
| Department of Education Notice of Proposed Rulemaking, 83 Fed. Reg. 37242 (July 31, 2018)* | 000316-000324 (Executive Summary; Background; Public Participation; Negotiated Rulemaking; Summary of Proposed Changes) 000356 (discussion of Proposed Rule) 000398 (Proposed Rule) |
| Comments received on Proposed regulatory changes to 34 C.F.R. § 682.410* | 000568-000574 (Ascendium comments) |
| Department of Education Final Regulations, 84 Fed. Reg. 49788 (Sept. 23, 2019)* | 000575-000578 (executive summary) 000663-000664 (analysis of Final Rule) 000713 (text of Final Rule). |

* indicates excerpted pages only

**ORIGINAL**

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

NEW ALBANY DIVISION

EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,

    Plaintiff,

    v.      Case No.
            NA 00-0241-C-D/S

DAVID A. BARNES and
NANCY A. BARNES,

    Defendants.

Washington, D.C.

Wednesday, July 11, 2001

Deposition of:

    GARY HOPKINS

called for examination by counsel for the Chapter 13

Trustee, pursuant to notice, at Room 6-E100, 400

Maryland Avenue, S.W., Washington, D.C., at 4:00 p.m.,

when were present on behalf of the respective parties:

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433    www.nealrgross.com

2

APPEARANCES:

On behalf of the Plaintiff:

    JOHN S. EGAN, ESQ.
of: Frost, Brown, Todd, LLC
    32nd Floor
    400 West Market Street
    Louisville, Kentucky 40202
    (502) 589-5400

On behalf of the Department of Education:

    JEFFREY HUNTER, ESQ.
    Assistant U.S. Attorney
    Office of the United States Attorney
    10 West Market Street, Suite 2100
    Indianapolis, Indiana 46204

On behalf of the Chapter 13 Trustee:

    DAVID C. OLLIS, ESQ.
    144 West Tipton Street
    P.O. Box 846
    Seymour, Indiana 47274
    (812) 524-7211

Also Present:

    JOE BLACK, ESQ.
    FRED MARINUCCI, ESQ.
    DANIEL FISHER, ESQ.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433    www.nealrgross.com

## Page 4

P-R-O-C-E-E-D-I-N-G-S

(4:10 p.m.)

1
2 Whereupon
3
4 GARY HOPKINS
5 was called as a witness by counsel for the Chapter 13
6 Trustee and, having been first duly sworn, was
7 examined and testified as follows:
8     MR. OLLIS: Good afternoon. Today is July
9 the 11th, 2001. My name is David Ollis, the attorney
10 for Joseph M. Black, Jr., the Chapter 13 Trustee in
11 the Chapter 13 bankruptcy proceeding of David and Mary
12 Barnes currently pending before the United States
13 Bankruptcy Court for the Southern District of Indiana,
14 New Albany Division, Case Number 99-92958.
15     The subject matter of today's deposition
16 is the trustee's objection to the claim of the
17 Educational Credit Management Corporation, which has
18 been removed to and is currently pending before the
19 United States District Court for the Southern District
20 of Indiana, the Albany Division, under Case Number NA-
21 00-0241-C-D\S.
22 We are here in Washington, D.C. to take

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE, N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433     www.nealrgross.com

## Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gary Hopkins | 4 | 46 | 55 | 58 |

E X H I B I T S

| Exh. No. | Document Description | Page |
|---|---|---|
| H-1 | Regulation 34 CFR 688 . . . . . . | 47 |
| H-2 | Federal Register, Vol. 57, No. 244, . . . pp. 60311, 60312 | 52 |

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE, N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433     www.nealrgross.com

5

the deposition of the representative of the Department

of Education.

Present are John Egan and Mr. Fisher,

counsel for Educational Credit Management Corporation;

Jeffrey Hunter, Assistant United States Attorney; and

Mr. Marinucci, counsel of the Department of Education;

David Ollis on behalf of the Trustee; Joseph M. Black

and the Trustee in person; and the deponent Gary

Hopkins, the representative of the Department of

Education.

DIRECT EXAMINATION

BY MR. OLLIS:

Q    Mr. Hopkins, please state your name.

A    Gary Hopkins.

Q    And what is your position with the

Department of Education?

A    Acting Director of Collections in the

Office of Student Financial Assistance.

Q    Okay. And what's your mailing address at

the Department of Education?

A    400 Maryland Avenue, Southwest, ROB-3,

Room 5126.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                      www.nealrgross.com

6

Q    And how long have you been employed with

the Department of Education?

A    Three years.

Q    What did you do prior to that?

A    I worked with the private collection

agency, NCO Financial Systems, Inc.

Q    And what type of collections did they do?

A    Various types, mostly contingency fee

based, personal debt, and educational debt.

Q    They did do work for the Department of

Education?

A    Yes, sir.

Q    What's your job description at the

Department of Education?

A    Primarily managing the default portfolio

of title IV loans.

Q    What duties does that entail?

A    Recovering, maximizing net recoveries; also

providing -- while providing customer service to the

borrowers that owe the money.

Q    Now, in your position, are you familiar

with the assessment of the collection charges by the

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                      www.nealrgross.com

1   Department of Education and its guarantee agencies on
2   defaulted student loans under the federal regulations?
3       A   I'm familiar with Department of
4   Education's assessment. With respect to guarantors
5   I'm familiar with the regulations.
6       Q   What is the federal regulation that
7   provides for the assessment of collection charges on
8   defaulted student loans?
9       A   I can't quote the actual regulation.
10      Q   Okay. My guess is that it's 34 CFR
11  682.410(b)(2). Does that sound correct?
12      A   Sounds right.
13      Q   Okay. Under that regulation, what cost
14  may be included in the collection charges assessed by
15  the Department of Education for a guarantee agency?
16      A   I'm sorry. I can't list all. I can't be
17  specific and list them all.
18      Q   Can you give me some?
19      A   The use of external agencies, processing,
20  systems cost, letters, mailing letters, phone calls,
21  administrative.
22      Q   What's the underlying federal statute that

1   serves as the basis for this federal regulation that
2   allowed the Secretary of Education to promulgate these
3   regulations. Are you familiar with that?
4       A   I can't -- I'm sorry. I can't quote the
5   actual statute.
6       Q   Can you tell me how the allowable
7   collection charges on a defaulted student loan are
8   computed under 34 CFR 682.410(b)(2)?
9       A   No, sir.
10      Q   Okay. How does the Department of
11  Education compute its collection charge on a defaulted
12  student loan?
13      A   Our collection costs are based on the
14  costs we incur through the fees that we pay to
15  private collection agencies.
16      Q   Okay. Are there not -- I believe there's
17  also a formula for the guarantee agency under 34 CFR
18  30.60. Is there not a formula under that that the
19  guarantee agencies use to calculate their fee?
20      A   Yes, sir.
21      Q   Okay. Could you tell me about that? Tell
22  me about that formula?

**ORIGINAL**

UNITED STATES DISTRICT COURT

+ + + + +

SOUTHERN DISTRICT OF INDIANA

+ + + + +

NEW ALBANY DIVISION

------------------------------x
IN THE MATTER OF:                :
                                 :
EDUCATIONAL CREDIT               :  CASE NO.
MANAGEMENT CORPORATION,          :
                                 :  NA 00-0241-C-D/S
      Plaintiff,                 :
                                 :
      v.                         :
                                 :
DAVID A. BARNES and              :
NANCY K. BARNES,                 :
                                 :
      Defendants.                :
------------------------------x

                 Wednesday,
                 July 12, 2001

                 Washington, D.C.

DEPOSITION OF

           PAMELA MORAN

was called for examination by counsel for Chapter 13
Trustee, pursuant to notice, at 1:00 p.m., at 400
Maryland, S.W., Room 6-E100, where were present on
behalf of the respective parties:

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                                    www.nealrgross.com

000104

---

APPEARANCES:

On Behalf of the Chapter 13 Trustee:

      DAVID C. OLLIS, ESQ.
      144 West Tipton Street
      P.O. Box 846
      Seymour, Indiana 47274
      (812) 524-7211

On Behalf of the ECMC:

of:   JOHN S. EGAN, ESQ.
      Frost Brown Todd LLC
      400 West Market Street
      32nd Floor
      Louisville, Kentucky 40202
      (502) 589-5400
      Fax:  581-1087

On Behalf of the Department of Education:

      JEFFREY HUNTER, ESQ.
      Assistant U.S. Attorney
      Office of the United States Attorney
      10 W. Market Street, Ste. 2100
      Indianapolis, Indiana 46204
      (317) 226-6333

ALSO PRESENT:

      JOE BLACK, ESQ.
      MR. MARINUCCI, MARINUCCI, ESQ.
      DANIEL FISHER, ESQ.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                                    www.nealrgross.com

3

I-N-D-E-X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAMELA MORAN | 4, | 111 | 114 | -- |

E-X-H-I-B-I-T-S

Chapter 13 Trustee

| Exhibit Nos. | Document | Page |
|---|---|---|
| T-1 | Department of Education Letter Assigning Its Rights Title | 40 |

ECMC

| Exhibit Nos. | Document | Page |
|---|---|---|
| ECMC-1 | 20 U.S.C. § 1091a | 73 |
| ECMC-2 | 53 Fed Reg 8136, p 102-118, 2-18-88 | 74 |
| ECMC-3 | Part 30 of Title 34 of the Code of Federal Regulations | 82 |
| ECMC-4 | 34 C.F.R. 30.60 | 83 |
| ECMC-5 | Federal Register, November 20, 1990--Department of Education. 34 C.F.R. Part 682, Guaranteed Student Loan Program Proposed Rule | 87 |
| ECMC-6 | Final Regulations from 1996 Notice of Proposed Rulemaking | 89 |
| ECMC-7 | 34 C.F.R. 682.410 | 93 |
| ECMC-8 | Federal Register, November 27, 1996 | 94 |

---

4

P-R-O-C-E-E-D-I-N-G-S

(1:23 p.m.)

WHEREUPON,

PAMELA MORAN

was called as a witness by Counsel for the Chapter 13

Trustee, having been first duly sworn, assumed the

witness stand, was examined and testified as follows:

DIRECT EXAMINATION

MR. OLLIS:  Good afternoon.  Today's July

12, 2001.  My name is David Ollis, the attorney for

Joseph M. Black, Jr., the Chapter 13 Trustee in the

Chapter 13 bankruptcy proceeding of David and Mary

Barnes, currently pending before the United States

Bankruptcy Court for the Southern District of Indiana,

New Albany Division under Case No. 99-92958.

The subject matter of today's deposition

is the Trustee's objection to the timing of the

Educational Credit Management Corporation which has

been removed to and is currently pending before the

United States District Court for the Southern District

of Indiana, New Albany Division under Case No. NA 00-

0241-C-D/S.

## 5

1    We are in Washington, D.C. to take the

2    deposition of a representative of the Department of

3    Education.

4         Present are John Egan, and Mr. Fisher,

5    Counsel for Educational Credit Management Corporation,

6    Jeffrey Hunter, Assistant United States Attorney and

7    MR. MARINUCCI: Marinucci, Counsel for the Department

8    of Education, David Ollis on behalf of the Chapter 13

9    Trustee, Joseph M. Black, Jr., in person as the

10   standing Trustee and the deponent, Pamela Moran, the

11   representative of the Department of Education.

12        BY MR. OLLIS:

13   Q    Miss Moran, please state your name.

14   A    Pamela A. Moran.

15   Q    And what is your position with the

16   Department of Education?

17   A    My title is Chief Loans Branch, which

18   includes the FFEL and Perkins Loan Programs, in the

19   Program Development Division of the Office of Student

20   Financial Assistance.

21   Q    And what is your mailing address at the

22   Department of Education?

## 6

1    A    It's Seventh and D Streets, S.W., Room

2    3042, the building number is ROB #3, Washington, D.C.

3    20202.

4    Q    How long have you been employed with the

5    Department of Education?

6    A    Since August of 1987.

7    Q    And in what capacities have you worked

8    with the Department since August of '87.

9    A    I started as a Program Specialist in what

10   was then the Loan Branch for the Guaranteed Student

11   Loan Program, now the Federal Family Education Loan

12   Program.

13        And I progressed to Section Chief in

14   December of 1987 and assumed my current

15   responsibilities in 1994, I believe.

16        And I have basically worked with the FFEL

17   Program and the Perkins Loan Program in the last five

18   years, so all of my work has been with the Student

19   Financial Assistance Programs and with the Student

20   Loan Programs.

21   Q    Prior to coming to the Department of

22   Education, what was your prior work history?

7

1    A    I spent one year as an Administrator at
2    the Vermont Student Assistance Corporation, which is
3    a state grant and guarantee agency in the State of
4    Vermont.  That was between my undergraduate and
5    graduate education.
6         I spent nine years as a Student Financial
7    Aid Officer at various colleges in Pennsylvania and in
8    the Washington, D.C. area.
9         I was hired as a contractor by the
10   Department to prepare training materials on student
11   financial aid for Neophyte Training Officers, that was
12   a private consulting firm.
13        And then joined the Department in August
14   of '87.
15   Q    And very briefly, your educational
16   background?
17   A    I have an undergraduate degree from the
18   University of Vermont and a graduate degree from Duke
19   University.
20   Q    Would that be a master's?
21   A    Yes, a master's, I'm sorry.
22   Q    In? What area?

8

1    A    Liberal arts.
2    Q    Okay.  What's your job description with
3    the Department?
4    A    The Program Development Division and the
5    job of the Branch Chief in that division, there are
6    four of us.
7         We have responsibility for statutory
8    interpretations, for recommendations for statutory
9    change, regulatory development, regulatory
10   interpretation, development of other program guidance
11   of a policy or programmatic nature that falls out of
12   statute or regulations.
13   Q    Okay.  And your actual duties entail what?
14   A    Within the Loan Branch, supervising a
15   staff of about seven people that provide, on a day-to-
16   day basis, policy guidance, either over the telephone
17   or in some cases in person, in writing, lots of e-
18   mail.
19        On the interpretation of regulations, our
20   guidance, interpretation of statute.
21   Q    Okay.  In your capacity, are you familiar
22   with the assessment of collection charges by the

1  as I know, is the underlying basis that came out of
2  the Debt Collection Act of '82.
3  Q   Okay. Now, under (b)(2), what are the
4  allowable collection charges on a defaulted student
5  loan?
6  A   We don't specify in that section of the
7  regs what the collection costs or charges, acceptable
8  charges, are.
9      What we do is establish a framework of
10  maximums that a guarantee agency can assess.
11  Q   Okay, and could you tell me about that
12  please?
13  A   I believe the reg provides that
14  notwithstanding state law, and, of course, preserving
15  whatever any cap that might exist in a borrower's
16  promissory note, that the guarantee agency is to
17  assess the lesser of the costs that would be
18  determined using the formula that is in 34 C.F.R.
19  30.60 or the costs that the Department itself would
20  assess if, in fact, the Department held the loan and
21  was collecting on the loan.
22  Q   Okay. And 34 C.F.R. 30.60 is actually a

---

1  Department of Education and its guarantee agencies on
2  defaulted student loans under the federal regulations?
3  A   I'm familiar with the provisions that are
4  in the FFEL program regulations that we promulgated
5  that apply to the guarantee agencies.
6  Q   And what is the federal regulation that
7  provides for the assessment of a collection charge on
8  a defaulted student loan?
9  A   It's 34 C.F.R. 682.410(b)(2).
10  Q   Okay. And under Section (b)(2) of that
11  regulation, what costs may be included in the
12  collection charge assessed by the Department or a
13  guarantee agency?
14  A   We don't specify in that section of the
15  regulation what the costs are that can be included.
16      What we actually do there is establish
17  maximums of what collection costs are that can be
18  assessed a defaulted borrower.
19  Q   Okay, and is the underlying federal
20  statute now by Congress that serves as the basis for
21  collection?
22  A   The Federal Claims Collection Act, as far

11

1  reg designed to set fees for collection agencies, is
2  that it? And it's referred to -- it's incorporated
3  under (b)(2) of it?
4  A  Well 30.60 governs what the Secretary is
5  going to do in assessing costs, collection-related
6  costs, to delinquent and defaulted borrowers basically
7  for loans that we hold.
8  It sets forth, it does have a listing, not
9  an exclusive listing, but a listing of the kinds of
10  costs that can be considered and then states
11  approaches when you're using contingency fee-based
12  contractors.
13  Q  Are you familiar with the actual formula
14  under 34 C.F.R. 30.60?
15  A  I'm not familiar with the -- I have never
16  done the calculation of the formula. I understand
17  what the formula is supposed to represent when it
18  deals with contingency fee-based collection agents.
19  And acknowledges the use of them, number
20  one.
21  Q  Okay, what is the formula supposed to
22  represent?

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

12

1  A  As I understand it, and I did not write
2  that regulation, it is supposed to provide for a make
3  whole approach in assessing collection costs if you
4  are using a contingency fee-based collector.
5  And then it gives you another formula to
6  use to come up with a weighted average approach if
7  you're using multiple contingency fee-based
8  collectors.
9  Q  Okay, could you explain the make whole
10  concept Mr. Hunter refers to in his brief? And I see
11  you have a copy of that?
12  A  Right.
13  Q  Could you explain that concept?
14  A  Well the Higher Education Act provides
15  that reasonable collection costs should be passed
16  along to a borrower.
17  And that the taxpayers basically shouldn't
18  assume those costs. That those costs should be borne
19  by the borrower.
20  The Federal Claims Collection Standards
21  set forth a scenario whereby you can use average costs
22  and you can use a make whole kind of an approach so

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

13

1     that no only will the debt will be paid off, the

2     individual principle and accrued interest, but any

3     contingency fee that you might have paid for an

4     outside private collector.

5     So that all those costs are covered in

6     what is being passed along to the defaulted

7     individual. So that in essence, the Federal Fund of

8     the guarantee agency, in this case, is made whole and

9     the taxpayers are not bearing a portion of those

10     costs.

11     Q   Now under this make whole theory, is there

12     any relationship between the amount of collection work

13     done by a guarantee agency and the allowable

14     collection charges assessed on the defaulted student

15     loan under your regulations?

16     A   There's a relationship of the actual costs

17     incurred by the agency in collecting its defaulted

18     loan portfolio. There's a relationship in what the

19     assessment will be on an average basis.

20     Q   Okay. On an average basis. So what you

21     are essentially telling me is you're taking the

22     collection costs for -- you're spreading the

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE, N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                  www.nealrgross.com

14

1     collection cost of defaulted student loans throughout

2     the country, at least on the individual guarantee

3     agencies, and you're telling those agencies that you

4     do not have to breakdown your costs on a per case

5     basis.

6     A   We are not requiring the agency to

7     individually document every activity that they

8     undertake with every single individual.

9     And consistent with 30.60 that we point

10     people to, and the listing of costs that's in 30.60,

11     if you look at some of those costs, salaries of all

12     the staff involved say at the guarantee agency that

13     might be involved in collection activity.

14     Some of those things can only be dealt

15     with if you're going to pass them along to a defaulted

16     individual on an averaging kind of basis.

17     The make whole approach to the use of

18     contingency fee collectors, especially if you're using

19     multiple contingency fee collectors like the

20     Department does and like many guarantee agencies do,

21     it lends itself to an averaging process that just in

22     an administratively realistic -- from a realistic

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE, N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                  www.nealrgross.com

15

1 standpoint administratively and also from a cost
2 effective standpoint for the federal program, because
3 the guarantee agencies primarily using federal money
4 to do collections on behalf of the taxpayers on these
5 defaulted accounts.
6 Q   Doesn't 34 C.F.R. 682.410(b)(6), which
7 refers to collection efforts on defaulted loans,
8 require a guarantee agency to document all its
9 collection activities on the loan?
10 A   The agency would need to support whatever
11 it said its costs related to collection were, in a
12 sense to support -- there has to be support for
13 whatever percentage they are using in an assessment of
14 collection costs.
15                    410(b)(6)   which   requires   certain
16 activities in due diligence in the post-default
17 collection arena for the individual borrower, that
18 would have to be documented.
19      That's separate from documenting the costs
20 of the overall operation of the agency in collecting
21 those debts including using contingency fee-based
22 collectors.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                    www.nealrgross.com

16

1 Q   But the reason for (b)(6) is to allow the
2 Department to determine if the percentage rate is a
3 reasonable percentage rate?
4 A   No, the purpose of (b)(6) is to prescribe
5 the activities that the Department expects at a
6 minimum a guarantee agency will undertake to collect
7 a defaulted loan.
8 Q   And then the purpose of the documentation
9 of those activities is --
10 A   Is to support compliance with (b)(6) that
11 the agency has undertaken the required efforts that we
12 are laying down as a minimum.
13      Now they may exceed that.  We're only
14 promulgating in that section of the reg the minimum
15 requirements for due diligence in collection.
16 Q   And what collection efforts are required
17 by guarantee agencies under (b)(6)?
18 A   It's basically a series of letters and
19 phone calls that are made to the borrower over a
20 period of time.
21      There's also a final demand letter if the
22 borrower doesn't respond to the series of letters and

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                    www.nealrgross.com

17

1  phone calls.
2      If you get further along in the process,
3  the borrower's not responding, there's a requirement
4  on the agency that they use federal offset, which is
5  primarily IRS offset of tax returns, that they get
6  into administrative wage garnishment if, in fact,
7  there are earnings to be garnished.
8      In some cases there's litigation of
9  account. If the whereabouts of the borrower is
10  unknown, there is a skip tracing effort that's
11  required.
12      There's a whole series of activities, not
13  all of which would apply necessarily if, you know,
14  skip tracing wouldn't be necessary if you know where
15  the person is. But there's a whole area of activity
16  that we regulate and expect the agencies to comply
17  with in attempts to collect this defaulted debt, to
18  return money to the taxpayers because we have paid a
19  reinsurance claim to the guarantee agency on that
20  defaulted debt.
21      Q   And does the rate or the contingency fee
22  paid to the guarantee agency contemplate all of these

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                    www.nealrgross.com

18

1  things being done, or a portion of these things being
2  done?
3      A   Well, the contingency fee collection fee,
4  I mean different agencies do their collections
5  differently.
6      Some of them have a certain level of
7  collection staff in house and only send their loans to
8  contingency fee-based collectors at a certain point in
9  the activity -- in the required activity.
10      Sometimes it's when they've exhausted, you
11  know, their basic efforts.
12      The Department turns their loans over to
13  contingency fee-based collectors, I believe like after
14  day 60, after some initial work.
15      There's different combinations of that
16  across the agencies as to how much work they do in-
17  house versus how much work they do with contingency
18  fee-based collectors.
19      But I think in pointing the agencies to
20  30.60, or in what the Department is doing in its
21  efforts under the Fair Credit Collection Standards, we
22  are basically telling them that you can look at all of

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701
(202) 234-4433                    www.nealrgross.com

19

1 these costs that you are incurring for all of these
2 activities, including passing the loans off to a
3 private collector under a contingency fee-based
4 contract.
5 And you can use all of those costs, direct
6 and indirect, in determining what your flat rate
7 percentage that you'll be assessing in terms of
8 collection costs.
9 Q Okay, and in the Secretary's amicus brief,
10 I think there is a reference made to direct and
11 indirect costs that are included in this contingency
12 fee.
13 A Yes.
14 Q What's the distinction between those
15 costs?
16 A Well an indirect cost could be lighting
17 and heating and air conditioning in the area, computer
18 time that you might share with the rest of the
19 guarantee agency operation.
20 Maybe even some portion of the salaries of
21 staff that are working in the collection area.
22 That would be, in my mind, examples of

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701

(202) 234-4433                    www.nealrgross.com

20

1 sort of indirect costs that lend themselves to
2 determining some kind of average.
3 Q Indirect costs would be?
4 A The fee you have to pay to a collection,
5 I'm sorry, to a credit bureau organization to secure
6 a credit report or to send information to a credit
7 bureau, court filing fees, attorney's expenses for
8 litigation.
9 They have to conduct hearings. Borrowers
10 have an opportunity when a default is initially filed.
11 But before any adverse action is taken to report them
12 to a credit bureau or to assess collection costs, an
13 opportunity for hearing, either in person or
14 telephonically, where, in fact, they can challenge the
15 debt.
16 They can review documents, they can
17 challenge the amount of it, whether the status really
18 should be that of a default before anything further
19 happens.
20 And we ask in the regs that that be
21 conducted by someone that is independent of the
22 collection staff and many agencies hire someone.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701

(202) 234-4433                    www.nealrgross.com

1  There also is a separate hearing process,
2  due process, attached to the wage garnishment process
3  And agencies are required to hire, I
4  believe, excuse me, an independent party to collect --
5  to sort of oversee those hearings.
6  So those kinds of things I would think are
7  direct.
8  Q  Now it's my understanding that at the
9  current time, the only charges, collection charges,
10  assessed by the Department are the intercept charges
11  and the contingency fees charges to the collection
12  agencies and the guarantee agencies. Is that correct?
13  A  I can't really -- Gary Hopkins is the
14  better person to address specifically what the
15  Department is doing in the debt collection of the
16  debts that we hold.
17  Q  What steps are necessary before a
18  collection fee can be assessed after the guarantee
19  agency receives a loan?
20  A  Okay. Lender claim filing of a default
21  claim would, let's say, let's start with default
22  claims, would happen currently under at day 270 past

1  due or 270 of delinquency. Previously it was 180, now
2  it's 270.
3  Agency files a claim with the guarantee
4  agency, agency has about 90 days to review the claim
5  and the documentation supporting the due diligence
6  that the lender is required to undertake to prevent
7  the borrower from going into default or to attempt to
8  get the borrower into repayment during the delinquency
9  period up to day 270.
10  And then if the agency is satisfied on the
11  Secretary's behalf, that everything has been done
12  appropriately by the lender, then the Agency would pay
13  a claim.
14  The agency then, within 45 days of payment
15  of the default claim would request reinsurance from
16  the Secretary, but the lender is out of the picture.
17  The legal title of the loan is now with
18  the guarantee agency. They now have responsibility
19  for collecting the loan on behalf of the Secretary.
20  It's a federal claim.
21  The money they're using to undertake the
22  collections and return the money to the taxpayers is

1 primarily federal money.

2 They, as I mentioned before, are required

3 to notify the borrower that they have paid a default

4 claim to the lender, that they are to send a notice,

5 I think that's covered in 410(b)(5), delineating what

6 information they must provide the borrower in the

7 notice.

8 A lot of it has to do with what activities

9 might come to play if the borrower does not honor the

10 debt or contact them and make repayment arrangements.

11 It does provide the borrower with the

12 hearing possibility to challenge the debt, challenge

13 the status of the debt.

14 And then after that period of time where

15 that opportunity is given, if the borrower doesn't

16 contact the agency and either satisfactorily prove the

17 case relative to its being non-enforceable or not a

18 correct amount or not in default.

19 They have an opportunity to make

20 satisfactory repayment arrangements also as part of

21 that process and if they don't make satisfactory

22 repayment arrangements, then you move into the phase

1 of post-default collection activity where the agency

2 would then start doing a series of letter and phone

3 calls.

4 And take the other steps that I described

5 like possible litigation, administrative wage

6 garnishment, IRS offset, assessment of collection

7 charges, turning them over to a contingency fee-based

8 contractor at some point.

9 Q  Now you mentioned the fact that the

10 default of the student loan is a federal claim,

11 controlled by the Federal Claims Collection Standards.

12 Is that correct?

13 A  I don't think I meant that quite as

14 literally as that.  I mean, it's a federal claim in

15 the sense that it's a federal asset.  And federal

16 money is basically being used by the agency in an

17 attempt to try to return money back on that defaulted

18 loan that we have had to pay in federal reinsurance.

19 The Federal Claims Collection Standards,

20 which we're under, are the model that we've used in

21 promulgating the regulations for the agencies.

22 Q  Okay, could you pull Mr. Hunter's brief.

Morgan Lewis
COUNSELORS AT LAW

THE HIGHER EDUCATION ACT OF 1965 AND ITS IMPLEMENTING REGULATIONS
ALLOW A GUARANTY AGENCY TO ASSESS COLLECTION COSTS AGAINST A FIRST
TIME DEFAULTED BORROWER WHO TIMELY ENTERS INTO A REHABILITATION
AGREEMENT AND COMPLIES WITH THAT AGREEMENT

The text, structure, purpose, and long-standing implementation of the Higher Education

Act of 1965 ("HEA") and its associated regulations confirm that the assessment of collection

costs is not—and should not be—barred when a defaulted borrower timely agrees to enter into a

Rehabilitation Agreement.  Collection costs against defaulted borrowers are mandated by the

statute and regulations, as described further below.  The key "trigger" for the imposition of

collection costs is the default itself, which generates a host of obligations on the part of the

guaranty agency.  Rehabilitation Agreements are certainly a part of the overall scheme (they can

help to eventually reverse the default), but there is nothing special about a Rehabilitation

Agreement that eliminates the obligation of a defaulted borrower to pay collection costs.  Indeed

and to the contrary, as the Seventh Circuit has held, "[n]othing in the HEA prohibits a guaranty

agency from assessing collection costs as a flat rate percentage upon rehabilitation." *Black v.*

*Educational Credit Management Corp*, 459 F.3d 796, 803 (7th Cir. 2006) (emphasis supplied).

By way of general background, the *Bible* case involves the Federal Family Education

Loan ("FFEL") Program (sometimes also referred to as "FFELP").  Under the FFEL Program, a

"guaranty agency" buys a default claim from a private lender after 270 days of delinquency, and

then is obligated to institute a variety of collection procedures and processes.  A description of

the basics of the FFEL Program is contained in the Department's brief to the United States Court

of Appeals for the Seventh Circuit in *Black*, 2005 U.S. 7th Cir. Briefs LEXIS 662, which was the

1

appeal from the _Barnes_ case identified by the Seventh Circuit in the _Bible_ order dated January 28, 2015.   A copy of that brief is being supplied.

A.   _The Statute and Regulations Allow for the Assessment of Collection Costs At Issue In the Bible Case._

The essential starting point is that the HEA itself provides that "a borrower who has defaulted on a loan . . . shall be required to pay . . . reasonable collection costs." 20 U.S.C. § 1091a(b)(1).   Assessment and recovery of collection costs against borrowers who default is, and has long been, a critical component of the FFEL Program.   The regulations expressly mandate the imposition of such collection costs in Section 682.410, entitled "Fiscal, administrative, and enforcement requirements."   In particular, in the "administrative requirements" subsection, in a sub-subsection entitled "collection costs," the regulation provides:

> Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, _the guaranty agency shall charge a borrower_ an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim. . . .

34 C.F.R. § 682.410(b)(2) (emphasis supplied).   The ability to assess collection costs is a crucial part of the FFEL Program, "mandating that borrowers themselves, not the taxpayers, should bear the reasonable costs of collecting student loans in default." _Black v. Educational Credit Mgmt. Corp.,_ 459 F.3d 796, 800 (7th Cir. 2006); _see also United States v. Larson,_ Case No. 08-3438 ADM/AJB, 2010 WL 76433, *3 (D. Minn. Jan. 5, 2010) (adopting _Black_ analysis regarding calculation of collection costs).

That same Section 682.410(b) of the regulations also sets forth various other types of administrative requirements regarding enforcement efforts and reporting obligations. The portion of the regulation invoked by the plaintiff in the _Bible_ case is a sub-subsection of the

2

subsection entitled "Reports to consumer reporting agencies." 34 C.F.R. § 682.410(b)(5).[1]

That subsection requires a guaranty agency to provide a defaulted student loan borrower

with various things within 45 days after the guaranty agency has paid a default claim.

Specifically, "[t]he guaranty agency, after it pays a default claim on a loan but before it

reports the default to a consumer reporting agency *or assesses collection costs against a*

*borrower*, shall, within [45 days],[2] provide the borrower with—(A) Written notice [of the

proposed actions]; (B) An opportunity to inspect and copy agency records pertaining to the

loan obligation; (C) An opportunity for an administrative review of the legal enforceability

or past due status of the loan obligation; and (D) *An opportunity to enter into a repayment*

*agreement on terms satisfactory to the [guaranty] agency*." 34 C.F.R. §

682.410(b)(5)(ii)(D) (emphasis supplied).

The regulatory argument by the plaintiff in the *Bible* case is to equate "a repayment

agreement on terms satisfactory to the agency" as described in Section 682.410(b)(5)(ii)(D)

with any repayment agreement at all—and, more particularly, with a Rehabilitation

Agreement that the guaranty agency is required by separate statutory and regulatory

provisions to afford to a defaulted borrower. Ms. Bible argues that if a defaulted borrower

"timely" agrees to a Rehabilitation Agreement and does not breach that Rehabilitation

Agreement, then no "collection costs" may be assessed on the defaulting borrower.

---

[1]    After providing for independent audits (682.410(b)(1)), the above-noted "collection costs" (682.410(b)(2)), interest charged by guaranty agencies (682.410(b)(3)), capitalization of unpaid interest (682.410(b)(4)), and the above-described "reports to consumer reporting agencies" (682.410(b)(5)), the rest of Section 482.410(b) then goes on to describe required collection efforts on defaulted loans (682.410(b)(6)); special conditions for agency payment of claims (682.410(b)(7)); preemption of state law (682.410(b)(8)); administrative garnishment (682.410(b)(9)); and conflicts of interest rules for employees of guaranty agencies (682.410(b)(10)).

[2]    The 45 days comes from 34 C.F.R. § 682.410(b)(6)(ii), which is incorporated by reference by Section 682.410(b)(5)(ii).

Purely as a matter of proper interpretation of the regulations themselves, that position cannot be supported.

1.      First, the separate section governing Loan Rehabilitation Agreements, Section 682.405, makes crystal clear that collection costs are, in fact, permissible—and contemplated—for defaulted borrowers who enter into Rehabilitation Agreements. Specifically, a guaranty agency is required to inform the borrower in a written Rehabilitation Agreement "of the amount of any collection costs to be added to the unpaid principal of the loan when the loan is sold to an eligible lender, which may not exceed 18.5 percent of the unpaid principal and accrued interest on the loan at the time of the sale."[3] 34 C.F.R. § 682.405(b)(1)(vi)(B) (2014).[4] Such language is drawn directly from the HEA, which provided that, with respect to a rehabilitated loan sold to another lender, the guaranty agency "may, in order to defray collection cost . . . charge to the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale . . . ." 20 U.S.C. 1078-6(a)(1)(D)(i) (2009).  Effective July 1, 2014, Congress amended that section of the statute, adjusting the ceiling amount to "not to exceed 16 percent of the outstanding principal and interest at the time of the loan sale."  Pub. L. 113-67 § 501(1), 127 Stat 1186 (December 26, 2013).  But, the basic proposition that collection costs were contemplated, and the specific regulatory command that a guaranty agency

---

[3]      The "sale" occurs after a nine or ten month repayment period, if the defaulted borrower makes such payments.  Upon the sale of a rehabilitated loan to an eligible lender, the loan is deemed rehabilitated, and the guaranty agency must, within 45 days of the date of the sale, request that any consumer reporting agencies to which the default was reported remove the record of default from the borrower's credit history.  34 C.F.R. § 682.405(b)(3)(i)(B).

[4]      Minor, non-substantive changes were made to the wording of this provision that became effective on July 1, 2014.  The quoted language was broken out into a new sub-subsection "(B)", the word "the" preceding "collection costs" was changed to "any," and the description of the required notice was combined into one sentence, from two. To date and to our knowledge, the regulations do not yet reflect the change in the statute, effective July 1, 2014, from 18.5% to 16%.

4

provide written notice to a defaulting borrower who enters into a Rehabilitation Agreement of the amounts of such collection costs, was left unchanged.  The rehabilitation regulations do not presuppose that one subset of rehabilitated borrowers (*i.e.*, those who timely after default enter into and complete their Rehabilitation Agreements) would be treated differently than any other subset of rehabilitated borrowers (*i.e.*, those who less timely after default enter into and complete their Rehabilitation Agreement).

It is simply not possible to reconcile the proposition (asserted by the plaintiff in the *Bible* case) that collection costs may not be assessed against a defaulted borrower who promptly enters into a Rehabilitation Agreement on the one hand, with the unambiguous provision in 34 C.F.R. § 682.405(b)(1)(vi)(B) that expressly contemplates and <u>allows</u> for the assessment of such costs, with notice, on the other. *See First Bank of Oak Park v. Ave. Bank & Trust Co. of Oak Park*, 605 F.2d 372, 375 (7th Cir. 1979) (refusing to apply a broad definition to a regulatory term because "to do so . . . would render subsection (1) meaningless, and we hardly think that is the intent of those who wrote the regulations"); *Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984) ("[A] regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements.").  The construction of the *Bible* plaintiff would read the language of Section 682.405(b)(1)(vi)(B) out of the regulations, which is of course impermissible. *E.g., Dantran, Inc. v. U.S. Department of Labor*, 171 F.3d 58, 63 (1st Cir. 1999) ("accepted rule" that "all words and phrases in a statute or regulation should be given effect."), *citing, Walters v. Metropolitan Educ. Enterprise, Inc.*, 519 U.S. 202, 117 S. Ct. 660, 664 (1997).

000208

Similarly, 34 C.F.R. § 682.404(f), which dictates the required "application of borrower payments," further confirms that the collection costs at issue are permissible. That provision states that "[a] payment made to a guaranty agency by a borrower on a defaulted loan must be applied first to the collection costs incurred to collect that amount and then to other incidental charges, such as late charges, then to accrued interest and then to principal." Defaulted borrowers, like Ms. Bible, who enter into a Rehabilitation Agreement most certainly make "payment[s] to a guaranty agency," and those payments, by regulation, must be applied, first, to "collection costs." If no "collection costs" were permitted against such defaulted borrowers, then this provision would be rendered meaningless and make no sense. Which, again, cannot be the case. *See Seitz v. City of Elgin*, 719 F.3d 654, 657 (7th Cir. 2013) (rejecting interpretation of the term "entity" in the PATRIOT Act that would render it superfluous); *Gomez-Diaz v. Ashcroft*, 324 F.3d 913, 916 (7th Cir. 2003) (rejecting plaintiff's "self-serving" interpretation of the Child Citizenship Act because "it would render meaningless the final clause").

2.  Second, it is not correct to equate a Loan Rehabilitation Agreement (as described in Section 682.405 and as agreed to by the plaintiff in the *Bible* case) with a "repayment agreement on terms satisfactory to the [guaranty] agency," as identified in Section 682.410(b)(5)(ii)(D). And, it is only such a "repayment agreement on terms satisfactory to the [guaranty] agency" that can serve to avoid the imposition of collection costs. The meaning of the term in Section 682.410(b)(5)(ii)(D), and the wide discretion afforded to the guaranty agency, is informed by the context in which the term appears—in a listing of procedural rights that, if successfully exercised, could affect the actual "legal enforceability or past due status," of the loan itself. *E.g.,* 34 C.F.R. § 682.410(b)(5)(ii).

6

Whether or not, in other words, there really is a "default." Such rights must be afforded

before the machinery of reporting to credit agencies and the imposition of collection costs

are initiated. In light of that, it is apparent that only a repayment agreement that was akin to

full payment—i.e., an immediate curing, reversal, or elimination of the default—would be

the sort of repayment agreement that could be "satisfactory to the agency" for these

purposes.

     As the statute and regulations make clear, a Rehabilitation Agreement is,

emphatically, <u>not</u> such an agreement. A Rehabilitation Agreement is merely a path toward

the eventual curing of the default, which takes a *minimum* of nine months, at (in all

likelihood) dramatically reduced payment levels below those that would be required during

a standard 10 year repayment period, and with a host of additional administrative

requirements and other costs. *See* 34 C.F.R. 682.405(a)(1) (purpose of Rehabilitation

Agreements to rehabilitate defaulted loans, "so that the loan may be purchased, if

practicable, by an eligible lender <u>and removed from default status</u>.") (emphasis supplied)

And, as noted above, once that process is successfully completed and the loan can then be

sold to an eligible lender, the statute and regulations expressly contemplate the imposition

of collection costs, in an amount not to exceed a percentage (18.5% then, and 16% now) of

the unpaid principal and accrued interest. 34 C.F.R. § 682.405(b)(1)(vi)(B); 20 U.S.C. §

1078-6(a)(1)(D)(i). It is facile, and ultimately incorrect, to contend (without regulatory

support) that merely because a guaranty agency voluntarily enters into a Rehabilitation

Agreement, then that agreement is a repayment agreement that is "satisfactory to the

agency" for all purposes, and satisfies the requirements of 34 C.F.R. §

682.410(b)(5)(ii)(D).

3.      Third, the mandate to assess "collection charges" in Section 682.410(b)(2)

applies, without exception, to any "loan on which the agency has paid a default or a

bankruptcy claim." The regulation does not say that collection costs shall only be charged

where no Rehabilitation Agreement has been agreed to. There are no "carve outs" to the

"default" trigger for the imposition of collection costs, and it would be error to read such an

unstated term into the regulation. *See Mercer v. Magnant,* 40 F.3d 893, 898 (7th Cir. 1994)

("Plaintiffs read into this regulation a rule that the household cannot be called on to make

good the overpayment unless it agrees to do so, but this is not what the regulation says.");

*see also Welsh v. Boy Scouts of Am.,* 993 F.2d 1267, 1270 (7th Cir. 1993) ("[w]e refuse to

read into the statute what Congress has declined to include."); *Baker v. F & F Inv.,* 420 F.2d

1191, 1195 (7th Cir. 1970) (refusing to read into Section 3 of the 1866 Civil Rights Act,

"any antipathy to the adoption of appropriate state statutes of limitations in civil rights

actions"). An entirely reasonable interpretation of the regulatory provisions, harmonizing

the terms and giving meaning to each, is possible here. That interpretation is preferred. *See

e.g., Koch Indus., Inc. v. United States,* 603 F.3d 816, 824 (10th Cir. 2010) (holding

undefined terms in IRS regulations "must be interpreted to harmonize" with the objectives

of the statute"). And, that interpretation allows the imposition of collection costs to

defaulted borrowers—even those that promptly agree to enter into Rehabilitation

Agreements, as Ms. Bible did.

4.      Fourth, the reference in the Seventh Circuit's Order in the *Bible* case to a

first-time defaulted borrower who "timely" enters into a rehabilitation agreement, and Ms.

Bible's invocation of a requirement that the Rehabilitation Agreement be entered in a

"timely" manner, are without any statutory or regulatory basis whatsoever: there is no time

limit for a defaulted borrower to enter into a Rehabilitation Agreement.  Without a fixed definition of "timely," any defaulted borrower who ever entered into a Rehabilitation Agreement could try to argue that it was "timely," and that collection costs were prohibited. The lack of any regulatory definition of such a critical term underscores the error of Ms. Bible's position.  How is a guaranty agency supposed to know what is "timely"?  Is that different for every borrower?  In addition to the blatant conflicts with the actual regulations described above, the position advocated by Ms. Bible would represent an utterly unworkable scheme.

What the regulations do provide by way of time limits is 45 days for a notice letter describing the procedural rights identified in Section 682.410(b)(5).  That is the period stated in 34 C.F.R. § 682.410(b)(6)(ii), which is incorporated by reference by Section 682.410(b)(5)(ii).  The plaintiff in the _Bible_ case (and, indeed, the Department of Education in the _Barnes_ briefing to the district court), refers to a sixty day "grace period" during which the borrower may enter into an agreement under Section 682.410(b)(5)(ii)(D), with the plaintiff in the _Bible_ case citing Section 682.410(b)(5)(iv)(B).  That provision, however, does not specify a time period during which a repayment agreement under Section 682.410(b)(5)(ii)(D) must be agreed to, in order to be "timely."  Rather, it requires a guaranty agency to provide sixty days to a borrower to request administrative review, from receipt of the required notice that such review is available.  In practice, most guaranty agencies (including USA Funds) send a comprehensive notice that incorporates the requirements of Sections 682.410(b)(5)(ii)(A) and 682.410(b)(6)(ii), and do not report defaulted borrowers to nationwide consumer reporting agencies or assess collection costs for 60+ days, consistent with the 60 days identified in

Section 682.410(b)(5)(iv)(B) for administrative review.  But, there is no regulatory requirement that they use that 60 day period for those other purposes.

B.      *There is no Department of Education practice or policy to the contrary.*

The specific issue regarding assessment of collection costs presented in the *Bible* case, and addressed in the request by the Seventh Circuit in its request, is one of apparent first impression in terms of express or formal stated Departmental policy.  We are aware of no Department of Education ruling, interpretation, Dear Colleague letter, testimony, or other written pronouncement or stated position on the specific issue presented here.  (As described below, however, the long-standing and consistent practice of the Department has been to at least implicitly endorse the imposition of the collection costs now being questioned in the *Bible* case.)

The proceedings that most closely approached the current issue were the *Barnes* matters from a decade ago, where the "central issue" was "whether a regulation promulgated by the Secretary of Education that allows the assessment of collection costs on defaulted student loans to be done on a formulaic basis was a permissible implementation of the governing statute, 20 U.S.C. § 1091a." *Black*, 459 F.3d at 797, *affirming Educational Credit Management Corporation v. Barnes*, 318 B.R. 482 (S.D. Ind. 2004).  That regulation, 34 C.F.R. § 682.410(b)(2), which was held to be permissible, expressly <u>allows</u> the imposition of collection costs on defaulted borrowers, without exception, as described above.  The appellant in that proceeding belatedly tried to argue on appeal that the regulation upon which the *Bible* plaintiff relies, 34 C.F.R. § 682.410(b)(5)(ii)(D), was violated, but the Seventh Circuit noted that the issue had not been presented to the trial court or preserved. *Black*, 459 F.3d at 803.

There are three additional facts to note about the *Barnes* proceedings.  First, to the extent that there were any statements by the Seventh Circuit that could be interpreted as

shedding light on the issue presented here, such statements strongly suggest that the position advocated by the *Bible* plaintiff is unavailing. In particular, the Seventh Circuit stated that "[n]othing in the HEA prohibits a guaranty agency from assessing collection costs as a flat rate percentage upon rehabilitation." *Black*, 459 F.3d at 803 (emphasis supplied). Imposition of collection costs "upon rehabilitation" is precisely what the *Bible* plaintiff challenges as impermissible.

Second, the rationale of the Seventh Circuit similarly undercuts the position advocated by the *Bible* plaintiff. The defaulted borrower in the *Barnes* proceedings, like Ms. Bible, argued that certain "types" of defaulted borrowers should not be subject to collection costs that were based upon aggregated collection efforts across a whole default portfolio. For the *Barnes* plaintiff, it was borrowers "who seek to repay their obligations." 459 F.3d at 800. For Ms. Bible it is almost the same thing—she argues that it is those defaulted borrowers who timely agree to a Rehabilitation Agreement. The Seventh Circuit rejected such an argument: "the real world does not work that way. The price of merchandise in a store reflects the fact that some people shoplift; the rates associated with credit cards reflect the fact that some cardholders never pay their bills. In these and countless other instances, the many who pay end up absorbing the costs for the few who do not." *Black*, 459 F.3d at 800.

Third, the Department of Education intervened in the *Barnes* proceedings, and the positions asserted by the Department there were not to the effect that a guaranty agency was precluded from assessing collection costs upon a defaulted borrower who timely enters into a Rehabilitation Agreement. Rather, the Department's submission to the Seventh Circuit—which the *Bible* plaintiff ignores—states unequivocally that it is a "mistaken assumption that rehabilitation would have enabled Barnes to pay lower collection costs." *Barnes*, 4/14/2005

11

Sec'y of Ed Br. at 12 (available at 2005 U.S. 7th. Cir. Briefs LEXIS 662) (emphasis supplied).
The Department went on to state that "the regulation governing rehabilitation plainly allows a
guaranty agency to assess collection costs at a flat rate as long as the rate does 'not exceed' 18.5
percent. See 34 C.F.R. § 682.405(b)(1)(iv) [now, 34 C.F.R. § 682.405(b)(1)(vi)(B)]." *Id.* The
Department concluded that "rehabilitation would have had no effect on the collection costs at
issue in this case." *Id.*

In the district court, the thrust of the submissions and testimony involved defending 34
C.F.R. § 682.410(b)(2) and, in particular, supporting the Department's position that collection
costs assessed against a specific defaulted borrower could be based upon a percentage-based
methodology involving aggregated costs across a default portfolio—such costs could not, as a
practical matter, be based upon just the individual collection costs that might have been
expended in connection with the particular defaulted borrower. *See Black*, 459 F.3d at 801. The
plaintiff in *Bible* has cherry-picked the handful of the snippets from that lower court briefing that
are most favorable for her arguments,[5] and we recognize that some aspects of the discussion in
those submissions were imprecise. When reviewed fairly and in context, however, those
snippets for the most part involve merely reciting or paraphrasing the regulations at 34 C.F.R. §
682.410(b)(5)(ii)(D), in connection with explaining the overall scheme. Other portions of the
same brief consistently describe the permissible assessment of collection costs as simply
against "defaulters" (which Mr. Barnes and Ms. Bible were), not, as Ms. Bible would have it,
against "defaulters who have not entered into Rehabilitation Agreements." *Barnes*, 3/14/2002
Sec'y of Ed. Br. at 7, 16, 17.   It is only borrowers whose loans are "not in default" who are

---

[5]      Specifically, *Barnes*, 3/14/2002 Sec'y of Ed. Br. at 14, 22, 23, and 27 n. 16.

000215

"not charged collection costs." *Barnes*, 3/14/2002 Sec'y of Ed. Br. at 24. By definition, the

loan of a borrower who enters into a Rehabilitation Agreement is "in default."[6]

In sum, no definition of a "repayment agreement satisfactory to the agency" for

purposes of Section 682.410(b)(5)(ii)(D) was described or identified by the Department in the

*Barnes* briefing, and the Department most certainly did <u>not</u> take the position that a

Rehabilitation Agreement was a "repayment agreement satisfactory to the agency" under

Section 682.410(b)(5)(ii)(D).[7] Indeed, the Department made clear in its briefing to the

Seventh Circuit that collection costs are, in fact, permissible against defaulted borrowers who

enter into Rehabilitation Agreements. Like Ms. Bible.

   C.   *Long standing and established practices in the industry*

USA Funds, and most other similarly situated guaranty agencies in the FFEL Program,

have long assessed collection costs, of the sort that Ms. Bible contends to be impermissible, upon

defaulted borrowers who enter into Rehabilitation Agreements. For USA Funds, if an account is

not "paid in full" within 60 days after a default claim is paid, collection costs are assessed, even

if a borrower has started making payments on a Rehabilitation track.

And, this is not (or should not be) news to the Department. The Department has, for

years and years, conducted comprehensive audits of USA Funds and other guaranty agencies. It

is not uncommon for guaranty agencies to provide detailed spreadsheets with rehabilitated loan

---

[6]    In addition, as noted below, the economic burden upon the taxpayers of not allowing the assessment of collection costs on defaulted borrowers was expressly acknowledged by the Department in the *Barnes* briefing. *Barnes*, 3/14/2002 Sec'y of Ed. Br. at 18, 19 n.10.

[7]    Not surprisingly, since it was not at issue, the trial court in the *Barnes* case made no findings regarding 34 C.F.R. § 682.410(b)(5)(ii)(D). In a single footnote without citation, describing a "typical delinquency," the trial court observed that if "no response" to a notice letter was received from a borrower, then collection costs could be assessed. *Educational Credit Management Corporation v. Barnes*, 318 B.R. 482, 491 n.9 (S.D. Ind. 2004). Especially in light of the Seventh Circuit's subsequent express ratification of the assessment of collection costs "upon rehabilitation," 459 F.3d at 803, that footnote is scant support for the notion that collection costs may not be assessed against a defaulted borrower who agrees to a Rehabilitation Agreement.

000216

information, by individual loan, broken out by interest, principal, and collection charges, with associated dates. Such detailed data makes clear that collection costs are routinely assessed against defaulted borrowers who are making Rehabilitation Agreement payments—even against those who entered into Rehabilitation Agreements within 60 days after a default claim is paid. Moreover, guaranty agencies routinely supply to the Department documentation of policies and internal audit procedures, which also make clear the practice of assessing collection costs upon defaulted borrowers who are in Rehabilitation Agreement status. The practices of USA Funds, and other similar guaranty agencies, with regard to collection costs have always been completely transparent to the Department. To the knowledge of USA Funds, the Department has never made any finding, nor taken any exception to, such practices.

February 25, 2015

14

**No. 14-1806**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BRYANA BIBLE,

Plaintiff-Appellant,

v.

UNITED STUDENT AID FUNDS, INC.,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
The Honorable Tanya Walton Pratt
(Case No. 1:13-cv-575-TWP-TAB)

**BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
IN SUPPORT OF THE APPELLANT AND REVERSAL**

BENJAMIN C. MIZER
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
JEFFRICA JENKINS LEE
  *(202) 514-5091
  Attorneys, Appellate Staff
  Civil Division, Room 7537
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001*

request the removal of the record of default from the borrower's credit history. *Id.* § 682.405(b)(3)(i)(B).

> B. *Collection Costs Under The Federal Family Education Loan Program.*

1. At all times pertinent here, 20 U.S.C. § 1091a(b)(1) has required a borrower who has defaulted on a loan to pay "reasonable collection costs." The Higher Education Act does not define the term "reasonable collection costs," but the Department, acting pursuant to Congress's express delegation of rulemaking authority (20 U.S.C. § 1082(a)(1)) has clarified which collection costs are "reasonable collection costs." The Department's regulations generally provide that when a guarantor has paid a default claim, it is required to charge the borrower "an amount equal to the reasonable costs incurred by the agency in collecting [the] loan." 34 C.F.R. § 682.410(b)(2).[2] These costs must equal the lesser of the amount the borrower would be charged as calculated under 34 C.F.R. § 30.60,[3] or the amount the Department would assess the same borrower if the Department held the loan. *Id.* § 682.410(b)(2)(i)-(ii).

With respect to borrowers who enter into loan rehabilitation agreements under the Higher Education Act's default reduction program, the Act provides

---

[2]Such costs "may include, but are not limited to, all attorney's fees, collection agency charges, and court costs." 34 C.F.R. § 682.410(b)(2).

[3]34 C.F.R. § 30.60 provides a non-exhaustive list of the costs the Department may impose on delinquent debtors and sets forth the procedures for calculating such costs if the Department uses a collection agency to collect a debt on a contingent fee basis.

5

that when a guaranty agency has secured all of the nine required payments and sells the loan to a lender, the guarantor "may, in order to defray collection costs . . . charge to the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale." 20 U.S.C. § 1078-6(a)(1)(D)(i)(II)(aa).[4] The Department's regulations in turn provide that the written rehabilitation agreement must inform the borrower of the amount of any collection costs that may be added to the unpaid loan principal at the time the loan is sold to an eligible lender, which "may not exceed 18.5 percent of the unpaid principal and accrued interest on the loan at the time of the sale." 34 C.F.R. § 682.405(b)(1)(vi).

As originally enacted, 20 U.S.C. § 1078-6(a) (1986) contained no provision addressing whether and in what amount a guarantor could charge a defaulted borrower collection costs. *See* Pub. L. No. 99-498, § 402(a), 100 Stat. 1394 (Oct. 17, 1986). Section 1078-6(a) was amended three times during the relevant time frame of the dispute in this case (June 12, 2006 to July 29, 2013); however, those amendments do not change the substance of the statute as it relates to the issue in dispute. For instance:

- Effective July 1, 2006, the section was amended to reduce from twelve to nine the number of consecutive payments payments needed to qualify a loan for rehabilitation and to permit the guarantor to charge the borrower collection

---

[4]Effective July 1, 2014, the statute was amended to lower the  percentage from 18.5 percent to 16 percent. Pub. L. No. 113-67, § 501(1), 127 Stat. 1187 (Dec. 2, 2013).

000228

costs not to exceed 18.5 percent of the outstanding
principal and interest at the time of sale of the
rehabilitated loan. Pub. L. No. 109-171, § 8014(h),
120 Stat. 171 (Feb. 8, 2006).

- In 2008, provisions were added establishing
  credit bureau reporting requirements regarding
  rehabilitated loans and limiting the number
  of times a borrower could rehabilitate a loan.
  Pub. L. No. 110-315, § 426, 122 Stat. 3235
  (Aug. 14, 2008).

- In 2009, provisions were added that permit a
  guarantor that is unable due to adverse market
  conditions to sell the loan, to assign the loan to
  the Department, and providing that the Depart-
  ment, upon assignment, was to reimburse the
  guarantor in the amount of those collection costs
  charged at the time of assignment, not to exceed
  18.5 percent of the outstanding balance, and to
  direct the guarantor to deposit that payment
  into the guarantor's operating fund. Pub. L. No.
  111-39, § 402(d)(1), 123 Stat. 1941 (July 1, 2009).

The Department's regulations implementing § 1078-6(a), published at 34
C.F.R. § 682.405, were also amended several times during the relevant time
period to conform to the statutory changes. *See* 71 Fed. Reg. 45666, 45677
(Aug. 9, 2006); 73 Fed. Reg. 63232, 63254 (Oct. 23, 2008); 74 Fed. Reg. 55972,
55973 (Oct. 29, 2009).[5]

---

[5]34 C.F.R. § 682.405 was again amended on November 1, 2013. Among
numerous other changes, the regulation was revised to require that the
rehabilitation agreement disclose the amount of "any" collection costs to be
added to the unpaid principal of the loan when the loan is sold to an eligible
lender, rather than "the collection costs to be added." 34 C.F.R. §
682.405(b)(1)(vi)(B); *see* 78 Fed. Reg. 65768, 65815, 65816 (Nov. 1. 2013).

7

2. The Department interprets its regulations to provide an exception with regard to collection costs charged when a borrower promptly enters into a loan repayment agreement after the borrower has been notified by the guarantor that it has paid a default claim. After a guaranty agency notifies a borrower that it has paid a default claim on a loan, "but before it . . . assesses collection costs against [the] borrower," § 682.410(b)(5)(ii), it must, among other things, "allow the borrower at least 60 days from the date the notice . . . is sent to request [administrative] review," § 682.410(b)(5)(iv)(B), and "provide the borrower with . . . [a]n opportunity to enter into a repayment agreement satisfactory to the agency." *Id.* §682.410(b)(5)(ii)(D); *see also id.* § 682.410(b)(5)(vi)(G). The terms of repayment agreements are generally within the discretion of the guarantor.

However, 20 U.S.C. § 1078-6 and 34 C.F.R. § 682.405 require the guarantor to accept, and enter into, a particular kind of repayment agreement – a rehabilitation agreement that can qualify the borrower to have the default status of the loan cured and the loan sold to a lender (or assigned to the Secretary) and thereby regain all benefits previously available on the loan.[6] *See* 20 U.S.C. § 1078-6(a)(1)(A), (C), (4); 34 C.F.R. § 682.405(a)(1), (3). The repayment arrangements available to a borrower therefore necessarily include a

---

[6]Such benefits include choice of repayment plans, deferment eligibility, and loan forgiveness for qualifying service. 20 U.S.C. §§ 1078(b)(1)(M), (b)(9); 1078-10; 1078-11; 1078-12.

rehabilitation agreement. Indeed, subsection (a) of the statutory authorization for rehabilitation, 20 U.S.C. §1078-6, is entitled "[o]ther repayment incentives." 20 U.S.C. § 1078-6(a). Further, subsection (a)(4) refers to the borrower "mak[ing] scheduled repayments" on a loan going through rehabilitation. *Id.* §1078-6(a)(4). Moreover, the Department's regulations governing rehabilitation refer to the rehabilitation agreement as a monthly "repayment agreement." 34 C.F.R. § 682.405(b)(1) (A "borrower must voluntarily make at least nine of the ten payments required under a monthly *repayment agreement.*") (emphasis added). Thus, if a defaulted borrower enters into a repayment agreement with a guaranty agency within the sixty-day period after the guarantor gives the borrower notice that it has paid a default claim, and complies with that agreement, the guarantor is not required or permitted to charge collection costs to the borrower.

II. Factual and Procedural Background.

On June 12, 2006, plaintiff Bryana Bible signed a Federal Stafford Loan Master Promissory Note that contains the terms of the loan, which incorporate provisions of the Higher Education Act and its implementing regulations.[7] Citibank was the private lender, and defendant United Student Aid Funds, Inc.

---

[7]The promissory note is a form that is required by the Higher Education Act to be used for loans made under the Federal Family Education Loan Program. 20 U.S.C. § 1082(m)(1)(D).

# DEPARTMENT OF EDUCATION

**CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (FFEL) - (Guaranty Agencies)**

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes the Federal Stafford Loan, Federal PLUS, Federal SLS and Federal Consolidation loan programs. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.     PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED. As part of these agreements, guaranty agencies (1) establish and maintain a Federal Student Loan Reserve Fund (Federal Fund) and the Agency Operating Fund; (2) service defaulted loans that have been submitted to them; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Initially, participation was limited to not more than six guaranty agencies (July 28, 1999 *Federal Register* (64 FR 40859)). Effective October 1, 2001, however, any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

**Source of Governing Requirements**

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

## III.     COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for a Federal program, the auditor should first look to Part 2, Matrix of Compliance Requirements, to identify which of the 14 types of compliance requirements described in Part 3 are applicable and then look to Parts 3 and 4 for the details of the requirements.**

### 10.   Investments - Federal Fund

**Compliance Requirement** - Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072A(b))).

**Audit Objective** - Determine whether the agency invested Federal funds only in approved securities or other instruments.

### Suggested Audit Procedures

Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

### 11.   Collection Charges

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.   The amount or rate, if any, specified in the borrower's note;

b.   The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.   The rate that would be charged if the loan were held by ED (through October 1, 2005– 25 percent of principal and interest; changes after October 1, 2005 are posted at: http://www.fsacollections.ed.gov/contractors/ga/ ).

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.   Borrowers who pay their defaulted loans by a Consolidation Loan may not be charged, for the payment received as proceeds of the Consolidation Loan, more than 18 ½ percent of the outstanding principal and interest on the defaulted loans (34 CFR section 682.401(b)(27)).

b.   Borrowers who complete the required 12 voluntary payments and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18 ½ percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(iv)).

c.   Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR section 682.410(b)(5)(ii)).

d.   The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective** - To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.   Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.   Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.   Enforcement Action

**Compliance Requirement** - The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty requirements and at a minimum, conduct biennial on-site program reviews of such lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (FFEL) - (Guaranty Agencies)

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes the Federal Stafford Loan, Federal PLUS, Federal SLS and Federal Consolidation loan programs. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.     PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED. As part of these agreements, guaranty agencies (1) establish and maintain a Federal Student Loan Reserve Fund (Federal Fund) and the Agency Operating Fund; (2) service defaulted loans that have been submitted to them; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

## III.     COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for a Federal program, the auditor should first look to Part 2, Matrix of Compliance Requirements, to identify which of the 14 types of compliance requirements described in Part 3 are applicable and then look to Parts 3 and 4 for the details of the requirements.**

b.      Ascertain that earnings were deposited in the Federal Fund.

**11.     Collection Charges**

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through October 1, 2005– 25 percent of principal and interest; changes after October 1, 2005 are posted at: http://www.fsacollections.ed.gov/contractors/ga/ ).

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      Borrowers who pay their defaulted loans by a Consolidation Loan may not be charged, for the payment received as proceeds of the Consolidation Loan, more than 18 ½ percent of the outstanding principal and interest on the defaulted loans (34 CFR section 682.401(b)(27)).

b.      Borrowers who complete the required 12 voluntary payments and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18 ½ percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(iv)).

    c.      Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR section 682.410(b)(5)(ii)).

    d.      The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective** - To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

    a.      Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

    b.      Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

**12.**      **Enforcement Action**

**Compliance Requirement** - The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty requirements and at a minimum, conduct biennial on-site program reviews of such lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

**Audit Objective** - Determine whether the guaranty agency is carrying out program reviews and related enforcement activity in accordance with the above requirements.

**Suggested Audit Procedures**

    a.      Review the guaranty agency's procedures for selecting lenders and schools to review to ascertain if they meet the regulatory criteria or an alternative methodology approved by the Secretary.

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (FFEL) - (Guaranty Agencies)

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes the Federal Stafford Loan, Federal PLUS, Federal SLS and Federal Consolidation loan programs. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.     PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations. In general, guaranty agencies (1) establish and maintain a Federal Student Loan Reserve Fund (Federal Fund) and the Agency Operating Fund; (2) service defaulted loans that have been submitted to them; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

## III.     COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for a Federal program, the auditor should first look to Part 2, Matrix of Compliance Requirements, to identify which of the 14 types of compliance requirements described in Part 3 are applicable and then look to Parts 3 and 4 for the details of the requirements.**

**Audit Objective** - Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.      Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.      Ascertain that earnings were deposited in the Federal Fund.

## 11.      Collection Charges

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through October 1, 2005– 25 percent of principal and interest; changes after October 1, 2005 are posted at: http://www.fsacollections.ed.gov/contractors/ga/ ).

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      Borrowers who pay their defaulted loans by a Consolidation Loan may not be charged, for the payment received as proceeds of the Consolidation Loan, more

than 18 ½ percent of the outstanding principal and interest on the defaulted loans (34 CFR section 682.401(b)(27)).

b.     Borrowers who complete the required 12 voluntary payments and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18 ½ percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(iv)).

c.     Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR section 682.410(b)(5)(ii)).

d.     The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective** - To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

### Suggested Audit Procedures

a.     Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.     Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.    Enforcement Action

**Compliance Requirement** - The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty requirements and at a minimum, conduct biennial on-site program reviews of such lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

# DEPARTMENT OF EDUCATION

## CFDA 84.032   FEDERAL FAMILY EDUCATION LOANS (FFEL) - (Guaranty Agencies)

## I.      PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes the Federal Stafford Loan, Federal PLUS, Federal SLS and Federal Consolidation loan programs.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.      PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Student Loan Reserve Fund (Federal Fund) and the Agency Operating Fund; (2) service defaulted loans that have been submitted to them; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

## III.      COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for a Federal program, the auditor should first look to Part 2, Matrix of Compliance Requirements, to identify which of the 14 types of compliance requirements described in Part 3 are applicable and then look to Parts 3 and 4 for the details of the requirements.**

### 10.    Investments - Federal Fund

**Compliance Requirement** - Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072a(b))).

**Audit Objective** - Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.    Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.    Ascertain that earnings were deposited in the Federal Fund.

### 11.    Collection Charges

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.    The amount or rate, if any, specified in the borrower's note;

b.    The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

    c.      The rate that would be charged if the loan were held by ED (through October 1, 2005– 25 percent of principal and interest; changes after October 1, 2005 are posted at: http://www.fsacollections.ed.gov/contractors/ga/ ).

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

    a.      Borrowers who pay their defaulted loans by a Consolidation Loan may not be charged, for the payment received as proceeds of the Consolidation Loan, more than 18 ½ percent of the outstanding principal and interest on the defaulted loans. For defaulted loans consolidated on or after October 1, 2006, the guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan.  On or after October 1, 2009 a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds as defined in 34 CFR section 682.401(b)(27)(v)(34 CFR section 682.401(b)(27)).

    b.      Borrowers who complete the required 9 voluntary payments and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

    c.      Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR sections 682.410(b)(5)(ii) and 682.410(b)(5)(iv)).

    d.      The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective -** To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

    a.      Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

    b.      Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

# DEPARTMENT OF EDUCATION

## CFDA 84.032    FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.    PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.    PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations. In general, guaranty agencies (1) establish and maintain a Federal Student Loan Reserve Fund (Federal Fund) and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

### 11. Collection Charges

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.     The amount or rate, if any, specified in the borrower's note;

b.     The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.     The rate that would be charged if the loan were held by ED (through March 1, 2007 – 25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount. See: http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.     Borrowers who pay their defaulted loans by a Consolidation Loan may not be charged, for the payment received as proceeds of the Consolidation Loan, more than 18.5 percent of the outstanding principal and interest on the defaulted loans. For defaulted loans consolidated on or after October 1, 2006, the guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan. On or after October 1, 2009 a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to

each defaulted loan that is paid off with excess consolidation proceeds as defined in 34 CFR section 682.401(b)(27)(v)(34 CFR section 682.401(b)(27)). (See III.N.7 above.)

b.     Borrowers who complete the required 9 voluntary payments and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.     Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR sections 682.410(b)(5)(ii) and 682.410(b)(5)(iv)).

d.     The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective** - To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

### Suggested Audit Procedures

a.     Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.     Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.     Enforcement Action

**Compliance Requirement** - The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

Case 1:19-cv-03831-CJN   Document 18   Filed 06/09/20   Page 54 of 111

# DEPARTMENT OF EDUCATION

## CFDA 84.032    FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.    PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.    PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations. In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders on defaulted loans; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

**Audit Objectives** - Determine whether the guaranty agency credited the required amounts to the Federal and Operating Funds, and used the resources of each fund solely for authorized purposes.

**Suggested Audit Procedures**

a.      Review revenue records to assure that amounts required to be credited to the Federal and Operating Funds were so credited. Review revenues and receipts that were not credited to the Federal or Operating Funds to assure that they were not inappropriately omitted.

b.      Test expenditures to ascertain if they were made for allowable purposes.

c.      Examine the general journal for unusual entries that impact the Federal or Operating funds.

**10.      Investments - Federal Fund**

**Compliance Requirement** - Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072a(b))).

**Audit Objective** - Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.      Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.      Ascertain that earnings were deposited in the Federal Fund.

**11.      Collection Charges**

**Compliance Requirement** - The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on

reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through March 1, 2007 – 25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount.  See: http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP Consolidation Loan that is paid off by a Federal Consolidation Loan.  For defaulted loans consolidated on or after October 1, 2006, the guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan.  On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)).  (See III.N.7, "Federal Share of Borrower Payments.")

b.      Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.      Borrowers who enter into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan

to national credit bureaus, may not be charged collection costs on payments made under that agreement (34 CFR sections 682.410(b)(5)(ii) and 682.410(b)(5)(iv)).

d.      The guaranty agency may waive or reduce collection cost charges as part of a compromise agreement (34 CFR section 682.401(d)(1)).

**Audit Objective** - To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.      Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.      Ascertain if the method used to calculate the amount charged: (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.      Enforcement Action

**Compliance Requirement** - The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty agency requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

**Audit Objective** - Determine whether the guaranty agency is carrying out program reviews and related enforcement activity in accordance with the above requirements.

**Suggested Audit Procedures**

a.      Review the guaranty agency's procedures for selecting lenders and schools to review to ascertain if they meet the regulatory criteria or an alternative methodology approved by the Secretary.

b.      Review guaranty agency's program review guidance to ascertain if it is up-to-date and includes, when problems are found, a statistically valid method for determining liabilities due the Secretary.

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.      PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans. The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.      PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations. In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure. Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))). VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements. If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA. (ED entered into five VFA's; four of which ended on December 31, 2007 and the fifth VFA ended on October 1, 2008.)

**Source of Governing Requirements**

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2). Program regulations are located at 34 CFR part 682.

## III.      COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for a Federal program, the auditor should first look to Part 2, Matrix of Compliance Requirements, to identify which of the 14 types of compliance requirements described in Part 3 are applicable and then look to Parts 3 and 4 for the details of the requirements.**

### 10. Investments – Federal Fund

**Compliance Requirement** – Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072a(b))).

**Audit Objective** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.     Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.     Ascertain that earnings were deposited in the Federal Fund.

### 11. Collection Charges

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data.  A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed.  However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.     The amount or rate, if any, specified in the borrower's note;

b.     The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.     The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a

payment; thereafter, 24 percent of the amount. See:
http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the
limits in c. above no later than the date on which it ordinarily implements any adjustment
based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the
rate determined as specified above:

a.      A guaranty agency may charge collection costs in an amount not to exceed 18.5
        percent of the outstanding principal and interest on a defaulted FFELP
        Consolidation Loan that is paid off by a Federal Consolidation Loan.   For
        defaulted loans consolidated on or after October 1, 2006, the guaranty agency
        must remit to the Secretary a portion of the collection charge equal to the lesser of
        the amount charged the borrower or 8.5 percent of the outstanding principal and
        interest of the loan.  On or after October 1, 2009, a guaranty agency must remit
        directly to the Secretary the entire amount of the collection charge with respect to
        each defaulted loan that is paid off with excess consolidation proceeds, as defined
        in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)).
        (See III.N.7, "Federal Share of Borrower Payments.")

b.      Borrowers who make the required nine voluntary and on-time payments within
        10 months and whose loans are then rehabilitated by sale to an eligible lender may
        not be charged, for the payment derived from the sale proceeds, more than 18.5
        percent of the outstanding principal and interest on the loans being rehabilitated
        (34 CFR section 682.405(b)(1)(vi)).

c.      A guaranty agency may choose not to charge collection costs to a borrower who
        enters into a voluntary repayment agreement with the guaranty agency during the
        60-day period after notice from the guaranty agency that the guaranty agency has
        paid a default claim and will report default status on the loan to national credit
        bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs
for its default collection activities to borrowers on defaulted loans acquired by the
guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.      Test a sample of defaulted loan accounts to determine whether the guaranty
        agency charged only for reasonable costs of collection.

b.      Ascertain if the method used to calculate the amount charged: (1) included only
        appropriate expenses of default collection activities, and (2) was limited to the
        amount prescribed by regulation.

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program, which includes Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.     PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.  (ED entered into five VFA's; four of which ended on December 31, 2007 and the fifth VFA ended on October 1, 2008.)

The Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, provides that, after June 30, 2010, no new student loans will be made under the Federal Family Education Loan (FFEL) Program.  Therefore, beginning July 1, 2010, all new subsidized and unsubsidized Stafford Loans made to students, PLUS loans made to parents and to graduate/professional students, and consolidation loans made to borrowers, can only be made under the Federal Direct Student Loans (Direct Loan) program (CFDA 84.268) and will not be handled by guaranty agencies.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

were not credited to the Federal or Operating Funds to assure that they were not inappropriately omitted.

b.      Test expenditures to ascertain if they were made for allowable purposes.

c.      Examine the general journal for unusual entries that impact the Federal or Operating funds.

## 10.    Investments – Federal Fund

**Compliance Requirement** – Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072a(b))).

**Audit Objective** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.      Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.      Ascertain that earnings were deposited in the Federal Fund.

## 11.    Collection Charges

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.     The amount or rate, if any, specified in the borrower's note;

b.     The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.     The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount.  See: http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.     A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP Consolidation Loan that is paid off by a Federal Consolidation Loan.   For defaulted loans consolidated on or after October 1, 2006, the guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan.  On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)). (See III.N.7, "Federal Share of Borrower Payments.")

b.     Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged, for the payment derived from the sale proceeds, more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.     A guaranty agency may choose not to charge collection costs to a borrower who enters into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

## DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program.  FFEL program loans include Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.    PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine: (1) which of the III. Compliance Requirements below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.  (On May 31, 2011, ED invited guarantee agencies to submit proposals for VFAs in the *Federal Register* (104 FR 31312).  There were 22 submitted proposals by the August 1, 2011 deadline (http://www.fp.ed.gov/attachments/misc/VFASubmissionAnnc.pdf ))

The Student Aid and Fiscal Recovery Act of 2009 (SAFRA Act), Title II of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, provides that, after June 30, 2010, no new student loans will be made under the FFEL program.  Therefore, beginning July 1, 2010, all new subsidized and unsubsidized Stafford Loans made to students, PLUS loans made to parents and to graduate/professional students, and consolidation loans made to borrowers, can only be made under the Federal Direct Student Loans (Direct Loan) program (CFDA 84.268) and will not be handled by guaranty agencies.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

Case 1:19-cv-03831-CJN   Document 18   Filed 06/09/20   Page 65 of 111

- Failure to report all credits to the Federal Fund on ED Form 2000.

- Use of the Federal Funds for other programs (e.g., Leveraging Educational Assistance Partnerships (LEAP) and other State programs).

- Commingling of funds.

**Audit Objectives** – Determine whether the guaranty agency credited the required amounts to the Federal and Operating Funds, and used the resources of each fund solely for authorized purposes.

**Suggested Audit Procedures**

a.     Review revenue records to assure that amounts required to be credited to the Federal and Operating Funds were so credited. Review revenues and receipts that were not credited to the Federal or Operating Funds to assure that they were not inappropriately omitted.

b.     Test expenditures to ascertain if they were made for allowable purposes.

c.     Examine the general journal for unusual entries that impact the Federal or Operating funds.

**10.     Investments – Federal Fund**

**Compliance Requirement** – Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary. Earnings from the Federal Fund shall be the sole property of the Federal government. (Section 422A(b) of the HEA (20 USC 1072a(b))).

**Audit Objective** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.     Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.     Ascertain that earnings were deposited in the Federal Fund.

**11.     Collection Charges**

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the

agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount. See: http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP Consolidation Loan that is paid off by a Federal Consolidation Loan. For defaulted loans consolidated on or after October 1, 2006, the guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan. On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)). (See III.N.7, "Federal Share of Borrower Payments.")

b.  Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.  A guaranty agency may choose not to charge collection costs to a borrower who enters into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.  Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.  Ascertain if the method used to calculate the amount charged:  (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.  Enforcement Action

**Compliance Requirement** – The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty agency requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary.  The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days.  A guaranty agency also is required to adopt procedures for identifying fraudulent loan applications, and to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants.  It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

**Audit Objective** – Determine whether the guaranty agency is carrying out program reviews and related enforcement activity in accordance with the above requirements.

# DEPARTMENT OF EDUCATION

## CFDA 84.032    FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.    PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program.  FFEL program loans include Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.    PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agrees to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine (1) which of the III, Compliance Requirements, below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

The Student Aid and Fiscal Recovery Act of 2009, Title II of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, provides that, after June 30, 2010, no new student loans will be made under the FFEL program.  Therefore, beginning July 1, 2010, all new subsidized and unsubsidized Stafford Loans made to students, PLUS loans made to parents and to graduate/professional students, and consolidation loans made to borrowers, can only be made under the Federal Direct Student Loans (Direct Loan) program (CFDA 84.268) and will not be handled by guaranty agencies.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

**Audit Objectives** – Determine whether the guaranty agency credited the required amounts to the Federal and Operating Funds, and used the resources of each fund solely for authorized purposes.

**Suggested Audit Procedures**

a.   Review revenue records to assure that amounts required to be credited to the Federal and Operating Funds were so credited. Review revenues and receipts that were not credited to the Federal or Operating Funds to assure that they were not inappropriately omitted.

b.   Test expenditures to ascertain if they were made for allowable purposes.

c.   Examine the general journal for unusual entries that impact the Federal or Operating funds.

**10.   Investments – Federal Fund**

**Compliance Requirement** – Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary (such as pooled investments as part of a State investment program). Earnings from the Federal Fund shall be the sole property of the Federal Government (Section 422A(b) of the HEA (20 USC 1072a(b)); DCLID: 99-G-316 which is available at http://www.ifap.ed.gov/dpcletters/doc0515_bodyoftext.htm).

**Audit Objectives** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.   Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.   Ascertain that earnings were deposited in the Federal Fund.

**11.   Collection Charges**

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount. See http://www.fsacollections.ed.gov/contractors/ga/).

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP loan that is paid off by a Federal Consolidation Loan. The guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan. On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)). (See III.N.7, "Federal Share of Borrower Payments.")

b.      Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.     A guaranty agency may choose not to charge collection costs to a borrower who enters into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.     Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.     Ascertain if the method used to calculate the amount charged (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.  Enforcement Action

**Compliance Requirement** – The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty agency requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary. The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days. A guaranty agency also is required to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

**Audit Objective** – Determine whether the guaranty agency is carrying out program reviews and related enforcement activity in accordance with the above requirements.

**Suggested Audit Procedures**

a.     Review the guaranty agency's procedures for selecting lenders and schools to review to ascertain if they meet the regulatory criteria or an alternative methodology approved by the Secretary.

b.     Review the guaranty agency's program review guidance to ascertain if it is up-to-date and includes, when problems are found, a statistically valid method for determining liabilities due the Secretary.

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.    PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program.  FFEL program loans include Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.    PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agreed to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine (1) which of the III, Compliance Requirements, below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

The Student Aid and Fiscal Recovery Act of 2009, Title II of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, provides that, after June 30, 2010, no new student loans will be made under the FFEL program.  Therefore, beginning July 1, 2010, all new subsidized and unsubsidized Stafford Loans made to students, PLUS loans made to parents and to graduate/professional students, and consolidation loans made to borrowers, can only be made under the Federal Direct Student Loans (Direct Loan) program (CFDA 84.268) and will not be handled by guaranty agencies.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

as pooled investments as part of a State investment program). Earnings from the Federal Fund shall be the sole property of the Federal Government (Section 422A(b) of the HEA (20 USC 1072a(b)); DCLID: 99-G-316 which is available at http://www.ifap.ed.gov/dpcletters/doc0515_bodyoftext.htm).

**Audit Objectives** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.     Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.     Ascertain that earnings were deposited in the Federal Fund.

**11.     Collection Charges**

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities. The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)). Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities. Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.     The amount or rate, if any, specified in the borrower's note;

b.     The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.     The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount.

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.     A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP loan that is paid off by a Federal Consolidation Loan.   The guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan.  On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)). (See III.N.7, "Federal Share of Borrower Payments.")

b.     Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.     A guaranty agency may choose not to charge collection costs to a borrower who enters into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.     Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.     Ascertain if the method used to calculate the amount charged (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

## 12.     Enforcement Action

**Compliance Requirement** – The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty agency requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative

# DEPARTMENT OF EDUCATION

## CFDA 84.032     FEDERAL FAMILY EDUCATION LOANS (Guaranty Agencies)

## I.     PROGRAM OBJECTIVES

Non-profit and State guaranty agencies are established to guarantee student loans made by lenders and perform certain administrative and oversight functions under the Federal Family Education Loans (FFEL) program.  FFEL program loans include Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS loans, and Federal Consolidation loans.  The Department of Education (ED) provides reinsurance to the guaranty agency.

## II.     PROGRAM PROCEDURES

To participate in the FFEL programs and to receive various payments and benefits incident to that participation, a guaranty agency enters into agreements with ED under which the guaranty agency agreed to comply with the applicable law and regulations.  In general, guaranty agencies (1) establish and maintain a Federal Fund and the Agency Operating Fund; (2) collect on defaulted loans on which they have paid claims; (3) make timely claim payments to lenders; (4) make timely reinsurance filings with ED; (5) provide accurate and reliable reports to ED; (6) apply proper charges to defaulted borrowers; and (7) take proper enforcement measures with respect to lenders, lender servicers, and defaulted borrowers.

Section 428A of the Higher Education Act, as amended (HEA), allows ED to enter into Voluntary Flexible Agreements (VFA) with guaranty agencies to pilot alternatives to the current guaranty agency financing model or structure.  Any guaranty agency or consortium of agencies may apply to enter into a VFA with ED (Section 428A(a)(3) of the HEA (20 USC 1078-1(a)(3))).  VFA pilots are uniquely designed by each guaranty agency and may waive some of the compliance requirements.  If a VFA exists, the auditor should review the VFA and determine (1) which of the III, Compliance Requirements, below are applicable, and (2) what, if any, additional or alternative audit procedures should be performed to test compliance with the terms of the VFA.

The Student Aid and Fiscal Recovery Act of 2009, Title II of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, provides that, after June 30, 2010, no new student loans will be made under the FFEL program.  Therefore, beginning July 1, 2010, all new subsidized and unsubsidized Stafford Loans made to students, PLUS loans made to parents and to graduate/professional students, and consolidation loans made to borrowers, can only be made under the Federal Direct Student Loans (Direct Loan) program (CFDA 84.268) and will not be handled by guaranty agencies.

### Source of Governing Requirements

The FFEL program is authorized by the Higher Education Act (HEA) of 1965, as amended (20 USC 1071 to 1087-2).  Program regulations are located at 34 CFR part 682.

**Audit Objectives** – Determine whether the guaranty agency credited the required amounts to the Federal and Operating Funds, and used the resources of each fund solely for authorized purposes.

**Suggested Audit Procedures**

a.     Review revenue records to assure that amounts required to be credited to the Federal and Operating Funds were so credited.  Review revenues and receipts that were not credited to the Federal or Operating Funds to assure that they were not inappropriately omitted.

b.     Test expenditures to ascertain if they were made for allowable purposes.

c.     Examine the general journal for unusual entries that impact the Federal or Operating funds.

**10.     Investments – Federal Fund**

**Compliance Requirement** – Funds transferred to the Federal Fund shall be invested in obligations issued or guaranteed by the United States or a State, or in other similarly low-risk securities selected by the guaranty agency, with the approval of the Secretary (such as pooled investments as part of a State investment program).  Earnings from the Federal Fund shall be the sole property of the Federal Government (Section 422A(b) of the HEA (20 USC 1072a(b)); DCLID: 99-G-316 which is available at http://www.ifap.ed.gov/dpcletters/doc0515_bodyoftext.htm).

**Audit Objectives** – Determine whether the agency invested Federal funds only in approved securities or other instruments and properly accounted for investment earnings.

**Suggested Audit Procedures**

a.     Review investment activity during the period to ascertain that Federal Fund assets were invested in approved securities or other instruments.

b.     Ascertain that earnings were deposited in the Federal Fund.

**11.     Collection Charges**

**Compliance Requirement** – The guaranty agency must charge each defaulted borrower reasonable costs incurred by the agency for its default collection activities.  The agency must charge these costs on defaulted loans whether acquired by a default or bankruptcy claim (34 CFR section 682.410(b)(2)).  Costs of collection on defaulted loans include those direct costs of collection activities conducted after default on loans held by the agency, and indirect costs that are properly allocated to those same activities.  Direct costs include the expenses listed in 34 CFR section 30.60(a), such as collection agency charges, court costs, and attorney fees.

Because HEA section 484A(b) makes the defaulter liable only for reasonable collection costs, and costs are reasonable only if they are based on actual collection expenses being incurred by the guaranty agency, the agency must ensure that the estimate is based on reliable data. A charge based on expense and recovery data incurred in the most recently completed and audited fiscal year of the guaranty agency can be reasonably expected to predict actual costs being incurred in the year for which the charge is assessed. However, when changes that will affect that rate are reasonably expected in expenses or recoveries during the year for which the charge is computed, adjustments may be warranted.

The rate or amount to be charged the borrower to satisfy collection costs is the least of the following three rates:

a.      The amount or rate, if any, specified in the borrower's note;

b.      The rate determined by dividing the agency's expected expenses by its expected recoveries for the period at issue; or

c.      The rate that would be charged if the loan were held by ED (through March 1, 2007—25 percent of the amount of principal and interest satisfied from a payment; thereafter, 24 percent of the amount.

An agency that is limited to the amount charged by ED must conform its charges to the limits in c. above no later than the date on which it ordinarily implements any adjustment based on its annual assessment of costs and recoveries.

There are instances when collection charges may not be assessed to the borrower at the rate determined as specified above:

a.      A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFELP loan that is paid off by a Federal Consolidation Loan. The guaranty agency must remit to the Secretary a portion of the collection charge equal to the lesser of the amount charged the borrower or 8.5 percent of the outstanding principal and interest of the loan. On or after October 1, 2009, a guaranty agency must remit directly to the Secretary the entire amount of the collection charge with respect to each defaulted loan that is paid off with excess consolidation proceeds, as defined in 34 CFR section 682.401(b)(27)(v) (34 CFR section 682.401(b)(27)). (See III.N.7, "Federal Share of Borrower Payments.")

b.      Borrowers who make the required nine voluntary and on-time payments within 10 months and whose loans are then rehabilitated by sale to an eligible lender may not be charged more than 18.5 percent of the outstanding principal and interest on the loans being rehabilitated (34 CFR section 682.405(b)(1)(vi)).

c.    A guaranty agency may choose not to charge collection costs to a borrower who enters into a voluntary repayment agreement with the guaranty agency during the 60-day period after notice from the guaranty agency that the guaranty agency has paid a default claim and will report default status on the loan to national credit bureaus (34 CFR section 682.410(b)(5)(ii)).

**Audit Objective** – To determine whether the guaranty agency charged appropriate costs for its default collection activities to borrowers on defaulted loans acquired by the guaranty agency either by payment of a default or bankruptcy claim.

**Suggested Audit Procedures**

a.    Test a sample of defaulted loan accounts to determine whether the guaranty agency charged only for reasonable costs of collection.

b.    Ascertain if the method used to calculate the amount charged (1) included only appropriate expenses of default collection activities, and (2) was limited to the amount prescribed by regulation.

**12.    Enforcement Action**

**Compliance Requirement** – The guaranty agency shall take measures to ensure enforcement of all Federal, State and guaranty agency requirements and at a minimum, conduct biennial on-site program reviews of lenders and schools that meet criteria specified in 34 CFR section 682.410(c)(1) or are selected using an alternative methodology approved by the Secretary.  The guaranty agency is required to use statistically valid techniques to calculate liabilities owed the Secretary that the review indicates may exist; demand prompt payment from the responsible party; and refer to the Secretary any case in which the payment of funds is not made within 60 days.  A guaranty agency also is required to undertake or arrange for the prompt and thorough investigation of criminal or other programmatic misconduct by its program participants. It is responsible also for promptly reporting all of the allegations and indications of fraud or misconduct having a substantial basis in fact, and the scope, progress, and results of the agency's investigations (34 CFR section 682.410(c)).

**Audit Objective** – Determine whether the guaranty agency is carrying out program reviews and related enforcement activity in accordance with the above requirements.

**Suggested Audit Procedures**

a.    Review the guaranty agency's procedures for selecting lenders and schools to review to ascertain if they meet the regulatory criteria or an alternative methodology approved by the Secretary.

b.    Review the guaranty agency's program review guidance to ascertain if it is up-to-date and includes, when problems are found, a statistically valid method for determining liabilities due the Secretary.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

July 10, 2015

GEN-15-14

Subject: Repayment Agreements and Liability for Collection Costs on Federal Family Education Loan Program (FFELP) Loans

Summary: This letter restates the requirements for guaranty agencies regarding charging collection costs to FFELP borrowers who enter into repayment agreements

Dear Colleague:

In this letter we restate and clarify the rules that bar a guaranty agency from charging collection costs to a borrower who promptly after default enters into a repayment agreement, in particular a rehabilitation agreement, with that agency, and who honors that agreement.

A guaranty agency, after it pays a default claim and acquires the loan from the lender, is required to send an initial notice to the borrower. In that notice, the guaranty agency must give the borrower at least 60 days to take any of several actions, including entering into a repayment agreement with the guaranty agency. In this letter we refer to this step as the "notice and opportunity to resolve" the debt. A guaranty agency cannot charge collection costs to a defaulted borrower who, within the 60-day period following the initial notice, enters into a repayment agreement, including a rehabilitation agreement, and who honors that agreement.

These rules mirror how the Department treats those borrowers in its portfolio of FFELP and Direct Loans who enter into a repayment agreement during the initial notice and opportunity to resolve period for that borrower and honor that agreement. Few borrowers in the Department's portfolio enter into repayment within that initial period.

**Applicable provisions of the Higher Education Act**
Section 484A(a) of the Higher Education Act of 1965, as amended (HEA), provides that defaulted borrowers "shall be required to pay, in addition to other charges specified in this subchapter . . . reasonable collection costs." Section 428F(a) of the HEA requires the guarantor to offer the borrower an opportunity to have a defaulted loan "rehabilitated," and the default status cured, by making nine timely payments over 10 consecutive months, after which the loan may be sold to a FFELP lender or assigned to the Department, and the record of default as reported by the guarantor is removed from the borrower's credit history. Under the HEA and the Department's regulations, the installment amounts payable under a rehabilitation agreement must be "reasonable and affordable based on the borrower's total financial circumstances."

**Applicable provisions of Department regulations**
The regulations direct the guarantor to charge the borrower "reasonable" collection costs incurred to collect the loan. 34 C.F.R. 682.410(b)(2). Generally, the charges cannot exceed the

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

lesser of the amount the borrower would be charged as calculated under 34 C.F.R. 30.60 or the amount the Department would charge if the Department held the loan. However, there is an exception, discussed later, for collection costs charged in connection with loan rehabilitation. 34 C.F.R. 682.410(b)(2), citing 34 C.F.R. 682.405(b)(1)(vi)(B). Before the guarantor reports the default to a credit bureau or assesses collection costs against a borrower, the guarantor must provide the borrower written notice that explains the nature of the debt, and the borrower's right to request an independent administrative review of the enforceability or past-due status of the loan and to enter into a repayment agreement for the debt on terms satisfactory to the guarantor. 34 C.F.R. 682.410(b)(5)(ii).

The regulations also provide that the reasonable and affordable payment required under a rehabilitation agreement must generally be an amount equal to 15 percent of the amount by which the borrower's adjusted gross income exceeds 150 percent of the poverty guideline amount applicable to the borrower's family size and State, divided by 12. 34 C.F.R. 682.405(b)(1)(iii). If the borrower objects to that proposed monthly payment amount, the guaranty agency must offer a reasonable and affordable payment amount based on the borrower's individual financial circumstances. 34 C.F.R. 682.405(b)(1)(vii). The guarantor must disclose to the borrower who seeks rehabilitation of a loan, among other matters, the amount of any collection costs to be added to the unpaid principal at the time of sale of the loan to a lender, which amount cannot exceed, currently, 16 percent of the unpaid principal and accrued interest at the time of sale. Section 428F(1)(D)(i)(II)(aa) of the HEA, 20 U.S.C. 1078-6(1)(D)(i)(II)(aa).[1]

### Background and rationale for the requirement to provide an initial "notice and opportunity to resolve" the debt

This section describes the context in which the Department adopted regulations requiring a guarantor to provide a borrower with this notice and opportunity to resolve a defaulted loan. Section 430A of the HEA requires guarantors and the Department, prior to reporting to a credit bureau that the loan is in default, to provide the borrower with notice that the loan will be reported as in default status "unless the borrower enters into repayment," and requires the default to be reported "if the borrower has not entered into repayment within a reasonable time, but not less than 30 days from the date of the notice. . ." 20 U.S.C. 1080a(c)(4). In 1992, the Department adopted a regulation which requires the guarantor, "before it reports the default to a credit bureau or assesses collection costs against a borrower," to provide the borrower an initial opportunity to challenge the enforceability or past-due status of the loan, to obtain an independent review of that challenge, to access the related records, and to agree to voluntary repayment. 34 C.F.R. 682.410(b)(5), 57 FR 60280, 60355-56 (December 18, 1992). The regulation uses the future tense in describing those actions that the guarantor may take to collect the debt, after providing the required notice: "costs will be charged," and "the agency will report the default to credit bureaus." 34 C.F.R. 682.410(b)(5)(vi)(E), (F) (emphasis added).

---

[1] For sales prior to July 1, 2014, the maximum rate was 18.5 percent. That rate was reduced to 16 percent by section 501 of Pub. L. 113-67, Dec. 26, 2013. That change has not yet been reflected in the Department's regulations.

Page 3- Repayment Agreements and Liability for Collection Costs on FFELP Loans

In adopting the FFELP regulation in 1992, the Department expressly considered guaranty agencies' years of experience under the Federal tax refund offset program. Since 1984, the Department had been authorized to refer defaulted student loan debts to the Department of the Treasury for collection by offset against tax refunds owed to defaulted borrowers. 26 U.S.C. 6402(d), 31 U.S.C. 3720A. In 1986, the Department adopted regulations to establish the procedures for referring defaulted debt, which include giving the debtor notice of the proposed offset and an opportunity to avoid the offset by entering into a satisfactory repayment agreement. 34 C.F.R. 30.33, 51 FR 24092, 24095 (July 1, 1986). In adopting this offset rule, the Secretary made clear that the Department would use the guaranty agencies to perform certain functions on its behalf in order to collect those defaulted, federally reinsured loans held by guaranty agencies: sending the required pre-offset notice to the borrower, conducting an initial review if requested by the borrower, and providing the borrower an opportunity to avoid offset by making a timely agreement to repay the loan. 51 FR 24095, 24096 (July 1, 1986).

In 1992, the Department required a guaranty agency to provide the borrower an initial notice and opportunity to resolve the debt in all circumstances, not just for offset purposes, 57 FR 60280, 60356 (Dec. 18, 1992). Noting that guaranty agencies had experience with notice and opportunity because of their participation in the refund offset program, 57 FR 60280, 60312 (Dec. 18, 1992), the Department in these 1992 regulations provided that a guaranty agency would meet the new requirement by following those pre-offset rules: "the administrative offset procedures set forth at 34 C.F.R. 30.20 – 30.33 satisfy the requirements" that the guarantor must meet "before [the guarantor] reports the default to a credit reporting agency or assesses collection costs." 34 C.F.R. 682.410(b)(5)(iii). Thus, by pointing to the offset procedure as a model for the overall FFELP notice and opportunity to resolve rule, the Department showed that it intended the new FFELP rule to follow the same offset rules: the borrower could avoid the adverse consequences (report of the default status of the debt, liability for collection costs, and further collection actions) by making a timely agreement to repay the debt voluntarily.

**Background and rationale for the requirement to charge collection costs**
The 1992 final rule also required the guarantor, for the first time, to charge collection costs. 34 C.F.R. 682.410(b)(2); 57 FR 60280, 60355 (Dec. 18, 1992). In this rule the Department interpreted the statutory term "reasonable collection costs" in section 484A(b) of the HEA by capping the collections at the lesser of the actual costs incurred by the guarantor under a "make whole" formula in 34 C.F.R. 30.60, or the rate the Department would charge if it held the loan. As the Department explained in briefs and in the testimony of responsible Department officials in Education Credit Management Corp. v. Barnes, 318 B.R. 482 (S.D. Ind. 2004), aff'd, 459 F.3d 796 (7th Cir. 2006), claims for repayment of defaulted, federally reinsured FFELP loans are claims of the United States, and, accordingly, Department rules for their collection conform with the Federal Claims Collection Standards (FCCS).[2] At the time of the 1992 Department's collection costs rule, the FCCS directed Federal agencies to charge delinquent debtors the costs of collection, which an agency was to determine based "upon cost analyses establishing an

---

[2] The Department recognized the applicability of the FCCS to FFELP regulations in 1992 in issuing the FFELP collection costs regulation and again in 1996, in regulating the manner in which payments must be applied by the guaranty agency. 61 FR 60482 (Nov. 27, 1996).

average of actual additional costs incurred by the agency in processing and handling claims against other debtors <u>in similar stages of delinquency</u>." 4 C.F.R. 102.13(d)(1992) (emphasis added).[3]

In response to this government-wide directive, the Department adopted a regulation which distinguishes between defaulted borrowers who agree promptly to repay – within the 60-day resolution period – from those defaulters who do not immediately cooperate and for whom the guarantor may incur significant costs to pursue. Consistent with the Department's long-standing practice and with its interpretation of the HEA provisions, the FFELP regulation treats the two groups as in "different stages of delinquency" from the FCCS perspective, and directs that costs be charged only to the second group. The Department stated this position in response to an inquiry from a guarantor in 1997.[4]

Thus, the regulations direct the guaranty agency to charge the borrower collection costs - but only after the guaranty agency provides borrower the opportunity to dispute the debt, to obtain review the objection, and to agree to repay the debt on terms satisfactory to the guarantor. If the borrower agrees within that initial period to repay the debt under terms satisfactory to the guarantor and consistent with the requirements, the borrower cannot be charged collection costs at any time thereafter unless the borrower later fails to honor that agreement.[5] In determining whether those costs are reasonable and properly charged to a borrower who timely agrees to repay and honors that agreement, it is irrelevant whether the guaranty agency uses its own staff to provide the notice and opportunity to resolve or contracts for those services.

**Background and rationale for the requirement to offer loan rehabilitation**
In June 1994, the Department adopted a regulation to implement the loan rehabilitation provisions in section 428F(a) of the HEA (20 U.S.C. 1078-6(a)). 34 C.F.R. 682.405, 59 FR 33334, 33335 (June 28, 1994). To have a defaulted loan rehabilitated, a borrower must request rehabilitation and voluntarily make nine out of 10 monthly payments in the amount determined

---

[3] In describing the kinds of differences between groups of borrowers that would warrant differing charges, the General Accounting Office and the Justice Department distinguished in the FCCS between those costs incurred by the agency "in any event" in handling the debt, and those incurred "by virtue of the delinquency." 49 FR 8893 (March 9, 1984). Examples of costs incurred "by virtue of the delinquency" included the costs of hiring additional personnel and retaining private debt collectors to pursue recovery from those who do not respond to the routine initial demand by the agency. <u>Id</u>. FFELP regulations permit a lender to charge collection costs, but bar the lender from charging for costs of such routine activities as preparing notices and making contact with the borrower. 34 C.F.R. 682.202(f)(2). The Department or the guaranty agency, as applicable, must notify the borrower if it acquires a loan. The cost of doing so, and of responding to the initial notice in which this would be communicated, was expected to be minimal--more akin to the cost of servicing activities that lenders routinely conduct, such as considering requests for forbearances, deferments, or income-based repayment terms - costs which lenders must defray from interest earnings on their portfolio - than to the significant expenses in hiring additional staff or retaining private debt collectors to pursue those borrowers who do not promptly agree to repay.

[4] Letter from Ronald Streets, Program Specialist, Student Financial Assistance Programs, Department of Education, to Phillip Cervin, Asst. Vice President, Texas Guaranteed Student Loan Corporation (July 28, 1997).

[5] 34 C.F.R. 682.404(f) does not require or authorize the guarantor to charge the defaulter collection costs, but simply directs the order in which a payment must be applied to a loan on which those costs are properly charged. Thus, if there are no late charges owed on the loan, §682.404 does not authorize the guarantor to charge late fees simply by mentioning the order in which any late fees properly imposed are to be satisfied.

by the guarantor in a written installment payment agreement. Thus, a rehabilitation agreement is simply a specific form of a satisfactory repayment agreement.

The Department's loan rehabilitation regulations require that the guarantor explain to the borrower the terms of the rehabilitation agreement or arrangement, including "the amount of the collection costs to be added to the unpaid principal at the time of the sale [which] may not exceed 18.5 percent of the unpaid principal and accrued interest at the time of sale." 34 C.F.R. 682.405(b)(1)(iv) (1994).[6] As explained in a Departmental Dear Guaranty Agency letter on March 29, 1994, the Department did not adopt the (original) 18.5 percent regulatory "cap" on the collection costs charged at the time of sale in order to give guarantors authority to charge such costs, but rather to limit the amount that a guarantor could charge – at the time of the sale – to those borrowers who were already liable for collection costs under existing authority. The change was needed because, at that time, the maximum collection costs rate that was permitted on borrower payments generally was the rate then charged (on routine recoveries) by the Department, which was "sometimes as high as 43 percent of the outstanding principal and interest on the defaulted loan."[7] The Department "concluded that the amount of collection costs currently assessed borrowers as reasonable under 34 C.F.R. 682.410(b)(2) is not reasonable when the borrower has shown the initiative to address the default through [rehabilitation]."[8]

Nothing in the 1994 rehabilitation regulations exempts loan rehabilitation transactions from the general rule that allows a guarantor to charge collection costs only to a borrower who fails to enter into a repayment agreement satisfactory to the agency within the 60-day period following the initial notice and opportunity to resolve. The loan rehabilitation agreement with the borrower is clearly a "repayment agreement."[9] Moreover, the loan rehabilitation agreement is an agreement on terms that the guaranty agency must accept as satisfactory to the agency. Thus, a guaranty agency cannot use the collection activities otherwise required if a borrower, in this initial period, enters into a rehabilitation agreement and then honors that agreement.[10]

---

[6] As noted earlier, this rate was reduced to 16 percent by 2013 amendments.

[7] Dear Guaranty Agency Director Letter, March 29, 1994, at 2.

[8] Id. In March 1995, the Department reduced that charge to no more than 25 percent of the portion of the particular payment that is applied to principal and interest; the amount used to defray costs thus equals 20 percent of the total amount of the payment. Since that 1995 change, the "cap" has not exceeded that rate of 20 percent of the gross amount of the payment.

[9] See: 34 C.F.R. 682.405(a)(2)(i) and (b)(1), which refer to the "rehabilitation agreement" as a "monthly repayment agreement."

[10] The regulation states that to avoid credit reporting as in default and collection action, the borrower must enter into "a repayment agreement on terms satisfactory to the agency," 34 C.F.R. 682.410(b)(5)(ii)(D). The context makes clear that a rehabilitation agreement is such a "satisfactory" repayment agreement. First, 34 C.F.R. 682.410(b)(6) requires the guarantor to take specific collection action - garnishment and offset - if the borrower fails to timely enter into an "acceptable" repayment agreement. Section 488A of the HEA allows a guarantor to collect the debt by garnishment only if the borrower is "not currently making payments under a repayment agreement with . . . the guaranty agency," 20 U.S.C. §1095a(a) (emphasis added). The guarantor, further, may not even start garnishment for a borrower who "requests rehabilitation." 78 FR 45636 (July 29, 2013). Similarly, 31 U.S.C. §3720A permits collection by offset only of "past-due, legally-enforceable debt," allows the borrower to object to offset on the ground that the debt is not "past-due," 31 U.S.C. §3720A(b)(2), and requires the creditor agency to affirmatively determine that the debt is "past-due." 31 U.S.C. §3720A(b)(3). A "past-due" debt is a debt not paid by the date

The charging of collection costs upon completion of a loan rehabilitation by the sale or assignment of the loan was first addressed in the 2006 amendment to section 428F to the HEA. Those amendments provided that the guaranty agency "may in order to defray collection costs, charge the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale, and retain such amount from the proceeds of the loan sale." 20 U.S.C. 1078-6 as amended by the Higher Education Reconciliation Act of 2005 (HERA), P.L. 109-171, section 8014(h), February 8, 2006. The legislative history of this change shows that the amendment was intended to codify "the collection costs permissible for rehabilitated loans at up to 18.5 percent of the outstanding principal and interest of the loan." H.R. Rep. No. 276, 109th Cong. 1st Sess. (2005) at 240. Existing Department regulations had already established which costs were permissible; because the amendment simply "codified" the permissible costs, the amendment did not empower a guarantor to charge costs that were not already permitted under the regulations. The Department promptly recognized that this 2006 amendment simply "codified" those permitted costs, rather than superseding existing regulatory limits on collection costs. In Dear Colleague Letter Gen 06-02, issued March 2006, the Department characterized the HERA amendment not as granting "authority" to charge costs, but rather as merely "specifying" the limits to that existing authority as those already contained in the regulation.

**Conclusion**
Department regulations bar a guaranty agency from charging collection costs to a defaulted borrower who responds within 60 days to the initial notice provided by the guaranty agency, enters into a repayment agreement, including a rehabilitation agreement, and who honors that agreement. This includes, in the case of loan rehabilitation, both collection costs on the initial and subsequent qualifying payments and collection costs upon the ultimate sale or assignment of the loan. For defaulters who do not enter into a repayment agreement, guaranty agencies can and should charge collection costs.

Thank you for your cooperation.

Sincerely,

Lynn B. Mahaffie
Deputy Assistant Secretary for
Policy, Planning, and Innovation
Office of Postsecondary Education

---

specified, as pertinent here, in the "applicable agreement" "including a post-delinquency payment agreement." 31 C.F.R. 285.5(b). The guarantor cannot proceed to collect by offset or garnishment any debt already being repaid under any "post-delinquency payment agreement." Therefore, 34 C.F.R. 682.410(b)(6) must be read, in context, to require the guarantor to pursue such collection actions only against a borrower who fails to timely enter into, and to honor, any form of repayment agreement, including a rehabilitation agreement.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

March 16, 2017

GEN-17-02

Subject:        Withdrawal of Dear Colleague Letter (DCL) 15-14

Summary:        The purpose of this guidance is to inform you that the Department of Education is
                withdrawing the statements of policy and guidance reflected in its Dear Colleague
                Letter (DCL) GEN 15-14 that it issued on July 10, 2015, with the Subject line
                "Repayment Agreements and Liability for Collection Costs on Federal Family
                Education Loan Program (FFELP) Loans." The DCL specifically addresses
                FFELP loans and not Direct Loans in the Department's portfolio.

Dear Colleague:

The DCL stated that the Higher Education Act, as amended (HEA), and its implementing
regulations do not allow guaranty agencies to charge collection costs to a defaulted borrower
who enters into a repayment agreement (including a loan rehabilitation agreement under 34 CFR
§ 682.405) with the guaranty agency within 60 days of receiving the agency's initial notice of
default. In the DCL, the Department stated that its regulations bar a guaranty agency from
charging collection costs to a defaulted borrower who (i) responds within 60 days to the initial
notice sent by the guaranty agency after it pays a default claim and acquires the loan from the
lender; (ii) enters into a repayment agreement, including a rehabilitation agreement; and (iii)
honors that agreement.

The Department rescinds the DCL and its interpretation of the HEA and its implementing
regulations. The Department issued the DCL only after the United States Court of Appeals for
the Seventh Circuit asked for its views on the matter in *Bible v. United Student Aid Funds, Inc.,* a
case challenging the assessment of collection costs.[i] The Department subsequently filed an
*amicus* brief with the Seventh Circuit on May 21, 2015, announcing the position that it later
articulated in the DCL.

The Department thinks that the position set forth in the DCL would have benefitted from public
input on the issues discussed in the DCL. Accordingly, the Department withdraws the DCL, and
the Department will not require compliance with the interpretations set forth in the DCL without
providing prior notice and an opportunity for public comment on the issues addressed in the
DCL.

400 MARYLAND AVENUE, S.W., WASHINGTON, DC 20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

This withdrawal action does not affect borrowers whose loans are held by the Department because the Department does not charge the borrower for collection costs under the circumstances discussed in the DCL. This guidance does not add requirements to applicable law.

Sincerely,

Lynn B. Mahaffie
Acting Assistant Secretary
Office of Postsecondary Education

---

[i] *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (2015).

2

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 668, 674, 682, and 685

**RIN 1840–AD26**

**[Docket ID ED–2018–OPE–0027]**

### Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to create Institutional Accountability regulations that would amend the regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to establish a Federal standard for evaluating and a process for adjudicating borrower defenses to repayment for loans first disbursed on or after July 1, 2019, and provide for actions the Secretary may take to collect from schools financial losses due to successful borrower defense to repayment discharges. The Secretary also proposes to withdraw (*i.e.* rescind) certain amendments to the regulations already published but not yet effective.

**DATES:** We must receive your comments on or before August 30, 2018.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Adobe Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov*, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the proposed regulations, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 294–20, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** For further information related to Borrower Defenses to Repayment, Pre-dispute Arbitration Agreements, Internal Dispute Processes, and Guaranty Agency Fees, Barbara Hoblitzell at (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov* or Annmarie Weisman at (202) 453–6712 or by email at: *Annmarie.Weisman@ed.gov.* For information related to False Certification Loan Discharge, and Closed School Loan Discharge, Brian Smith at (202) 453–7440 or by email at: *Brian.Smith@ed.gov.* For information regarding Financial Responsibility and Institutional Accountability, John Kolotos at (202) 453–7646 or by email at: *John.Kolotos@ed.gov.* For information regarding Recalculation of Subsidized Usage Periods and Interest Accrual, Ian Foss at (202) 377–3681 or by email at: *Ian.Foss@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

Purpose of This Regulatory Action: Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Current regulations in 34 CFR 685.206(c) governing defenses to repayment have been in effect since 1995 but, until recently, were rarely used. Those regulations specify that a borrower may assert as a defense to repayment "any act or omission of the school attended by the student that would give rise to a cause of action

against the school under applicable State law."

On November 1, 2016, the Department published final regulations (81 FR 75926) (the 2016 final regulations) on the topic of borrower defenses to repayment. The 2016 final regulations were developed following negotiated rulemaking and after receiving and considering public comments on a notice of proposed rulemaking. Certain provisions of the 2016 final regulations have been delayed until July 1, 2019 (83 FR 6458).

These proposed regulations are designed to:

• Provide students with a balanced, meaningful process that relies on a single, Federal standard rather than 50 State standards to ensure that borrower defense to repayment discharges are handled swiftly, carefully, and fairly;

• Encourage students to seek remedies from institutions that have committed acts or omissions that constitute misrepresentation and cause harm to the student;

• Ensure that institutions rather than taxpayers bear the burden of billions of dollars [1] in losses from approvals of borrower defense to repayment discharges;

• Enable institutions to respond to borrower defense to repayment claims and provide evidence to support their response;

• Discourage institutions from committing fraud or other acts or omissions that constitute misrepresentation or from closing precipitously;

• Enable the Department to properly evaluate institutional financial risk in order to protect students and taxpayers;

• Provide students with additional time to qualify for a closed school loan discharge;

• Address the concerns expressed by negotiators, as well as in a suit filed by an association against the Department, that large financial liabilities resulting from the unclear borrower defense standard in the 2016 final regulations could cripple or force the closure of colleges and universities, even as they produce positive outcomes for students and provide students with accurate and complete information relating to enrollment;

• Reduce uncertainty about the future of the Federal financial aid system itself due to the strain on the government of large numbers of borrower defense to repayment discharges; and

---

[1] The Department estimated that borrower defense activity under the 2016 final regulation would have an estimated $14.9 billion net budget impact for the 2017 to 2026 loan cohorts. 71 FR 76055.

• Most of all, to ensure that millions of American students and borrowers are provided with accurate information to inform their enrollment decisions and to ensure that students are not subjected to narrowed educational options as a result of unwarranted school closures.

The goal of the Department is to enable students to make informed decisions on the front end of college enrollment, rather than to grant them financial remedies after-the-fact when lost time cannot be recouped and new educational opportunities may be sparse. Postsecondary students are adults who can be reasonably expected to make informed decisions and who must take personal accountability for the decisions they make. Institutions are prohibited from misleading students by providing false or incomplete information, and remedies should be provided to a student when misrepresentation on the part of an institution causes financial harm to that student. Regardless, students have a responsibility when enrolling at an institution or taking student loans to be sure they have explored their options carefully and weighed the available information to make an informed choice. The Department has an obligation to enforce the Master Promissory Note, which makes clear that students are not relieved of their repayment obligations if later they regret the choices they made.

Through these proposed regulations, the Department is considering whether to reaffirm the Department's original interpretation of the statute, which persisted for 20 years and provided borrowers an opportunity to raise defenses to the repayment of Direct Loans only in response to collection actions by the Department, or to continue with the Department's 2015 interpretation, which allowed borrowers to raise defenses to repayment in affirmative claims. The Department adopted that interpretation in response to advocacy efforts on behalf of student borrowers who had attended institutions owned by Corinthian Colleges, Inc., but without negotiated rulemaking.

This new interpretation to allow affirmative claims was codified in the Department's 2016 final regulations. The 2015 reinterpretation was designed to expand loan forgiveness for borrowers who had attended Corinthian institutions, which, following a sequence of events, closed precipitously after the Department placed the institutions on HCM1 status and added a delay in title IV reimbursement that is typically not associated with HCM1. The Department's closed school loan

discharge regulations provide that a student who was attending a school at the time of its closure, who did not complete his or her program of study prior to the school's closure, and who meets other criteria may receive a discharge of Federal student loans obtained for the student's enrollment at the institution. 34 CFR 674.33, 682.402, and 685.214. But the Department wished to extend loan forgiveness to borrowers who may not have qualified for this closed school loan discharge, so it created new policies for accepting affirmative claims.

The Department's experience with these affirmative claims has informed this NPRM. That experience has led the Department to realize that a clear Federal standard is required in order to adjudicate borrower defense claims in a fair and equitable manner. The Department has also heard concerns during the process about the Department's statutory authority to adjudicate these claims in an affirmative posture and about whether the process for adjudicating these claims appropriately balances the competing interests of borrowers, institutions, and taxpayers.

Among other issues enumerated throughout this document, the Department is concerned that a process that allows for borrowers to submit affirmative claims, where there are minimal consequences for submitting an unjustified claim, could potentially create improper incentives for borrowers with unsubstantiated allegations against schools to seek loan discharges. For example, a borrower may attempt to seek loan forgiveness simply because he or she is dissatisfied with the education received or with his or her ability to get a particular job, rather than as a result of a misrepresentation by the institution. This situation could easily increase the burden on the Department of identifying legitimate claims among those that do not meet the defense to repayment standard. And with nothing to lose by submitting a claim, a borrower could be tempted to submit a claim whether or not he or she has been harmed. The Department does not have sufficient information to determine the extent of this potential incentive effect. As of January 2018, it had received 138,989 claims, of which 23 percent had been processed, and only 2 percent of the processed claims were associated with schools other than Corinthian and ITT, but that targeted rather than random sample is insufficiently representative to support conclusions on the issue at this point.

In any case, an influx of affirmative claims could itself cause harm to borrowers. For example, even if the Department can accurately distinguish between genuine and frivolous claims, the time it takes to do so may prolong the time it takes to provide relief to deserving borrowers. And borrowers not entitled to relief may find themselves worse off if they receive a forbearance while the claim is being processed, because interest would accrue and increase the amount the borrower would be required to repay when the loan reenters repayment.

In addition, the Department is concerned that several features of the 2016 final regulations might have put the Department in the untenable position of forgiving billions of dollars of Federal student loans based on potentially unfounded accusations. Specifically, those regulations would allow the Department to afford relief to borrowers without providing an opportunity for institutions to adequately tell their side of the story. And they would allow the Department to afford relief to entire groups of borrowers, including those who did not apply for relief or who were potentially not harmed by the institution.

However, despite these concerns, the Department is considering the continuation of its current practice of accepting affirmative claims from borrowers not in a collections status. A policy that limits borrower defense eligibility to defensive claims may have the unintended effect of treating borrowers harmed by a misrepresentation who default on their loans better than other defrauded borrowers who stay out of default by responsibly enrolling in income-driven repayment plans and making payments on their loan.

In addition, lessons learned from the recent mortgage crisis raise concerns that limiting borrower defense eligibility to defensive claims could lead some relief-seeking borrowers to strategically default. Researchers observed similar strategic behavior by homeowners in response to a 2008 mortgage modification program offered by a large financial institution to borrowers who were at least sixty days delinquent.[2] The study found that the program's structure, which relied on the borrower's repayment status, yielded a thirteen percent increase in the probability of that financial institution's borrowers rolling over from current to delinquent status—evidence of strategic behavior by borrowers aiming to take advantage of mortgage modifications. A

---

[2] *http://www.nber.org/papers/w17065.pdf.*

similar behavioral response from relief-seeking borrowers choosing to enter default could result in a range of troubling unintended consequences, including damage to borrower credit scores, increased default collection costs for taxpayers, and increases to institutional cohort default rates.

The Department is trying very carefully to balance relief for borrowers who have been harmed by acts of institutional wrongdoing, with its obligation to the taxpayer to provide reliable stewardship of Federal dollars. With more than a trillion dollars in outstanding student loans, the Department must uphold its fiduciary responsibilities and exercise caution in forgiving student loans to ensure that it does not create an existential threat to a program that lacks typical credit and underwriting standards.

With so much at stake for all parties, it seems reasonable that consumer complaints should continue to be adjudicated through existing legal channels that put experienced judges or arbitrators in the position of weighing the evidence and rendering an impartial decision. Significant reputational damage could be done to an institution from an affirmative borrower defense claim long before an institution is given an opportunity to contest that claim in a recoupment proceeding. Such damage could weaken or even force institutions to close, regardless of the truth, extent, or other circumstances surrounding the unverified claims. And if the institution prevails in a recoupment proceeding, it is the taxpayer who is left responsible for the claims the Department approved in error.

These concerns have led the Department to reconsider and seek public comment on whether it should reaffirm the Department's original interpretation of the statute, which provided borrowers an opportunity to raise defenses to the repayment of Direct Loans only in response to collection actions by the Department. The Department is interested in comments about its statutory authority to consider defenses to the repayment of Direct Loans in an affirmative posture, and about the risks and benefits of doing so.

However, the Department is also considering continuing to accept affirmative claims from borrowers not in a collections action. In either case, the Department would need to implement provisions that would protect institutions and taxpayers against frivolous claims. Our initial review of pending claims suggests that some borrowers may believe that the process allows for a discharge based on a borrower's dissatisfaction with the education he or she received or the outcomes he or she realized following enrollment, even in the absence of a misrepresentation on the part of the institution. That is not the case. As stated in the Master Promissory Note the borrower signs when initiating their first loan, the borrower is expected to repay the loan even if the borrower fails to complete the program or is dissatisfied with the institution or his or her outcomes. The Department seeks comments from the public regarding what types of provisions or requirements could be used to reduce frivolous claims while still ensuring a borrower a fair and meaningful opportunity to seek relief in the event of fraud.

The Department is also proposing to change its approach to a possible group adjudication of borrower defense claims. The 2016 final regulations would enable the Department to initiate affirmative claims on behalf of entire groups of borrowers, if the Secretary determines that there are common facts and claims that apply to the group. However, in this NPRM, the Department is proposing a uniform standard based on a misrepresentation made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth. As this proposed standard is dependent upon a fact-specific inquiry, the Department does not believe that the group process is appropriate to include in these proposed regulations. Further, a group discharge process could place an extraordinary burden on both the Department and the taxpayer, and the Department has reconsidered whether such a process appropriately balances the need to reduce burden on borrowers and the Department with the obligation to protect taxpayer funds. Because an institution can refuse to provide an official transcript for a borrower whose loan has been forgiven, group discharges could render some borrowers unable to verify their credentials or work in the field for which they trained and have enjoyed employment.

Moreover, the Department believes that a review of claims on an individual basis is necessary to ensure that it affords appropriate relief to borrowers who suffered harm from an alleged misrepresentation. Since publication of the 2016 final regulations, the Department has conducted further analyses of the tens of thousands of defense to repayment applications for Corinthian students that the Department has received to date. Those analyses have demonstrated that students enrolled at Corinthian who submitted defense to repayment applications may not all have been harmed to the same extent. An individual process would offer all borrowers fair and equal access to defense to repayment relief. And these proposed regulations would not eliminate the opportunity for Corinthian or other students with loans first disbursed prior to July 1, 2019, to seek debt relief under the 2015 interpretation of the regulation.

The Department proposes a new Federal standard to govern claims on loans made after July 1, 2019 based on an alleged misrepresentation. Under that standard, a borrower may assert as a defense to repayment an eligible institution's misrepresentation—that is, a statement, act, or omission by the school to the borrower that is (i) false, misleading, or deceptive, (ii) made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth, and (iii) directly and clearly related to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was made. To relate to the "provision of educational services," a misrepresentation must relate to the borrower's program of study. Such misrepresentations can relate, for example, to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.

The proposed standard for a borrower defense discharge differs from the standard selected in the 2016 final regulations, which was based on the Department's authority during enforcement actions. The 2016 final regulations adopted the misrepresentation standard at 34 CFR 668.71, and provided that defenses to repayment may additionally be based upon breaches of contract and certain types of judgments. The proposed standard would not provide for a defense to repayment based on such breaches of contract or other judgments. Instead, such breaches or judgments may be considered as evidence of a misrepresentation, to the extent they bear on an act or omission related to the educational services provided. The Department believes this approach will assist it to quickly and fairly review each and every application and provide equitable relief to borrowers who were harmed.

The Department's proposed standard also does not distinguish between the types of institutions that committed the misrepresentation. Appendix A of the 2016 final regulations, by contrast, took the position that a student who attended a selective, non-profit institution would

not receive debt relief even if the institution committed an act that would otherwise entitle the borrower a defense to repayment because, in the opinion of the Department, the education received was valuable despite the misrepresentation. We cannot adequately support assumptions about the inherent quality of any institution, including a selective non-profit institution. The Department accordingly does not propose to maintain this position.

The Department does propose to maintain the standard of evidence or proof required to make a successful claim that was included in the 2016 final regulations—a preponderance of the evidence. The Department believes that this standard will allow claims to be asserted and handled in a manner that is genuinely fair to students, taxpayers, and institutions, especially since a borrower in collections could have left the institution many years prior to making a claim, which would make it exceedingly difficult to meet a higher evidentiary standards. However, if the Department chooses to continue to accept affirmative claims, where barriers to submitting such claims are very low and there are no penalties for a borrower who submits an unjustified claim, the Department believes that a higher evidentiary standard would be appropriate. The Department seeks comments from the public about whether or not a clear and convincing evidence standard would be appropriate if the Department chooses to continue to accept affirmative claims and, if so, whether that clear and convincing standard should apply solely to affirmative claims or to both affirmative and defensive claims.

Finally, the Department proposes to limit the period of time during which the Secretary may recoup funds discharged under these regulations. Specifically, for loans disbursed on or after July 1, 2019, the Secretary would have five years from the date of the final determination on a borrower's defense to repayment application to initiate a proceeding to recover from the school the amount of the losses incurred by the Secretary on the discharged loans.

In addition to the changes to the borrower defense regulations discussed above, we seek in this NPRM to strengthen the Department's ability to protect the Federal taxpayer from the consequences of a school's precipitous closure by amending the Department's financial responsibility regulations. The proposed regulations identify actions or events that the Secretary may consider in determining whether a school is financially responsible, provide that the

Secretary may accept other types of surety or financial protection in lieu of letters of credit, clarify that the Department may impose a limitation on a school by changing a school's participation status from "fully certified" to "provisionally certified", and update the Department's regulations as to initial and final decisions that may be made by a hearing official in a fine, limitation, suspension, or termination proceeding to incorporate the proposed alternate means of financial protection to the Department. These proposed regulations balance the need for consumer protection, regulatory enforcement, and fairness to schools. They seek to hold schools accountable, provide prospective and continuing students with information necessary to make informed choices, and mitigate actions that pose an existential threat to institutions. A school's precipitous closure—as opposed to a well-planned, accreditor approved teach-out—puts students, borrowers, and taxpayers at unnecessary risk.

Further, through these proposed regulations, the Department seeks to encourage schools that are closing to go through an orderly closure, which includes offering appropriate teach-outs to their students. Since 2015, precipitous closures have led to large numbers of defense to repayment and closed school discharge applications. We believe that closing schools should be encouraged to offer accreditor-approved and, if applicable, State authorizer-approved teach-out plans. Such plans allow students the reasonable opportunity to complete their academic programs, either at another location after the school has closed or through an orderly wind-down process before the school officially closes.

We also propose changes to the Department's current false certification regulations. The Department believes that in cases when the borrower is unable to obtain an official transcript or diploma from the high school, postsecondary institutions should be able to rely on an attestation from a borrower that the borrower earned a high school diploma since the Department relies on a similar attestation in processing a student's Free Application for Federal Student Aid (FAFSA). This policy change provides assurances to students that they will have a reasonable opportunity to pursue postsecondary education when they cannot obtain an official transcript or diploma, and to institutions that they will not face significant liabilities years later if a student's status cannot be verified. Therefore, we are proposing

regulatory language that when a borrower provides an institution an attestation of his or her high school graduation status for purposes of admission to the institution, the borrower may not subsequently qualify for a false certification discharge based on not having a high school diploma.

We do not propose to adopt the changes relating to pre-dispute arbitration agreements and class action waivers that are in the 2016 final regulations. In those regulations, the Department took the position that the HEA gives the Department broad authority to impose conditions on schools that wish to participate in a Federal benefit program and that regulation of the use of pre-dispute arbitration agreements and class action waivers was necessary to "protect the interests of the United States and promote the purposes" of the Direct Loan Program under Section 454(a)(6) of the HEA, 20 U.S.C. 1087d(a)(6). We continue to recognize, as explained in the preamble to the 2016 final regulations, that pre-dispute arbitration agreements and class action waivers, in some circumstances, may not be well understood by consumers and may not facilitate the Department's awareness of potential issues faced by students at a school. However, in re-weighing all applicable factors, including the current legal landscape, we have determined that the Department should take a position more in line with the benefits of arbitration and the strong Federal policy favoring it.

Several potential benefits of arbitration are relevant here. Arbitration is often a more efficient and less adversarial means of dispute resolution than time-consuming and expensive litigation that may result in borrowers waiting years to obtain a fair hearing and any relief. Arbitration may also allow borrowers to obtain greater relief than they would in a consumer class action case where attorneys often benefit most. Moreover, arbitration may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees. Arbitration also eases burdens on the overtaxed U.S. court system.

For all of these reasons, the Department has decided that the 2016 final regulations' provisions on class action waivers and pre-dispute arbitration should not be included in these proposed regulations. As stated above, we believe that borrower defense to repayment should be a last resort for borrowers. Arbitration is one means of dispute resolution through which borrowers may be able to obtain relief without filing a defense to repayment

with the Department. The Department does not propose to prevent that means. But because pre-dispute arbitration agreements or class-action waivers may limit the availability of certain alternative means of dispute resolution, we propose changes that would provide borrowers with a better understanding of the dispute resolution processes available to them when they enroll at a school.

The proposed regulations also update the appendices to subpart L of 34 CFR part 668 to account for changes in accounting standards and terminology.

*Incorporation by Reference*

In proposed § 668.175(d) with respect to the zone alternative, we reference the following accounting standards: FASB ASC 850, Accounting Standards Update (ASU) 2015–01, and ASC 225. FASB ASC 850 addresses disclosures of transactions between related parties. These disclosures are considered to be related party transactions even though they may not be given accounting recognition. While not providing accounting or measurement guidance for such transactions, FASB ASC 850 requires their disclosure nonetheless.

Accounting Standards Update (ASU) No. 2015–01 addresses extraordinary and unusual items, to simplify income statement classification by removing the concept of extraordinary items from United States generally accepted accounting principles (U.S. GAAP).

ASC 225 provides general income statement guidance. Specifically, it addresses the classification and resulting presentation and disclosure of extraordinary events and transactions. It also addresses the presentation and disclosure of unusual and infrequently occurring items that do not meet the extraordinary criteria, and speaks to business interruption insurance. The types of costs and losses covered by business interruption insurance typically include items such as gross margin that was lost or not earned due to the suspension of normal operations.

These items are accessible to the public on the Financial Accounting Standards Board (FASB) website, *www.fasb.org.*

Summary of the Major Provisions of This Regulatory Action:

For the Direct Loan Program, we propose new regulations governing borrower defenses that would—

• Establish a new Federal standard for borrower defenses to repayment submitted by borrowers with loans first disbursed on or after July 1, 2019;

• Establish a process for the assertion and resolution of borrower defenses to

repayment for loans first disbursed on or after July 1, 2019;

• Provide schools and borrowers with opportunities to provide evidence and arguments when a defense to repayment application has been filed and to provide an opportunity for each to respond to the other's submitted evidence;

• Require a borrower to sign an attestation to ensure that financial harm is not the result of the borrower's workplace performance, disqualification for a job for reasons unrelated to the education received, a personal decision to work less than full-time or not at all, or the borrower's decision to change careers.

• Establish a time limit for the Secretary to initiate an action to collect from the responsible school the amount of any loans first disbursed on or after July 1, 2019, that are subject to a successful borrower defense to repayment discharge for which the school is liable;

• Provide for remedial actions the Secretary may take to collect from the responsible school the amount of any loans subject to a successful borrower defense to repayment discharge for which the school is liable; and

• Establish institutional responsibility and financial liability for losses incurred by the Secretary for repayment of loan amounts discharged by the Secretary on the basis of a borrower defense to repayment discharge.

The proposed regulations would also revise the Student Assistance General Provisions regulations to—

• Provide for schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to make a plain language disclosure of those requirements to prospective and enrolled students and place that disclosure on its website where information regarding admissions and tuition and fees is presented; and

• Provide for schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to include information in the borrower's entrance counseling regarding the school's internal dispute and arbitration processes.

• Amend the financial responsibility provisions to establish the conditions or events that have or may have an adverse material effect on an institution's financial condition and which warrant financial protection for the Department, update the definitions of terms used to calculate an institution's composite score to conform with changes in

accounting standards but provide a six year phase-in to enable the Department adequate time to update the Composite Score regulations accordingly through future negotiated rulemaking, and expand the types of financial protection acceptable to the Secretary.

The proposed regulations would also—

• Revise the Perkins Loan, FFEL, and Direct Loan programs' closed school discharge regulations to extend the window for a borrower to qualify for a closed school discharge to 180 days;

• Revise the Perkins Loan, FFEL, and Direct Loan programs' closed school discharge regulations to specify that if a closing school provides an opportunity to complete the program of study approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, the borrower would not qualify for a closed school discharge;

• Modify the conditions under which a Direct Loan borrower may qualify for a false certification discharge by specifying that, in cases when the borrower could not reasonably provide the school an official transcript or diploma from the borrower's high school, but provided an attestation to the school that the borrower was a high school graduate, the borrower would not qualify for a false certification discharge based on not having a high school diploma;

• Prohibit guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency;

• Prohibit guaranty agencies from capitalizing interest on a loan that is sold following the completion of loan rehabilitation;

• Reflect the Department's policy regarding the impact that a discharge of a Direct Subsidized Loan has on the 150 Percent Direct Subsidized Loan Limit; and

• Update composite score calculations to reflect recent changes in FASB accounting standards and provide for a six year phase-in process to provide the Department sufficient time to update the Composite Score regulations accordingly through negotiated rulemaking.

In addition, for the reasons set forth below, we propose to withdraw (*i.e.,* rescind) specified provisions of the final regulations we published on November 1, 2016 (81 FR 75926) (the 2016 final regulations) that were delayed until July 1, 2019, pertaining to borrower defenses to repayment and related issues.

Please refer to the *Summary of Proposed Changes* section of this notice of proposed rulemaking (NPRM) for more details on the major provisions contained in this NPRM.

*Costs and Benefits:* As further detailed in the *Regulatory Impact Analysis,* the benefits of the proposed regulations include: (1) An updated and clarified process and the creation of a Federal standard to streamline the administration of defense to repayment applications; (2) improved financial protections for the Federal government and taxpayers by requiring institutions to incur the losses associated with a successful defense to repayment application and reducing the likelihood of taxpayers incurring costs related to paying claims submitted by students who were not harmed; (3) additional information to help students, prospective students, and their families make educated decisions based on information about a school's mandatory arbitration or class action waiver requirements and to effectively use arbitration when necessary; (4) an extended window for a borrower to qualify for a closed school discharge and revisions incentivizing completion of educational programs; (5) revised conditions under which a Direct Loan borrower may qualify for a false certification discharge to ensure that students who are unable to obtain a high school transcript have an opportunity to participate in postsecondary education and that a student's intentional misrepresentation of his or her high school graduation status cannot then be used to justify a false certification discharge; (6) restrictions on guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency, and from capitalizing interest on a loan that is sold following the completion of loan rehabilitation; (7) recalculating subsidized usage periods, as appropriate, when a borrower has received a loan discharge; and (8) updating the calculation of composite scores to reflect changes in FASB standards, but also providing a six-year phase in to provide time for the Department to update its composite score regulations through future negotiated rulemaking.

Costs include the paperwork burden associated with the required reporting and disclosures to ensure compliance with the proposed regulations, the cost to affected schools of providing financial protection, and the cost to taxpayers of borrower defense claims that are not reimbursed by schools.

There may also be costs to borrowers who may be reluctant to go into default, even if they have a claim that would result in loan relief or partial loan relief, and therefore do not benefit from that loan relief. There may also be costs to borrowers who use the legal system to seek damages from an institution rather than relying on the government to adjudicate consumer complaints.

*Invitation to Comment:* We invite you to submit comments regarding these proposed regulations.

To ensure that your comments have maximum effect in developing the final regulations, we urge you to identify clearly the specific section or sections of the proposed regulations that each of your comments addresses, and provide relevant information and data whenever possible, even when there is no specific solicitation of data and other supporting materials in the request for comment. We also urge you to arrange your comments in the same order as the proposed regulations. Please do not submit comments that are outside the scope of the specific proposals in this NPRM, as we are not required to respond to such comments.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about the proposed regulations by accessing *Regulations.gov.* You may also inspect the comments in person at 400 Maryland Ave. SW, Washington, DC, between 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday of each week except Federal holidays. To schedule a time to inspect comments, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the proposed regulations. To schedule an appointment for this type of accommodation or auxiliary aid, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT.**

## Background

The Secretary proposes to amend parts 668, 674, 682, and 685 of title 34 of the Code of Federal Regulations (CFR). The regulations in 34 CFR part 668 pertain to Student Assistance General Provisions. The regulations in 34 CFR part 674 pertain to the Perkins Loan Program. The regulations in 34 CFR part 682 pertain to the FFEL Program. The regulations in 34 CFR part 685 pertain to the Direct Loan Program.

We are proposing these amendments to: (1) Specify that the standard used to identify an act or omission of a school that provides the basis for a borrower defense to repayment discharge will depend on when the Direct Loan was first disbursed; (2) establish a new Federal standard that the Department will use to determine whether a school's act or omission constitutes a basis for a borrower defense to repayment discharge for loans disbursed on or after July 1, 2019; (3) provide an opportunity for an institution to know that a defense to repayment application has been lodged against it and to respond to claims made in that application; (4) establish the procedures to be used by a borrower to initiate a borrower defense to repayment application for loans first disbursed on or after July 1, 2019; (5) establish a time limit for the Secretary to initiate action to collect from the responsible school the amount of any loans first disbursed on or after July 1, 2019 that are subject to an approved borrower defense to repayment discharge; (6) establish the procedures that the Department would use to determine the liability of a school for the amount of any loan discharges and reimbursement of loan payments resulting from successful borrower defenses to repayment; (7) establish the conditions or events upon which an institution is or may be required to provide to the Department financial protection, such as a letter of credit, to help protect the Federal government and taxpayers, against potential institutional liabilities; (8) institute requirements to ensure borrowers are informed and educated about pre-dispute arbitration agreements and class action waivers that students are required to sign by the school as a condition of enrollment; (9) revise the closed school discharge regulations to extend the window for a borrower to qualify for a closed school discharge and specify that if a closing school provides a borrower an opportunity to complete his or her academic program through a teach-out plan approved by the school's accrediting agency and, if applicable, the school's State

authorizing agency, the borrower would not qualify for a closed school discharge; (10) amend the eligibility criteria for the false certification loan discharge by specifying that, in cases when a borrower could not provide the school an official high school transcript or diploma but provided an attestation that the borrower was a high school graduate, the borrower would not qualify for a false certification discharge based on not having a high school diploma; (11) clarify the conditions under which FFEL Program loan holders may capitalize the interest due on a loan to be consistent with the Department's practice for loans it holds; (12) reflect the conditions under which the discharge of a Direct Subsidized Loan will lead to the elimination or recalculation of a Subsidized Usage Period under the 150 Percent Direct Subsidized Loan Limit or the restoration of interest subsidy; and (13) prohibit guaranty agencies from charging collection costs if a borrower enters into a repayment agreement within 60 days of the default notice.

**Public Participation**

On June 16, 2017, we published a notification in the **Federal Register** (82 FR 27640) announcing our intent to establish a negotiated rulemaking committee under section 492 of the HEA to revise the regulations on borrower defenses to repayment of Federal student loans and other matters, and on the authority of guaranty agencies in the FFEL Program to charge collection costs to defaulted borrowers under 34 CFR 682.410(b)(6). We also announced two public hearings at which interested parties could comment on the topics suggested by the Department and suggest additional topics for consideration for action by the negotiated rulemaking committee. The hearings were held on—

July 10, 2017, in Washington, DC; and July 12, 2017, in Dallas, TX.

Transcripts from the public hearings are available at *www2.ed.gov/policy/ highered/reg/hearulemaking/2017/ index.html.*

We also invited parties unable to attend a public hearing to submit written comments on the proposed topics and to submit other topics for consideration. Written comments submitted in response to the June 16, 2017, **Federal Register** notification may be viewed through the Federal eRulemaking Portal at *www.regulations.gov,* within docket ID ED–2017–OPE–0076. Instructions for finding comments are also available on

the site under ''How to Use *Regulations.gov''* in the Help section.

On August 30, 2017, we published a notification in the **Federal Register** (82 FR 41194) requesting nominations for negotiators to serve on the negotiated rulemaking committee and setting a schedule for committee meetings.

**Negotiated Rulemaking**

Section 492 of the HEA, 20 U.S.C. 1098a, requires the Secretary to obtain public involvement in the development of proposed regulations affecting programs authorized by title IV of the HEA. After obtaining extensive input and recommendations from the public, including individuals and representatives of groups involved in the title IV, HEA programs, the Secretary in most cases must subject the proposed regulations to a negotiated rulemaking process. If negotiators reach consensus on the proposed regulations, the Department agrees to publish without alteration a defined group of regulations on which the negotiators reached consensus unless the Secretary reopens the process or provides a written explanation to the participants stating why the Secretary has decided to depart from the agreement reached during negotiations. Further information on the negotiated rulemaking process can be found at: *www2.ed.gov/policy/ highered/reg/hearulemaking/hea08/neg- reg-faq.html.*

On August 30, 2017, the Department published a notification in the **Federal Register** (82 FR 41194) announcing its intention to establish two negotiated rulemaking committees and a subcommittee to prepare proposed regulations governing the Federal Student Aid programs authorized under title IV of the HEA. One negotiated rulemaking committee was established to propose regulations relating to gainful employment and the other to propose regulations pertaining to borrower defenses to repayment of Federal student loans, the definition of misrepresentation as it pertains to borrower defense, the program participation agreement for schools participating in the title IV programs, closed school and false certification loan discharges, financial responsibility and administrative capability, arbitration and class action lawsuits, revisions to regulations that will address whether and to what extent guaranty agencies may charge collection costs under 34 CFR 682.410(b)(6) to a defaulted borrower who enters into a loan rehabilitation or other repayment agreement within 60 days of being informed that the guaranty agency has paid a claim on the loan.

A subcommittee, which was composed of individuals with expertise in the applicable financial accounting and reporting standards set by the Financial Accounting Standards Board (FASB), was established to discuss whether and how the (FASB's) recent changes to the accounting standards for financial reporting affected financial reporting requirements for schools and to recommend appropriate regulatory changes to the negotiated rulemaking committee.

The notification set forth a schedule for the committee meetings and requested nominations for individual negotiators to serve on the negotiating committee and the subcommittee. The Department sought negotiators to represent the following groups: Students and former students; consumer advocacy organizations; legal assistance organizations that represent students and former students; groups representing U.S. military service members or veteran Federal student loan borrowers; financial aid administrators at postsecondary schools; general counsels/attorneys and compliance officers at postsecondary schools; chief financial officers (CFOs) and experienced business officers at postsecondary schools; State attorneys general and other appropriate State officials; State higher education executive officers; institutions of higher education eligible to receive Federal assistance under title III, parts A, B, and F, and title V of the HEA, which include Historically Black Colleges and Universities, Hispanic-Serving Institutions, American Indian Tribally Controlled Colleges and Universities, Alaska Native and Native Hawaiian-Serving Institutions, Predominantly Black Institutions, and other institutions with a substantial enrollment of needy students as defined in title III of the HEA; two-year public institutions of higher education; four-year public institutions of higher education; private, nonprofit institutions of higher education; private, proprietary institutions of higher education; FFEL Program lenders and loan servicers; FFEL Program guaranty agencies and guaranty agency servicers (including collection agencies); and accrediting agencies. The Department sought subcommittee members to represent the following constituencies who also have expertise in the applicable financial accounting and reporting standards set by the Financial Accounting Standards Board (FASB): Private, nonprofit institutions of higher education, with knowledge of the accounting standards and title IV financial responsibility

requirements for the private, nonprofit sector; private, proprietary institutions of higher education, with knowledge of the accounting standards and title IV financial responsibility requirements for the proprietary sector; accrediting agencies; chief financial officers (to include experienced business officers and bursars) at postsecondary institutions; associations or organizations that provide accounting guidance to auditors and institutions; certified public accountants or firms who conduct financial statement audits of title IV participating institutions; and FASB. The Department considered the nominations submitted by the public and chose negotiators who would represent the various constituencies.

The negotiating committee included the following members: Joseline Garcia, United States Students Association, and Stevaughn Bush, (alternate) Student, Howard University School of Law, representing students and former students.

Ashley Harrington, Center for Responsible Lending, and Suzanne Martindale (alternate), Consumers Union, representing consumer advocacy organizations.

Abby Shafroth, National Consumer Law Center, and Juliana Fredman, (alternate) Bay Area Legal Aid, representing legal assistance organizations that represent students.

Will Hubbard, Student Veterans of America, and Walter Ochinko (alternate), Veterans Education Success, representing U.S. military service members or veterans.

Valerie Sharp, Evangel University, and Kimberly Brown (alternate), Des Moines University, representing financial aid administrators.

Aaron Lacey, Partner, Thomas Coburn LLP, and Bryan Black, (alternate), Attorney, representing General Counsels/attorneys and compliance officers.

Kelli Hudson Perry, Rensselaer Polytechnic Institute, and Dawnelle Robinson (alternate), Roanoke Chowan Community College, representing CFOs and business officers.

John Ellis, State of Texas Office of the Attorney General, and Evan Daniels (alternate), Office of the Arizona Attorney General, representing State attorneys general and other appropriate State officials.

Robert Flanigan, Jr., Spelman College, and Lodriguez Murray (alternate), United Negro College Fund, representing minority serving institutions.

Dan Madzelan, American Council on Education, and Barmak Nassirian (alternate), American Association of State Colleges and Universities, representing two-year public institutions.

Alyssa Dobson, Slippery Rock University, and Kay Lewis (alternate), University of Washington, representing four-year public institutions.

Ashley Ann Reich, Liberty University, and Gregory Jones (alternate), Compass Rose Foundation, representing private, non-profit institutions.

Mike Busada, Ayers Career College, and Chris DeLuca (alternate), DeLuca Law LLC, representing private, proprietary institutions with enrollment of 450 students or fewer.

Michael Bottrill, SAE Institute North America, and Linda Rawles, (alternate) Rawles Law, representing private, proprietary institutions with enrollment of 451 students or more.

Wanda Hall, Edfinancial Services, and Colleen Slattery (alternate), MOHELA, representing FFEL Program lenders and loan servicers.

Jaye O'Connell, Vermont Student Assistance Corporation, and Sheldon Repp (alternate), National Council of Higher Education Resources, representing FFEL Program guaranty agencies and guaranty agency servicers.

Dr. Michale McComis, Accrediting Commission of Career Schools and Colleges, and Karen Peterson Solinski, (alternate), Higher Learning Commission, representing accreditors.

Annmarie Weisman, U.S. Department of Education, representing the Department.

The subcommittee included the following members:

John Palmucci, Maryland University of Integrative Health, representing private, non-profit institutions.

Jonathan Tarnow, Drinker Biddle & Reath LLP, representing private, proprietary institutions.

Dr. Julianne Marie Malveaux, Economic Education, and formerly of Bennett College, representing minority serving institutions.

Dale Larson, Dallas Theological Seminary, representing Accrediting agencies.

Dawnelle Robinson, Shaw University, representing CFOs, business officers, and bursars.

Susan M. Menditto, National Association of College and University Business Officers, representing organizations that provide accounting guidance to auditors and institutions.

Ronald E. Salluzzo, Attain, representing Certified public accountants or firms who conduct compliance audits and/or prepare financial statements of participating Title IV institutions.

Jeffrey Mechanick, the Financial Accounting Standards Board (FASB), representing FASB.

The negotiated rulemaking committee met to develop proposed regulations on November 13–15, 2017, January 8–11, 2018, and February 12–15, 2018. The subcommittee met in person on November 16–17, 2017, January 4–5, 2018, and by telephone on January 30, 2018.

At its first meeting, the negotiating committee reached agreement on its protocols and proposed agenda. The protocols provided, among other things, that the committee would operate by consensus. Consensus means that there must be no dissent by any member in order for the committee to have reached agreement. Under the protocols, if the committee reached a final consensus on all issues, the Department would use the consensus-based language in its proposed regulations. Furthermore, the Department would not alter the consensus-based language of its proposed regulations unless the Department reopened the negotiated rulemaking process or provided a written explanation to the committee members regarding why it decided to depart from that language.

During the first meeting, the negotiating committee agreed to negotiate an agenda of eight issues related to student financial aid. These eight issues were: Borrower defense to repayment standard; the process for applying for and considering borrower defense claims; financial responsibility and administrative capability; pre-dispute arbitration agreements, class action waivers, and internal dispute processes; closed school discharges; false certification discharges; guaranty agency collection fees; and subsidized usage period recalculations.

During committee meetings, the negotiators reviewed and discussed the Department's drafts of regulatory language and the committee members' alternative language and suggestions. At the final meeting on February 15, 2018, the committee did not reach consensus on the Department's proposed regulations. For that reason, and according to the committee's protocols, all parties who participated in or who were represented in the negotiated rulemaking, in addition to all members of the public, may comment freely on the proposed regulations. For more information on the negotiated rulemaking sessions, please visit: *www2.ed.gov/policy/highered/reg/hearulemaking/2017/borrowerdefense.html.* Transcripts and audio recordings of the negotiated rulemaking session are also available at:

*www2.ed.gov/policy/highered/reg/hearulemaking/2017/borrowerdefense.html.*

While transcripts have been made available by the Department to aid public understanding of the negotiated rulemaking proceedings, the transcripts have not been vetted or reviewed for accuracy or completeness and should not be considered as the Department's official transcription of the negotiated rulemaking proceedings.

## Summary of Proposed Changes

The proposed regulations would—

• Rescind specified provisions of the 2016 final regulations, which have not yet become effective.

• Amend § 668.41 to require schools that require students to accept pre-dispute arbitration agreements or class action waivers as a condition of enrollment to disclose that information to students, prospective students, and the public in an easily accessible format;

• Amend § 668.91 to provide that the Secretary may accept other types of surety or financial protection in addition to letters of credit and that a hearing official must uphold the amount of financial protection required by the Secretary unless certain conditions are met;

• Amend § 668.94 to provide that a limitation on an institution's participation in the Title IV programs may include changing the institution's status from fully certified to provisionally certified;

• Amend § 668.171 to establish the actions or events that have or may have an adverse material effect on an institution's financial condition and revise appendices A and B of the financial responsibility regulations to conform with changes in accounting standards;

• Amend § 668.172 to address changes to the accounting standards regarding leases;

• Amend § 668.175 to expand the types of financial protection acceptable to the Secretary;

• Amend §§ 674.33, 682.402 and 685.214 to extend the window for a borrower to qualify for a closed school discharge and to specify that if a closing school provided a borrower the reasonable opportunity to complete his or her academic program through an orderly school closure or a teach-out plan and that is approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, the borrower will not qualify for a closed school discharge;

• Amend §§ 682.202, 682.405, and 682.410 to prohibit guaranty agencies

and FFEL Program lenders from capitalizing the outstanding interest on a FFEL loan when the borrower rehabilitates a defaulted FFEL loan;

• Amend § 682.405 to prohibit guaranty agencies and FFEL Program lenders from charging collections costs when a borrower enters into a repayment agreement within 60 days of the notice of default;

• Amend § 685.200 to specify that a loan discharge based on school closure, false certification, an unpaid refund, or a defense to repayment will lead to the elimination or recalculation of the subsidized usage period that is associated with the loan or loans discharged;

• Amend § 685.206 to clarify that existing regulations with regard to borrower defenses to repayment apply to loans first disbursed prior to July 1, 2019; to establish a Federal standard for deciding borrower defenses to repayment pertaining to a loan first disbursed on or after July 1, 2019; to establish the procedures that the Department would use to determine the liability of a school for the amount of any loan discharges resulting from borrower defense claims pertaining to loans first disbursed on or after July 1, 2019; and to provide that the Secretary may initiate a proceeding to recover from an institution the amount of any loan discharged by the Secretary based on a defense to repayment within five years of the date of the final decision to discharge the loan.

• Amend § 685.212 to add borrower defense to repayment discharges to the discharge provisions listed in this section.

• Amend § 685.215 to provide that in cases when a Direct Loan borrower could not obtain an official transcript or diploma from high school and instead provided an attestation to the institution that the borrower was a high school graduate, the borrower will not qualify for a false certification discharge based on not having a high school diploma.

• Amend § 685.300 to require institutions to accept responsibility for the repayment of amounts discharged by the Secretary pursuant to the borrower defense to repayment, closed school discharge, false certification discharge, and unpaid refund discharge regulations.

• Amend § 685.304 to require institutions that use pre-dispute arbitration agreements or class action waivers to provide written, plain language descriptions of those agreements and to provide the student borrower with written information on how to use the school's internal dispute resolution process.

• Amend § 685.308 to require the repayment of funds and the purchase of loans by the school if the Secretary determines that the school is liable as a result of a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to §§ 685.206, 685.214, and 685.216.

## Significant Proposed Regulations

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

In 2016, the Department conducted negotiated rulemaking and published the 2016 final regulations on the topic of borrower defenses to repayment and related issues, but those regulations have not yet gone into effect. On June 16, 2017, the Department published in the **Federal Register** a notification of the partial delay of effective dates under section 705 of the Administrative Procedure Act (5 U.S.C. 705) (82 FR 27621) (705 Notification), for certain provisions of the final regulations until a legal challenge by the California Association of Private Postsecondary Schools is resolved. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos*, Civil Action No. 1:17-cv-00999 (D.D.C. May 24, 2017). Subsequently, we published an interim final rule (82 FR 49114), which gave notice that after the 705 notification delayed implementation past July 1, 2017, pursuant to the Department's interpretation of the master calendar requirement, the earliest the regulation could go into effect was July 1, 2018. Then, on February 14, 2018, following a notice of proposed rulemaking, the Department published a final rule establishing July 1, 2019, as the effective date of the 2016 final regulations (83 FR 6458).

We now propose rescission of the 2016 final regulations that we delayed through previous notification. In this preamble, we describe the proposed changes to the regulations based on the currently effective regulations and not the delayed provisions of the 2016 final regulations. In light of the withdrawal (*i.e.* rescission) of the delayed provisions of the 2016 final regulations, this approach is required under 1 CFR part 21, which provides that each agency that drafts regulations must do so as an amendment to the Code of Federal Regulations. The currently effective regulations, not the delayed provisions of the 2016 final regulations, are the provisions codified in the Code of Federal Regulations. Thus, we are

of an institution if the Secretary determines that the institution is not financially responsible under § 668.171 or § 668.175.

*Proposed Regulations:* The Secretary proposes to amend § 668.94 to clarify that a change in an institution's participation status from fully certified to provisionally certified to participate in a title IV, HEA program under § 668.13(c) is a type of limitation that may be the subject of a limitation proceeding under § 668.86.

*Reasons:* The proposed change to § 668.94 would clarify current policy and provide for a more complete set of limitations covered in § 668.94. The 2016 final regulations included this same change to this regulation (previously designated as § 668.93, see 81 FR 76072), and we propose it again here to seek comment on it in the context of our complete current proposal.

*Guaranty Agency (GA) Collection Fees (34 CFR 682.202(b), 682.405(b), and 682.410(b)(2) and (4))*

*Statute:* Section 428F(a) of the HEA provides that to complete a FFEL borrower's loan rehabilitation, the FFEL guaranty agency must sell the loan to a FFEL Program lender or assign the loan to the Secretary.

Section 428H(e)(2) of the HEA allows a FFEL Program lender to capitalize outstanding interest when the loan enters repayment, upon default, and upon the expiration of periods of deferment and forbearance, but does not specifically authorize the capitalization of interest when the borrower rehabilitates a defaulted loan.

*Current Regulations:* The current FFEL Program regulations in §§ 682.202, 682.405, and 682.410 permit FFEL Program lenders to capitalize interest when the borrower enters or resumes repayment and requires a guaranty agency to capitalize interest when it pays the FFEL Program lender's default claim. However, these regulations do not specifically address whether a guaranty agency may capitalize interest when the borrower has rehabilitated a defaulted FFEL Loan or whether a FFEL Program lender may capitalize interest when purchasing a rehabilitated FFEL Loan from a guaranty agency. In addition, the Department interprets these regulations to bar guaranty agencies from imposing collection costs when a borrower enters into a satisfactory repayment agreement within 60 days of the first notice of default sent to the borrower.

*Proposed Regulations:* The proposed revisions to §§ 682.202, 682.405, and 682.410 would provide that the only

time a guaranty agency may capitalize interest owed by the borrower is when it pays the FFEL Program lender's default claim. Therefore, the guaranty agency would not be allowed to capitalize interest when it sells a rehabilitated FFEL Loan.

Similarly, the proposed regulations would bar a FFEL Program lender from capitalizing outstanding interest when purchasing a rehabilitated FFEL Loan.

The proposed regulations would also provide that when a guaranty agency holds a defaulted FFEL Loan and the guaranty agency has suspended collection activity to give the borrower time to submit a closed school or false certification discharge application, interest capitalization is not permitted if collection on the loan resumes because the borrower does not return the appropriate form within the allotted timeframe.

Finally, the Department proposes to prohibit guaranty agencies from charging collection costs to borrowers who, within 60 days of receiving notice of default, enter into an acceptable repayment arrangement, including a loan rehabilitation plan.

*Reasons:* Recently, the Department became aware that some guaranty agencies and FFEL Program lenders were capitalizing interest when a borrower rehabilitates a loan, while others were not. In addition, some guaranty agencies were capitalizing interest when resuming collection on a defaulted FFEL Loan when a borrower had not submitted a closed school or false certification discharge within a specific timeframe. The Department does not believe that interest capitalization in either circumstance is appropriate, and the Department does not capitalize interest on loans that it holds in comparable circumstances.

Additionally, to encourage borrowers to enter into satisfactory repayment plans, the Department proposes that guaranty agencies may not assess collection costs to a borrower who enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement, within 60 days of receiving notice of default.

The negotiators did not object to any of these changes. In addition, the 2016 final regulations included the changes we propose in this NPRM regarding interest capitalization when a borrower rehabilitates a loan, as well as when a guaranty agency resumes collection on a defaulted FFEL Loan when a borrower had not submitted a closed school or false certification discharge within a specific timeframe. 81 FR 76079–80. We propose these changes again here to

seek comment on them in the context of our complete current proposal.

The changes we propose regarding collection costs for borrowers who enter into an acceptable repayment arrangement, including a loan rehabilitation plan, within 60 days of receiving notice of default were not included in the 2016 final regulations. These changes are consistent with the interpretation and position that the Department previously took in Dear Colleague Letter (DCL) GE–15–14 (July 10, 2015). That DCL was withdrawn in order to allow for public comment on our interpretation, which we seek through this notification.

*Subsidized Usage Period and Interest Accrual (34 CFR 685.200(f))*

*Statute:* Section 455(q) of the HEA provides that a first-time borrower on or after July 1, 2013, is not eligible for additional Direct Subsidized Loans if the borrower has received Direct Subsidized Loans for a period that is equal to or greater than 150 percent of the length of the borrower's current program of study ("150 percent limit"). In addition, some borrowers who are not eligible for Direct Subsidized Loans because of the 150 percent limit become responsible for the interest that accrues on their loans when it would otherwise be paid by the government. The statute does not address what effect a discharge of a Direct Subsidized Loan has on the 150 percent limit. The statute also does not address whose responsibility it is to pay the outstanding interest on any remaining loans that have not been discharged, but which have previously lost eligibility for interest subsidy.

*Current Regulations:* Section 685.200(f)(4) provides two exceptions to the calculation of the period of time that counts against a borrower's 150 percent limit—the subsidized usage period— that can apply based on the borrower's enrollment status or loan amount. The regulations do not have an exception to the calculation of a subsidized usage period if the borrower receives a discharge of his or her Direct Subsidized Loan. They also do not address whose responsibility it is to pay the outstanding interest on any remaining loans that have not been discharged, but have previously lost eligibility for the interest subsidy based on the borrower's remaining eligibility period and enrollment.

*Proposed Regulations:* Proposed § 685.200(f)(4)(iii) would specify that a discharge based on a school closure, false certification, unpaid refund, or borrower defense will lead to the elimination, or recalculation, of the subsidized usage period that is

school's closure from the Secretary, the agency must—

(1) Notify all lenders participating in its program to mail a discharge application approved by the Secretary to all borrowers who may be eligible for a closed school discharge; and

(2) Review the records of loans that it holds, identify the loans made to any borrower (or student) who appears to have been enrolled at the school on the school closure date or who withdrew not more than 180 days prior to the closure date, and mail a discharge application to the borrower. The application informs the borrower of the procedures and eligibility criteria for obtaining a discharge.

\*   \*   \*   \*   \*

(F) If the guaranty agency determines that a borrower identified in paragraph (d)(6)(ii)(C) or (D) of this section does not qualify for a discharge, the agency must notify the borrower in writing of that determination, the reasons for the decision, and how the borrower may ask the Secretary to review the decision within 30 days after the date the agency—

\*   \*   \*   \*   \*

(G) Upon receipt of a closed school discharge claim filed by a lender, the agency must review the borrower's completed application in light of the information available from the records of the agency and from other sources, including other guaranty agencies, state authorities, and cognizant accrediting associations, and must take the following actions—

(1) If the agency determines that the borrower satisfies the requirements for discharge under paragraph (d) of this section, it must pay the claim in accordance with § 682.402(h) not later than 90 days after the agency received the claim; or

(2) If the agency determines that the borrower does not qualify for a discharge, the agency must, not later than 90 days after the agency received the claim, return the claim to the lender with an explanation of the reasons for its determination.

(H) If a borrower fails to submit the completed application described in paragraph (d)(3) of this section within 60 days of being notified of that option, the lender or guaranty agency must resume collection and must be deemed to have exercised forbearance of payment of principal and interest from the date it suspended collection activity. The lender or guaranty agency may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period.

\*   \*   \*   \*   \*

(J)(1) Within 30 days after receiving the borrower's request for review of its decision that the borrower did not qualify for a discharge under paragraph (d)(6)(ii)(F) of this section, the agency must forward the borrower's discharge request and all relevant documentation to the Secretary.

(2) After reviewing the documents provided by the agency, the Secretary notifies the agency and the borrower of the decision on the borrower's application for a discharge. If the Secretary determines that the borrower is not eligible for a discharge under paragraph (d) of this section, within 30 days after being informed of the Secretary's decision, the agency must take the actions described in paragraph (d)(6)(ii)(H) of this section, as applicable.

(3) If the Secretary determines that the borrower meets the requirements for a discharge under paragraph (d) of this section, the agency must, within 30 days after being informed of the Secretary's decision, take the actions required under paragraphs (d)(6)(ii)(E) and (d)(6)(ii)(G)(1) of this section and the lender must take the actions described in paragraph (d)(7)(iv) of this section, as applicable.

\*   \*   \*   \*   \*

■ 15. Section 682.405 is amended by adding paragraph (b)(4)(ii) to read as follows:

### § 682.405   Loan rehabilitation agreement.

\*   \*   \*   \*   \*

(b) \* \* \*

(4) \* \* \*

(ii) The purchase of a rehabilitated loan is not considered a borrower's entry into repayment or resumption of repayment for the purposes of interest capitalization under § 682.202(b).

\*   \*   \*   \*   \*

■ 16. Section 682.410 is amended by revising paragraphs (b)(2) and (4) to read as follows:

### § 682.410   Fiscal, administrative, and enforcement requirements.

\*   \*   \*   \*   \*

(b) \* \* \*

(2) *Collection charges.* (i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim unless, within the 60-day period following the initial notice described in paragraph (b)(6)(ii) of this section, the borrower enters into an acceptable repayment agreement, including a

rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrower any collection costs.

(ii) An acceptable repayment agreement may include an agreement described in § 682.200(b) (Satisfactory repayment arrangement), § 682.405, or paragraph (b)(5)(ii)(D) of this section. An acceptable repayment agreement constitutes a repayment arrangement or agreement on repayment terms satisfactory to the guaranty agency, under this section.

(iii) The costs under this paragraph (b)(2) include, but are not limited to, all attorneys' fees, collection agency charges, and court costs. Except as provided in §§ 682.401(b)(18)(i) and 682.405(b)(1)(vi)(B), the amount charged a borrower must equal the lesser of—

(A) The amount the same borrower would be charged for the cost of collection under the formula in 34 CFR 30.60; or

(B) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

\*   \*   \*   \*   \*

(4) *Capitalization of unpaid interest.* The guaranty agency must capitalize any unpaid interest due on the loan at the time the agency pays a default claim to the lender, but must not capitalize any unpaid interest thereafter.

\*   \*   \*   \*   \*

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 17. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 18. Section 685.200 is amended by adding paragraphs (f)(3)(v) and (f)(4)(iii) to read as follows:

### § 685.200   Borrower eligibility.

\*   \*   \*   \*   \*

(f) \* \* \*

(3) \* \* \*

(v) A borrower who receives a closed school, false certification, unpaid refund, or defense to repayment discharge that results in a remaining eligibility period greater than zero is not responsible for the interest that accrues on a Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan unless the borrower once again becomes responsible for the interest that accrues on a previously received Direct Subsidized Loan or on the portion of a Direct Consolidation Loan that repaid a Direct Subsidized Loan, for the life of



August 30, 2018

Mr. Jean-Didier Gaina
U.S. Department of Education
400 Maryland Ave. SW
Mail Stop 294-20
Washington, DC 20202

Submitted electronically via www.regulations.gov

RE: Docket ID ED-2018-OPE-0027

Dear Mr. Giana:

This letter is in response to the request for comments on the Notice of Proposed Rulemaking (NRPM) published in the *Federal Register* (Volume 83, Number 147) on July 31, 2018.

Great Lakes Higher Education Guaranty Corporation (GLHEGC) submits the enclosed comments on its own behalf, and on behalf of its affiliate guaranty agencies, United Student Aid Funds (USAF), and Northwest Education Loan Association (NELA).Together, we hold approximately $80 billion in FFELP guarantees, or nearly 40% of the total outstanding non-ED held FFELP portfolio.

As stated publicly on January 11, 2018, during the second round of negotiated rulemaking, Great Lakes and affiliates adamantly oppose the proposed changes to §682.410(b)(2). Our opposition, explained more thoroughly in attached comments, is based on the fact that regulations cannot contradict the law. The Higher Education Act (HEA), in §428F, explicitly permits a guarantor to charge a borrower who enters into a rehabilitation agreement reasonable collection costs up to 16%. Additionally, §484A(b) states that a borrower who has defaulted *must* pay reasonable collection costs. There are no carve-outs and no exceptions delineated in either section.

With these changes, the Department is attempting to regulate the definition of what a guarantor may charge to *when* a guarantor can charge collection costs. This is in direct conflict with the statute. In our comments, we also outline why the Department's proposed changes are unsound and will end up harming rather than helping borrowers.

Aside from providing specific comments opposing the proposed changes to §682.410(b)(2), we want to relay that we endorse many of comments submitted by NCHER, SLSA, EFC and CBA. Specifically, we support the comments made by these organizations on the borrower defense to repayment (including early implementation of a guarantor's ability to stop collection when a borrower applies for borrower defense to repayment and consolidating FFELP loans into a Direct Consolidation loan for purposes of receiving relief), closed school discharge, false certification, and forbearance. We do not, however, support the trade associations' comments on the proposed collection costs changes.

GLHEGC appreciates the opportunity to submit comments on the proposed regulatory package.

Sincerely,

Richard George
President & CEO

GREAT LAKES HIGHER EDUCATION GUARANTY CORPORATION
2401 INTERNATIONAL LANE | MADISON, WI 53704-3192
PHONE: 608.246.1800 | WEB: MYGREATLAKES.ORG

000568

I. **Great Lakes Higher Education Guaranty Corporation is a fiduciary of the federal government and a nonprofit committed to improving access to and success in higher education and to ensuring that borrowers have the information and support they need to repay their loans.**

Great Lakes Higher Education Guaranty Corporation (GLHEGC) has served as a fiduciary of the federal government in the capacity of a Federal Family Education Loan Program (FFELP) guarantor for over 50 years. GLHEGC also manages the FFELP portfolios of two of its guarantor affiliates—United Student Aid Funds, Inc. and Northwest Education Loan Association—and together GLHEGC and its affiliates serve as the designated FFELP guarantor for 22 states and territories.

In addition to being a long-standing FFELP guarantor, GLHEGC is a non-profit with the philanthropic mission of improving access to and success in higher education. GLHEGC is one of the largest higher-education philanthropies in the country.[1] It made $73 million in grants last year alone—all aimed at helping low-income students, students of color, and first-generation students obtain the degree or other credential needed to achieve a safe, secure, and sustainable livelihood.[2]

Consistent with both its fiduciary obligations and its philanthropic mission, GLHEGC's operational units focus on ensuring that borrowers have the information and support they need to make informed financial decisions about getting and repaying student loans:

- GLHEGC was the first—and only—guarantor to enter into a Voluntary Flexible Agreement with the Department of Education ("Department") that pegged its compensation to its success in helping borrowers stay out of default (something it did more than 94% of the time).[3]

- GLHEGC recently participated in a behavioral economics study with Ideas42 to evaluate ways to enhance its outreach to increase borrower responsiveness and improve outcomes.[4]

- GLHEGC developed a self-service application that many thousands of borrowers have used to enter a repayment plan or rehabilitation agreement that will enable them to get out of default.

- GLHEGC has a suite of financial-literacy products ("Attigo") aimed at ensuring that borrowers have sufficient information to make informed choices about college costs when they first take out loans as well as when they need to repay them.[5]

II. **GLHEGC opposes the proposal to prohibit guarantors from assessing an end-of-rehabilitation fee to borrowers who entered rehabilitation agreements within 60 days of receiving a default notice out of fidelity to both its fiduciary obligations and its philanthropic mission.**

The same dual-commitment that drives all GLHEGC's activities—GLHEGC's fidelity to its fiduciary obligations and its philanthropic mission—motivated GLHEGC to submit this reply to the proposal to amend 34 CFR § 682.410(b)(2) to prohibit guarantors from assessing a fee of 16% outstanding principal

---

[1] *See Inside Philanthropy*, "This Top Funder of Higher Education Keeps Stepping Things Up" (March 16, 2018) available at https://www.insidephilanthropy.com/home/2018/3/16/great-lakes-higher-education-corporation-grants-strategy.
[2] *See id.*
[3] *See* 20 USC § 1078-1; https://ifap.ed.gov/eannouncements/attachments/0213AmendGrtLakeAgreeA.pdf.
[4] *See* Ideas42, *Nudging for Success*, http://www.ideas42.org/wp-content/uploads/2016/09/Nudging-For-Success-FINAL.pdf.
[5] *See* https://www.attigo.com/.

and interest ("Rehabilitation Fee") to borrowers who enter rehabilitation agreements within 60 days of receiving a default notice ("Proposal"). Though the Department correctly notes that the negotiators did not object to the Proposal, GLHEGC lodged an objection on its own behalf during a public comment session during the Negotiated Rulemaking.[6]

GLHEGC first explains in Section III that the Proposal is outside the bounds of the Department's authority because it contradicts the Higher Education Act ("HEA") and also raises equal-protection and due-process concerns.[7] GLHEGC next explains in Section IV that, even if the Department had the authority to proceed, it should not. The Proposal may initially appear "borrower friendly," but adopting it would ultimately harm borrowers and the federal financial interest by chilling the very type of activities—early outreach and innovations like GLHEGC's self-service tool—most likely to help borrowers get out of default. This is the opposite of what the Department should do. The Department should reward rather than punish guarantors for doing what works helping borrowers get out of default.

III. **The Department lacks authority to adopt the Proposal because the Proposal conflicts with the HEA's plain language and raises serious equal-process and due-process concerns.**

　　A. **The HEA expressly allows guarantors to assess the Rehabilitation Fee <u>whenever</u> borrowers rehabilitate.**

The Department is charged with administering the HEA. Through its regulations, guidance, and executive acts, the Department gives life to the HEA—advancing Congress's intent to promote access to higher education while protecting taxpayers and the federal financial interest.

This is an important responsibility. It comes with tremendous authority. But that authority is not limitless. The Department, like all federal agencies, is limited by the statutes it administers. The Department may not make laws. That is Congress's job. The HEA, in turn, defines the Department's authority.[8] And the HEA clearly and expressly allows guarantors to assess the Rehabilitation Fee whenever borrowers rehabilitate defaulted FFELP loans—without exception.

The HEA establishes rehabilitation (or a "Default Reduction Program") in 20 U.S.C. § 1078-6(a)(1)(D)(i)(II), which provides that borrowers may get out of (or "cure") default by making "9 payments . . . within 20 days of the due date during 10 consecutive months." The HEA expressly establishes guarantors' right to assess the Rehabilitation Fee when they sell loans to a lender or assign them to the Department after a borrower has made the requisite payments.[9] It provides that guarantors: "may, in the case of a sale made on or after July 1, 2014, in order to defray collection costs—(aa) charge to the borrower an amount not to exceed 16 percent of the outstanding principal and interest at the time of the loan sale; and (bb) retain such amount from the proceeds of the loan sale."[10]

The HEA does not contain any exceptions or carve-outs at all, let alone one based on when borrowers entered a rehabilitation agreement. The 60-day dividing line the Department proposes, in

---

[6] *See* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/bdday4session2.docx.
[7] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).
[8] *Id.*
[9] *See* 20 U.S.C. § 1078-6(a)(1)(D)(i)(II).
[10] *Id.*

turn, is a creature entirely of its own making and is completely at odds with the HEA's plain language. The Department would consequently exceed the bounds of its statutorily- (and hence constitutionally-) conferred authority by adopting the Proposal.[11]

**B.   The Proposal raises significant equal-protection and due-process concerns.**

The Proposal's clear conflict with the HEA's plain language is reason enough for the Department not to proceed with it. But the Proposal suffers from other constitutional infirmities as well.

The Proposal raises equal protection concerns because it ties the Rehabilitation Fee to a distinction—on what side of some 60-day dividing line borrowers happen to fall—that does not have any discernable or rational relationship to borrowers, guarantors, default, or anything else related to the Rehabilitation Fee.[12] The Proposal also raises due process concerns because it calls for the elimination of a statutorily-conferred right to payment that, as discussed more fully in Section IV, is often guarantors' only real compensation for fulfilling their fiduciary obligation to the Department and helping borrowers rehabilitate defaulted loans.[13]

There is no legitimate government purpose or rational basis to counteract these serious constitutional problems. The work guarantors must do to monitor and conclude a loan rehabilitation— and the costs guarantors incur—is identical regardless of whether borrowers enter rehabilitation agreements before or after the 60-day or any other arbitrary period. Further, as also discussed more fully in Section IV, the partial ban on Rehabilitation Fees would actually undermine the government's interests by chilling the very activities most likely to help borrowers get out of default.

**IV.   Partially banning the Rehabilitation Fee as proposed would harm borrowers, the Department, and taxpayers by chilling the very activities most likely to help borrowers get out of default.**

At first glance, it may seem intuitive that keeping a subset of borrowers from paying the Rehabilitation Fee is "borrower-friendly." But initial appearances can be deceiving, and they are here. When the strategies most likely to help borrowers are considered alongside guarantors' compensation model, it becomes quickly apparent that partially banning the Rehabilitation Fee as proposed would create perverse incentives and harm borrowers, the federal government, and taxpayers.

**A.   Borrowers are often particularly motivated to get their student loans on track—and receptive to help—when they first default.**

Borrowers do not default overnight. Default follows a lengthy period of delinquency. But GLHEGC's extensive experience helping borrowers avoid and cure defaults has shown it that default can be a wake-up call to borrowers and that borrowers are often particularly responsive to outreach—and interested in getting their student loans on track—right after they have defaulted.

The significance of this initial period after default has been underscored for GLHEGC by its experience with the online self-service tool it developed. GLHEGC launched the self-service tool hoping

---

[11] *Chevron*, 467 U.S. 837.

[12] *See* U.S. Const. amend. V; *Heller v. Doe*, 509 U.S. 312, 319-21 (1993).

[13] *See* U.S. Const. amend. V; *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).

to find a way to connect with borrowers who may be too busy, intimidated, or embarrassed to talk with someone. The self-service tool has been a huge success, helping nearly 20,000 borrowers to-date get out of default. A significant percentage of the borrowers who have been helped, nearly 20%, have self-served within 60 days of receiving the default notice letter; based, in many cases, on nothing more than the instructions for accessing the self-service tool GLHEGC includes on its default notice letters.

**B. Partially banning the Rehabilitation Fee as proposed would make it financially impossible for guarantors to engage in activities aimed at helping borrowers in the critical period of when they first default and are often the most receptive to help.**

Banning the Rehabilitation Fee when borrowers enter a rehabilitation agreement within 60 days of receiving a default notice would result in a major missed opportunity for guarantors, borrowers, the Department, and taxpayers alike. Such a partial-ban would chill activities aimed at helping borrowers get out of default from occurring when borrowers first default and are often most receptive to help.

Such chilling would not be a case of guarantors (all of which are non-profits or state agencies) being greedy or wanting to profit at borrowers' expense. Eliminating the Rehabilitation Fee would be tantamount to entirely eliminating guarantors' compensation and ability to cover basic operational expenses. It would not just discourage activities that are effective and should be encouraged; it would render such activities completely financially unsustainable.

This is a product of how guarantors are compensated. Guarantors receive two forms of compensation when borrowers default: the Rehabilitation Fee and per-payment collection fees. The Rehabilitation Fee and per-payment collection fees have sometimes been discussed interchangeably in connection with the Proposal, with the Rehabilitation Fee being referred to as a "collection fee," but they are distinct. Guarantors assess the Rehabilitation Fee just once, when a borrower exits default because a loan is rehabilitated by being sold to a lender or assigned to the Department. In contrast, guarantors assess per-payment collection fees as a percentage of each payment borrowers make.

The per-payment collection fees cover guarantors' expenses when borrowers do not rehabilitate and instead enter an "acceptable repayment plan." With such repayment plans, borrowers agree to pay off their loan balance "on terms satisfactory to the agency." Guarantors have discretion to set repayment terms, including the assessment (or not) of per-payment collection fees. Guarantors also have flexibility in setting their per-payment collection fees based on their actual costs, up to a Department-imposed ceiling.[14] Guarantors do not receive any end-of-default compensation equivalent to the Rehabilitation Fee because there is no outstanding balance or sale or assignment when borrowers complete acceptable repayment plans. But guarantors are poised to receive per-payment collection fees for borrowers' entire loan balance (or whatever lesser amount guarantors—within regulatory limits and exercising their discretion and understanding of their own cost structure—agree to).[15]

---

[14] Notably, GLHEGC's per-payment collection fees are among the lowest if not the lowest among guarantors.
[15] *See* 34 CFR 682.410(b)(5); *Bible v. United Student Aid Funds, Inc.,* 799 F.3d 633, 666 ( 7th Cir. 2015) (Manion, J. dissenting), *reh'g denied,* 807 F.3d 839 (7th Cir. 2015) *cert. denied* 136 U.S. 1607 (2016).

None of this is true for rehabilitation. Rehabilitation is essentially a redo or an escape hatch for defaulters who have not defaulted on a particular loan before. It is not about full repayment, at least in the immediate sense. It provides a way for borrowers to establish a consistent repayment history so lenders will repurchase their loans (at which point the history of the default is removed from their credit report, as if it never happened). Guarantors do not set the repayment terms in rehabilitation agreements. The HEA provides that rehabilitation agreements shall be for a term of nine payments over 10 consecutive months. The Department, in turn, provides in its regulations that repayment amounts set in rehabilitation agreements be "reasonable and affordable." Borrowers' monthly payments are often as low as $5 per month using the reasonable and affordable formula.[16] This means that borrowers may pay just $45 in total to rehabilitate defaulted loans—rendering the per-payment collection fee almost null, and certainly not enough to begin to cover guarantors' costs.

Congress appears to have understood this when establishing guarantors' right to assess the Rehabilitation Fee. Congress characterized the Rehabilitation Fee as a way for guarantors to "defray collection costs," thus implicitly distinguishing between the Rehabilitation Fee and the per-payment collection fees and recognizing that the per-payment collection fees would be insufficient in the rehabilitation context. Congress has notably created a similar one-time fee for another situation, consolidation, in which the per-payment collection fee may be insufficient to compensate guarantors for all their post-default work because borrowers exit default before completing an acceptable repayment plan. Congress's establishment of guarantors' right to collect end-of-default fees when borrowers rehabilitate and consolidate reflects Congress's appreciation of the work guarantors do servicing defaulted borrowers and recognition that the per-payment collection fees are insufficient compensation for such work when borrowers exit default without completing acceptable repayment plans (the terms of which a guarantor had discretion to negotiate).[17]

### V. Guarantors' practice of not charging per-payment collection fees to borrowers who enter "acceptable repayment plans" within 60 days of receiving a default notice does not provide a basis for taking away guarantors' statutory right to assess the Rehabilitation Fee.

The Proposal's evolution to this point is a bit curious given the HEA's plain language allowing guarantors to assess the Rehabilitation Fee whenever borrowers rehabilitate. It is a wonder how the notion of prohibiting guarantors from receiving compensation the HEA so clearly entitles them to got this far. One possible explanation is suggested by the Department's reference in the Notice of Proposed Rulemaking to rehabilitation agreements as "acceptable repayment plans."[18] This same comparison has been made throughout discussions of the Proposal, with guarantor practices surrounding "acceptable repayment plans" frequently and improperly cited as a model for rehabilitation agreements.

It is a common practice for guarantors to dispense with per-payment collection fees when borrowers enter an acceptable repayment plan within 60 days of receiving a default notice. There is nothing in the HEA or regulations requiring this. But guarantors nonetheless have—undoubtedly for all

---

[16] 34 CFR § 682.405(b).
[17] 34 CFR § 682.401(b)(18); 20 USC § 1078(c)(6).
[18] 83 Fed. Reg. 37242, 37282 (July 31, 2018).

sorts of reasons but it seems that many were influenced by the rule prohibiting credit reporting when borrowers enter acceptable repayment plans within the 60-day period.[19]

Such discretionary practices cannot, however, override the HEA's plain and specific language entitling guarantors to assess the Rehabilitation Fee whenever borrowers rehabilitate. Even if they could, however, such efforts would be entirely misplaced. Such practices involve an entirely different context. As explained in Section III, rehabilitation agreements are not the same as the "acceptable repayment plans" in which guarantors have adopted the practice. Rehabilitation is a unique process that is defined and mandated by the HEA and controlled by detailed regulations.[20] Further, the practice does not involve the Rehabilitation Fee or any end-of-default equivalent (which makes sense given the fact that, unlike with rehabilitation, borrowers complete such plans and get out of default by paying off their loans). They instead involve the per-payment collection fees.

## VI. The Department should not penalize—and should instead encourage—activities like early-default outreach that work and are most effective in helping borrowers get out of default.

The concept of penalizing guarantors who help borrowers get out of default early (and, by doing so, help protect the Department's and taxpayers' financial interest) is completely backwards. If anything, the Department should reward guarantors for engaging in early outreach and developing innovations like GLHEGC's self-service tool that work and are particularly effective at helping borrowers get out of default. GLHEGC has experience with such an incentive structure from its participation in a Voluntary Flexible Agreement under which it was paid for its effectiveness helping borrowers stay out of default. Even if the Department does not want to create such an incentive structure here, however, the Department certainly should avoid creating perverse incentives that chill activities that work.

## VII. The Department may not and should not adopt the Proposal.

GLHEGC opposes the Proposal because it conflicts with the plain language of the HEA and raises serious equal-protection and due-process concerns. The Department consequently lacks authority to adopt it. Even if the Department had authority to proceed with the Proposal, however, GLHEGC would oppose it as bad policy. Partially banning Rehabilitation Fees as proposed would create perverse incentives and chill early-default outreach and innovation aimed at helping borrowers when they first default and are most receptive to help. Instead of penalizing the activities most likely to help borrowers get out of default, GLHEGC urges the Department to consider doing exactly the opposite and actually encouraging guarantors to engage in activities that work and are most effective in helping protect borrowers, the Department, and taxpayers.

---

[19] 20 U.S.C. § 1080a(c)(4).
[20] See 34 CFR § 682.410(b)(5); Bible, 799 F.3d 633, 666 (Manion, J. dissenting).

**49788** Federal Register / Vol. 84, No. 184 / Monday, September 23, 2019 / Rules and Regulations

## DEPARTMENT OF EDUCATION

**34 CFR Parts 668, 682, and 685**

**RIN 1840–AD26**

**[Docket ID ED–2018–OPE–0027]**

### Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule.

**SUMMARY:** The Department of Education (Department or We) establishes new Institutional Accountability regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to revise a Federal standard and a process for adjudicating borrower defenses to repayment claims for Federal student loans first disbursed on or after July 1, 2020, and provide for actions the Secretary may take to collect from schools the amount of financial loss due to successful borrower defense to repayment loan discharges. The Department also amends regulations regarding pre-dispute arbitration agreements or class action waivers as a condition of enrollment, and requires institutions to include information regarding the school's internal dispute resolution and arbitration processes as part of in the borrower's entrance counseling. We amend the Student Assistance General Provisions regulations to establish the conditions or events that have or may have an adverse, material effect on an institution's financial condition and which warrant financial protection for the Department, update the definitions of terms used to calculate an institution's composite score to conform with changes in certain accounting standards, and account for leases and long-term debt. Finally, we amend the loan discharge provisions in the Direct Loan Program.

**DATES:** These regulations are effective July 1, 2020. The incorporation by reference of certain publications listed in these regulations is approved by the Director of the Federal Register as of July 1, 2020. Implementation date: For the implementation dates of the included regulatory provisions, see the *Implementation Date of These Regulations* in **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** For further information related to borrower defenses to repayment, pre-dispute arbitration agreements, internal dispute processes, and guaranty agency fees,

Barbara Hoblitzell at (202) 453–7583 or by email at: *Barbara.Hoblitzell@ed.gov.* For further information related to false certification loan discharge and closed school loan discharge, Brian Smith at (202) 453–7440 or by email at: *Brian.Smith@ed.gov.* For further information regarding financial responsibility and institutional accountability, John Kolotos (202) 453–7646 or by email at: *John.Kolotos@ed.gov.* For information regarding recalculation of subsidized usage periods and interest accrual, Ian Foss at (202) 377–3681 or by email at: *Ian.Foss@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

*Purpose of This Regulatory Action*

Section 455(h) of the Higher Education Act of 1965, as amended (HEA), authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. The regulations at 34 CFR 685.206(c) governing defenses to repayment were first put in place in 1995. Those 1995 regulations specified that a borrower may assert as a defense to repayment "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law," (the State law standard) but were silent on the process to assert a claim.

In May 2015, a large nationwide school operator, filed for bankruptcy. The following month, the Department appointed a Special Master to create and oversee a process to provide debt relief for the borrowers associated with those schools, who had applied for student loan discharges on the basis of the Department's authority to discharge student loans under 34 CFR 685.206(c).

As a result of difficulties in application, interpretation of the State law standard, and the lack of a process for the assertion of a borrower defense claim in the regulations, the Department began rulemaking on the topic of borrower defenses to repayment. On November 1, 2016, the Department published final regulations [1] (hereinafter, "2016 final regulations") on the topic of borrower defenses to repayment, which significantly expanded the rules regarding how

borrower defense claims could be originated and how they would be adjudicated. The 2016 final regulations were developed after the completion of a negotiated rulemaking process and after receiving and considering public comments on a notice of proposed rulemaking. In accordance with the HEA, the 2016 final regulations were scheduled to go into effect on July 1, 2017.

On May 24, 2017, the California Association of Private Postsecondary Schools (CAPPS) filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court), challenging the 2016 final regulations in their entirety, and in particular those provisions of the regulations pertaining to: (1) The standard and process used by the Department to adjudicate borrower defense claims; (2) financial responsibility standards; (3) requirements that proprietary institutions provide warnings about their students' loan repayment rates; and (4) the provisions requiring that institutions refrain from using arbitration or class action waivers in their agreements with students.[2]

In light of the pending litigation, on June 16, 2017, the Department published a notification of the delay of the effective date [3] of certain provisions of the 2016 final regulations under section 705 of the Administrative Procedure Act [4] (APA), until the legal challenge was resolved (705 Notice). Subsequently, on October 24, 2017, the Department issued an interim final rule (IFR) delaying the effective date of those provisions of the final regulations to July 1, 2018,[5] and a notice of proposed rulemaking to further delay the effective date to July 1, 2019.[6] On February 14, 2018, the Department published a final rule delaying the regulations' effective date until July 1, 2019 (Final Delay Rule).[7]

Following issuance of the 705 Notice, the plaintiffs in *Bauer* filed a complaint challenging the validity of the 705 Notice.[8] The attorneys general of eighteen States and the District of Columbia also filed a complaint challenging the validity of the 705

---

[1] 81 FR 75926.

[2] Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos*, No. 17–cv–00999 (D.D.C. May 24, 2017).

[3] 82 FR 27621.

[4] 5 U.S.C. 705.

[5] 82 FR 49114.

[6] 82 FR 49155.

[7] 83 FR 6458.

[8] Complaint for Declaratory and Injunctive Relief, *Bauer* v. *DeVos*, No. 17–cv–1330 (D.D.C. Jul. 6, 2017).

Notice.[9] Plaintiffs in both cases subsequently amended their complaints to include the IFR and the Final Delay Rule, and these cases were consolidated by the Court.

In November 2017, the Department began a negotiated rulemaking process. The resultant notice of proposed rulemaking was published on July 31, 2018 (2018 NPRM).[10] The 2018 NPRM used the pre-2016 regulations, which were in effect at the time the NPRM was published, as the basis for proposed regulatory amendments.

The 2018 NPRM also expressly proposed to rescind the specific regulatory revisions or additions included in the 2016 final regulations, which were not yet effective. Accordingly, the preamble of the 2018 NPRM generally provided comparisons between the regulations as they existed before the 2016 final regulations, the 2016 final regulations, and the proposed rule. The Department received over 30,000 comments in response to the 2018 NPRM. Many commenters compared the Department's proposed regulations to the 2016 final regulations, when the 2016 final regulations differed from a proposed regulatory change in the 2018 NPRM. The Department also provided a Regulatory Impact Analysis that was based on the President's FY 2018 budget request to Congress, which assumed the implementation of the 2016 final regulations.

On September 12, 2018, the Court issued a Memorandum Opinion and Order in the consolidated matter, finding the challenge to the IFR was moot, declaring the 705 Notice and the Final Delay Rule invalid, and convening a status conference to consider appropriate remedies.[11]

Subsequently, on September 17, 2018, the Court issued a Memorandum Opinion and Order immediately vacating the Final Delay Rule and vacating the 705 Notice, but suspending its vacatur of the 705 Notice until 5 p.m. on October 12, 2018, to allow for renewal and briefing of CAPPS' motion for a preliminary injunction in *CAPPS* v. *DeVos* and to give the Department an opportunity to remedy the deficiencies with the 705 Notice.[12] The Department decided not to issue a revised 705 notice.

On October 12, 2018, the Court extended the suspension of its vacatur until noon on October 16, 2018.[13] On October 16, 2018, the Court denied CAPPS' motion for a preliminary injunction, ending the suspension of the vacatur.[14]

In the 2018 NPRM, we proposed to rescind provisions of the 2016 final regulations that had not yet gone into effect.[15] However, as detailed in the Department's **Federal Register** notice of March 19, 2019,[16] as a result of the Court's decision in *Bauer*, those regulations have now become effective. This change necessitates technical differences in the structure of this document, which rescinds certain provisions, and amends others, of the 2016 final regulations that have taken effect, compared with that of the 2018 NPRM.

In particular, while the 2018 NPRM technically proposed to amend the pre-2016 regulations (in addition to proposing that the 2016 regulations be rescinded), these final regulations, as a technical matter, amend the 2016 final regulations which have since taken effect. Thus, we describe the changes to the final regulations and show them in the amendatory language at the end of the document based on the currently effective 2016 final regulations. We do this in order to accurately instruct the **Federal Register**'s amendments to the Code of Federal Regulations.

With the 2016 final regulations in effect, the Department initially considered publishing a second NPRM that used those regulations as the starting point, rather than the pre-2016 regulations. However, given that the policies we proposed in the 2018 NPRM were not affected by the set of regulations that served as the underlying baseline, and that we provided a meaningful opportunity for the public to comment on each of the regulatory proposals in the NPRM and on the rescission of the 2016 final regulations, we determined that an additional NPRM would further delay the finality of the rulemaking process for borrowers and schools without adding meaningfully to the public's participation in the process. The Department addressed the provisions in these final regulations in the 2018 NPRM and afforded the public a meaningful opportunity to provide comment. For these reasons, despite the intervening events since publication of the 2018 NPRM, we are proceeding with the publication of these final regulations.

Additionally, after further consideration, we are keeping many of the regulatory changes that were included in the 2016 final regulations. Some of the revisions proposed in the 2018 NPRM are essentially the same as, or similar to, the revisions made by the Department in the 2016 final regulations, which are currently in effect. The Department is not rescinding or further amending the following regulations in title 34 of the Code of Federal Regulations, even to the extent we proposed changes to those regulations in the 2018 NPRM:

• § 668.94 (Limitation),
• § 682.202(b) (Permissible charges by lenders to borrowers),
• § 682.211(1)(7) (Forbearance),
• § 682.405(b)(4)(ii) (Loan rehabilitation agreement),
• § 682.410(b)(4) and (b)(6)(viii) (Fiscal, administrative, and enforcement requirements), and
• § 685.200 (Borrower eligibility).

The Department also did not propose to rescind in the 2018 NPRM, and is not rescinding here, 34 CFR 685.223, which concerns the severability of any provision of subpart B in part 685 of title 34 of the Code of Federal Regulations; 34 CFR 685.310, which concerns the severability of any provision of subpart C in part 685 of title 34 of the Code of Federal Regulations; or 34 CFR 668.176, which concerns the severability of any provision of subpart L in part 668 of title 34 of the Code of Federal Regulations. If any provision of subparts B or C in part 685, subpart L in part 668, or their application to any person, act, or practice is at some point held invalid by a court, the remainder of the subpart or the application of its provisions to any person, act, or practice is not affected.

While the negotiated rulemaking committee that considered the draft regulations on these topics during 2017–2018 did not reach consensus, these final regulations reflect the results of those negotiations and respond to the public comments received on the regulatory proposals in the 2018 NPRM. The regulations are intended to:

• Provide students with a balanced, meaningful borrower defense to repayment claims process that relies on a single, Federal standard;
• Grant borrower defense to repayment loan discharges that are adjudicated equitably, swiftly, carefully, and fairly;
• Encourage students to directly seek remedies from schools when acts or omissions by the school, including those that do not support a borrower defense to repayment claim, fail to

---

[9] *Massachusetts* v. *U.S. Dep't of Educ.*, No. 17–cv–01331 (D.D.C. Jul. 6, 2017).

[10] 83 FR 37242.

[11] *Bauer*, No. 17–cv–1330.

[12] *Bauer*, No. 17–cv–1330.

[13] Minute Order (Oct. 12, 2018), *Bauer*, No. 17–cv–1330.

[14] Memorandum Opinion and Order, *CAPPS*, No. 17–cv–0999 (Oct. 16, 2018).

[15] *See:* 83 FR 37250–51.

[16] 84 FR 9964.

provide a student access to the educational or job placement opportunities promised, or otherwise cause harm to students;

• Ensure that schools, rather than taxpayers, bear the burden of billions of dollars in losses from approvals of borrower defense to repayment loan discharges;

• Establish that the Department has a complete record to review in adjudicating claims by allowing schools to respond to borrower defense to repayment claims and provide evidence to support their responses;

• Discourage schools from committing fraud or other acts or omissions that constitute misrepresentation;

• Encourage closing institutions to engage in orderly teach-outs rather than closing precipitously;

• Enable the Department to properly evaluate institutional financial risk in order to protect students and taxpayers;

• Eliminate the inclusion of lawsuits as a trigger for letter of credit requirements until those lawsuits are settled or adjudicated and a monetary value can be accurately assigned to them;

• Provide students with additional time to qualify for a closed school discharge and protect students who elect this option at the start of a teach-out, even if the teach-out exceeds the length of the regular lookback period;

• Adjust triggers for Letters of Credit to reflect actual, rather than potential, liabilities; and

• Reduce the strain on the government, and the delay to borrowers in adjudicated valid claims, due to large numbers of borrower defense to repayment applications.

*Summary of the Major Provisions of This Regulatory Action: For the Direct Loan Program, the Final Regulations*

• Establish a revised Federal standard for borrower defenses to repayment asserted by borrowers with loans first disbursed on or after July 1, 2020;

• Revise the process for the assertion and resolution of borrower defense to repayment claims for loans first disbursed on or after July 1, 2020;

• Provide schools and borrowers with opportunities to provide evidence and arguments when a defense to repayment application has been filed and to provide an opportunity for each side to respond to the other's submissions, so that the Department can review a full record as part of the adjudication process;

• Require a borrower applying for a borrower defense to repayment loan discharge to supply documentation that affirms the financial harm to the borrower is not the result of the borrower's workplace performance, disqualification for a job for reasons unrelated to the education received, or a personal decision to work less than full-time or not at all;

• Revise the time limit for the Secretary to initiate an action to collect from the responsible school the amount of any loans first disbursed on or after July 1, 2020, that are discharged based on a successful borrower defense to repayment claim for which the school is liable;

• Modify the remedial actions the Secretary may take to collect from the responsible school the amount of any loans discharged to include those based on a successful borrower defense to repayment claim for which the school is liable; and

• Expand institutional responsibility and financial liability for losses incurred by the Secretary for the repayment of loan amounts discharged by the Secretary based on a borrower defense to repayment discharge.

The final regulations for the Direct Loan Program also include many of the same or similar provisions as the 2016 regulations, which are currently in effect. For example, both the 2016 regulations and these final regulations:

• Require a preponderance of the evidence standard for borrower defense to repayment claims;

• Provide that a violation by a school of an eligibility or compliance requirement in the HEA or its implementing regulations is not a basis for a borrower defense to repayment unless the violation would otherwise constitute a basis under the respective regulations;

• Allow the same universe of people to file a borrower defense to repayment claim, as the definition of "borrower" in the 2016 final regulations is the same as the definition of "borrower" in these final regulations;

• Provide a borrower defense to repayment process for both Direct Loans and Direct Consolidation Loans;

• Allow the Secretary to determine the order in which objections will be considered, if a borrower asserts both a borrower defense to repayment and other objections;

• Require the borrower to provide evidence that supports the borrower defense to repayment;

• Automatically grant forbearance on the loan for which a borrower defense to repayment has been asserted, if the borrower is not in default on the loan, unless the borrower declines such forbearance;

• Require the borrower to cooperate with the Secretary in the borrower defense to repayment proceeding; and

• Transfer the borrower's right of recovery against third parties to the Secretary.

The final regulations also revise the Student Assistance General Provisions regulations to:

• Provide that schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to make a plain language disclosure of those requirements to prospective and enrolled students and place that disclosure on their website where information regarding admission, tuition, and fees is presented; and

• Provide that schools that require Federal student loan borrowers to sign pre-dispute arbitration agreements or class action waivers as a condition of enrollment to include information in the borrower's entrance counseling regarding the school's internal dispute and arbitration processes.

The final regulations also:

• Amend the financial responsibility provisions with regard to the conditions or events that have or may have an adverse material effect on an institution's financial condition, and which warrant financial protection for students and the Department;

• Update composite score calculations to reflect certain recent changes in Financial Accounting Standards Board (FASB) accounting standards;

• Update the definitions of terms used to describe the calculation of the composite score, including leases and long-term debt;

• Revise the Direct Loan program's closed school discharge regulations to extend the time period for a borrower to qualify for a closed school discharge to 180 days;

• Revise the Direct Loan program's closed school loan discharge regulations to specify that if offered a teach-out opportunity, the borrower may select that opportunity or may decline it at the beginning of the teach-out, but if the borrower accepts it, he or she will still qualify for a closed school discharge only if the school fails to meet the material terms of the teach-out plan or agreement approved by the school's accrediting agency and, if applicable, the school's State authorizing agency;

• Affirm that in instances in which a teach-out plan is longer than 180 days, a borrower who declines the teach-out opportunity and does not transfer credits to complete a comparable program, continues to qualify, under the

exceptional circumstances provision, for a closed school loan discharge;

• Modify the conditions under which a Direct Loan borrower may qualify for a false certification discharge by specifying that the borrower will not qualify for a false certification discharge based on not having a high school diploma in cases when the borrower could not reasonably provide the school a high school diploma and has not met the alternative eligibility requirements, but provided a written attestation, under penalty of perjury, to the school that the borrower had a high school diploma; and

• Require institutions to accept responsibility for the repayment of amounts discharged by the Secretary pursuant to the borrower defense to repayment, closed school discharge, false certification discharge, and unpaid refund discharge regulations.

• Prohibit guaranty agencies from charging collection costs to a defaulted borrower who enters into a repayment agreement with the guaranty agency within 60 days of receiving notice of default from the agency.

*Timing, Comments and Changes*

On July 31, 2018, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register**.[17] The final regulations contain changes from the NPRM, which are fully explained in the *Analysis of Comments and Changes* section of this document.

*Implementation Date of These Regulations:* Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1, prior to the start of the award year (July 1) to which they apply. However, that section also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier with conditions for early implementation.

The Secretary is exercising her authority under section 482(c) of the HEA to designate the following new regulations at title 34 of the Code of Federal Regulations included in this document for early implementation beginning on September 23, 2019, at the discretion of each institution, as appropriate:

(1) Section 668.172(d).

(2) Appendix A to Subpart L of Part 668.

(3) Appendix B to Subpart L of Part 668.

The Secretary has not designated any of the remaining provisions in these final regulations for early implementation. Therefore, the remaining final regulations included in this document are effective July 1, 2020.

*Incorporation by Reference.* In § 668.172(d) of these final regulations, we reference the following accounting standard: Financial Accounting Standards Board (FASB) Accounting Standards Update (ASU) 2016–02, Leases (Topic 842).

FASB issued ASU 2016–02 to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. This standard is available at *www.fasb.org,* registration required.

*Public Comment.* In response to our invitation in the July 31, 2018, NPRM, more than 38,450 parties submitted comments on the proposed regulations, which included comments also relevant to the 2016 regulations, the implementation of which had been delayed.

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes in the preamble.

*Analysis of Comments and Changes*

An analysis of the comments and of any changes in the regulations since publication of the 2018 NPRM follows.

**Borrower Defenses—General (§ 685.206)**

*Comments:* Many commenters supported the Department's proposals to improve the borrower defense to repayment regulations. These commenters asserted that the proposed regulations would provide the necessary accountability in the system to prevent fraud, while giving borrowers a path to a more expedient resolution of complaints through arbitration or a school's internal dispute processes.

Some commenters claim that the regulations demonstrate government overreach by creating regulations that would add billions of dollars to Federal spending.

*Discussion:* We appreciate the comments in support of the proposed borrower defense to repayment regulations.

We disagree with commenters who state that these regulations represent government overreach. Section 455(h) of the HEA authorizes the Secretary to specify in regulation which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a Direct Loan. Section 455(h) of the HEA states: "Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."

The Department is not creating a new borrower defense to repayment program but rather is revising the terms under which a borrower may assert a defense to repayment of a loan, for loans first disbursed on or after July 1, 2020, which is the anticipated effective date of these regulations. The Department believes that these regulations strike an appropriate balance between attempting to correct aspects of the 2016 final regulations, that people criticized as Federal Government overreach, and the interests of students, institutions, and the Federal Government.

The Department acknowledges that the 2016 final regulations anticipated that taxpayers would bear a great expense and seeks to cabin that burden through these final regulations. The Department generally seeks to decrease costs to Federal taxpayers and decrease Federal spending through these final regulations. These costs are more fully outlined through the Regulatory Impact Assessment section to follow.

*Changes:* None.

*Comments:* One group of commenters supported the regulations for providing a better balance between relief for borrowers and due process for schools by providing both parties with an equal opportunity to provide evidence and arguments and to review and respond to evidence. These commenters acknowledged that balance is essential to a fair process. They expressed concern, however, that the pendulum has shifted too far once again and asserted that in comparison to the 2016 final regulations, the proposed regulations, which elevated the evidentiary standard to clear and convincing, make it too difficult for borrowers to obtain relief.

Other commenters generally opposed the Department's proposed rules concerning the borrower defense to repayment. One commenter suggested that the proposed rules would effectively block relief for the vast majority of borrowers, while shielding institutions from accountability for their misconduct.

---

[17] 83 FR 37242.

liabilities, or reimbursable costs owed to the Secretary that are not otherwise paid directly by the institution including costs associated with teach-outs as allowed by the Department.

### Section 668.41(h) and (i), Loan Repayment Rate and Financial Protection Disclosures

*Comments:* Some commenters believed that establishing early warning triggering events that require an institution to provide disclosures to students and financial protection to the Department, as promulgated in the 2016 final regulations, would offer critical information to students and help protect taxpayers from financial risk.

Some of these commenters argued that removing disclosures to students runs counter to the Department's stated goal of enabling students to make informed decisions on the front-end of college enrollment. For these reasons, the commenters urged the Department to maintain the disclosure requirements in the 2016 final regulations.

Similarly, other commenters believed that providing disclosures to students about institutions that are required to submit letters of credit to the Department, or after consumer testing, disclosures relating to triggering events, is important for alerting current and prospective students as well as the general public about potential financial problems at those institutions.

Some of these commenters stated that rather than presuming that prospective students would not understand letters of credit or the triggering events, as discussed in the preamble to the 2018 NPRM, the Department should leave those presumptions aside and require the disclosures. Other commenters likened the situation where a student does not understand the calculation of the debt to earnings rate but benefits nonetheless from the information that it provides about a program's quality to the letter of credit disclosure providing greater knowledge about the financial condition of the institution.

With regard to the disclosure associated with the loan repayment rate for proprietary institutions, some commenters agreed with the Department's proposal to rescind that disclosure, but other commenters cited research or analysis that they alleged supported maintaining the disclosure. Some of these commenters contend that a recent research paper found that almost 50 percent of the borrowers who attend proprietary institutions default on their loans within five years of entering repayment and that another paper shows that the relatively poor outcomes of students at for-profit institutions remain even after controlling for differences in family income, age, race, academic preparation, and other factors. Other commenters cited research showing that, among for-profit institutions, there were almost no schools with repayment rates above 20 percent. In addition, some commenters noted that in the preamble to the NPRM, the Department argued that repayment rates reflect financial circumstances and not educational quality, but did not cite any research, analysis, or data to support that claim. These commenters believed that repayment rates are a critical measure for safeguarding $130 billion in Federal aid and supported that belief by citing various reports raising concerns over rising default and delinquency rates and linking repayment outcomes to other metrics of educational outcomes. Other commenters argued that the focus on proprietary institutions is justified and cited research from the Brookings Institution, showing that among non-degree certificate students, those in for-profit programs earned less per year than their counterparts at public institutions despite taking out more in loans. Another commenter voiced similar concerns for proprietary institutions in New York, noting particularly that only seven percent of students enroll at those institutions but account for one in four New Yorkers who default on their loans within three years of entering repayment.

*Discussion:* We note that the loan repayment rate warning and financial protection disclosures were discussed during the Gainful Employment (GE) negotiated rulemaking and associated NPRM along with GE-related disclosures. However, we are including these disclosures in these final regulations because they were part of the 2016 final regulations we are proposing to revise.

In the 2016 final regulations, we explained that we were requiring repayment rate disclosures that relied upon a repayment rate calculation based on the data provided to the Department by institutions through the GE regulations and on the repayment calculation in those regulations. However, on July 1, 2019, the Department published a final rule that rescinds those requirements.[158] As a result, providing the same repayment rate disclosure as required in the 2016 final regulations is no longer feasible and we do not maintain this disclosure in these final regulations.

As a general matter, we consider repayment rates to be an important factor students and their families may consider when choosing an institution and the Department intends to continue to make comparable information about repayment rates, as well as other information, for all institutions publicly available on the Department's College Scorecard website.[159] This information is a useful resource because it includes repayment rate information, not only for proprietary institutions, but also for nonprofit and public institutions of higher education.

We believe that any benefit that a student may derive from knowing the loan repayment rate for a proprietary institution is negated by not knowing the comparable loan repayment rate at a non-profit or public institution, because the student may rely on the limited repayment rate information available and end up enrolling at an institution whose repayment rate is the same or even worse than the proprietary institution.

With respect to the financial protection disclosures, we acknowledge that some prospective students may find this information helpful, but on balance, we believe that the disclosures, if viewed without proper context, could tarnish the reputation of an institution that otherwise satisfies title IV provisions, and thus jeopardize or diminish the credential, or employment or career opportunities, of enrolled students and prior graduates.

*Changes:* None.

### Guaranty Agency (GA) Collection Fees (§§ 682.202(b)(1), 682.405(b)(4)(ii), 682.410(b)(2) and (4))

*Comments:* Some commenters supported the proposed changes in §§ 682.202(b)(1), 682.405(b)(4)(ii), and 682.410(b)(4), providing that a guaranty agency may not capitalize unpaid interest after a defaulted FFEL Loan has been rehabilitated, and that a lender may not capitalize unpaid interest when purchasing a rehabilitated FFEL Loan.

One commenter proposed that the Department retain in § 682.402(e)(6)(iii) a provision of the 2016 final regulations that deleted a reference to a guaranty agency capitalizing interest.

One commenter strongly opposed the changes to § 682.410(b)(2), asserting that section 484F of the HEA explicitly permits a guarantor to charge a borrower who enters into a rehabilitation agreement reasonable collection costs up to 16 percent. The commenter further asserted that section 484A(b) of the HEA provides that a defaulted borrower must pay reasonable collection costs and that there are no exceptions

---

[158] 81 FR 31392.

[159] *See: https://collegescorecard.ed.gov/.*

under which the borrower is not required to pay such costs. The commenter argued that the regulatory change raises equal protection concerns because it ties the Rehabilitation Fee to a 60-day interval that does not have any discernable or rational relationship to borrowers, guarantors, default, or anything else related to loan rehabilitation.

The commenter further asserted that the regulation creates due process concerns because it calls for the elimination of a statutorily-conferred right to payment that is often guarantors' only real compensation for fulfilling their fiduciary obligation to the Department and helping borrowers rehabilitate defaulted loans. The commenter expressed concern that the regulatory change could create perverse incentives and harm borrowers, the federal government, and taxpayers by inhibiting creative outreach tactics that have proven successful bringing defaulted borrowers back into repayment. This commenter also drew a distinction between a defaulted borrower entering into an "acceptable repayment plan" and a defaulted borrower entering into a Rehabilitation Agreement. This commenter noted that it is a common practice for guarantors to dispense with per-payment collection fees when borrowers enter an acceptable repayment plan within 60 days of receiving a default notice, even though they are required to do so. They reiterate that loan rehabilitation is a unique process that is defined and mandated by the HEA and controlled by detailed regulations.

*Discussion:* We thank the commenters who are supportive of the proposed revisions of the guaranty agency collection fee regulatory provisions. We will retain the 2016 final regulations, which are currently effective, with respect to §§ 682.202(b)(1), 682.405, and 682.410(b)(4) because the 2016 final regulations effectively accomplish the same policy objective as the proposed amendatory language in the 2018 NPRM.

We agree with the comment about 34 CFR 682.402(e)(6)(iii) and retain the change made in the 2016 final regulations to remove the sentence regarding capitalization of interest.

We disagree with the commenter who raised legal objections to the Department's proposed regulation. The changes in § 682.410(b)(2) are consistent with the regulatory interpretation and position that the Department outlined in Dear Colleague Letter (DCL) GEN–15–14 (July 10, 2015). We withdrew that DCL to allow for public comment on a regulatory change rather than rely solely

on our interpretation of existing regulations.

The Department has considered the commenter's objections but believes that the proposed change is consistent with the HEA and the existing regulations. We note that the United States Court of Appeals for the Seventh Circuit accepted the Department's statutory and regulatory interpretation in *Bible* v. *United Student Aid Funds, Inc.*[160]

Section 484A(a) of the HEA provides that defaulted borrowers "shall be required to pay, in addition to other charges specified in this subchapter . . . reasonable collection costs." Section 428F(a) of the HEA requires the guarantor to offer the borrower an opportunity to have a defaulted loan "rehabilitated," and the default status cured, by making nine timely payments over 10 consecutive months, after which the loan may be sold to a FFEL Program lender or assigned to the Department, and the record of default as reported by the guarantor is removed from the borrower's credit history. Under the HEA and the Department's regulations, the installment amounts payable under a rehabilitation agreement must be "reasonable and affordable based on the borrower's total financial circumstances."

The regulations direct the guarantor to charge the borrower "reasonable" collection costs incurred to collect the loan.[161] Generally, the charges cannot exceed the lesser of the amount the borrower would be charged as calculated under 34 CFR 30.60 or the amount the Department would charge if the Department held the loan. Before the guarantor reports the default to a credit bureau or assesses collection costs against a borrower, the guarantor must provide the borrower written notice that explains the nature of the debt, and the borrower's right to request an independent administrative review of the enforceability or past-due status of the loan and to enter into a repayment agreement for the debt on terms satisfactory to the guarantor.[162]

Thus, the regulations direct the guaranty agency to charge the borrower collection costs, but only after the guaranty agency provides the borrower the opportunity to dispute the debt, to review the objection, and to agree to repay the debt on terms satisfactory to the guarantor. If the borrower agrees within that initial period to repay the debt under terms satisfactory to the guarantor and consistent with the requirements, the borrower cannot be

charged collection costs at any time thereafter unless the borrower later fails to honor that agreement.

We also disagree with the commenter's suggestion that the imposition of collection costs is intended to compensate the guaranty agencies and provide them an incentive to offer loan rehabilitation. A guaranty agency is permitted to charge the borrower for the reasonable collection costs it incurs in collecting on loans. It is not reasonable for the guaranty agency to charge collection costs for collection activities it does not need to take because the borrower entered into and met the requirements of a loan rehabilitation agreement. Collection costs are not intended to be a funding source for guaranty agencies or an incentive for them to offer a statutorily required opportunity to borrowers.

*Changes:* The Department retains the 2016 regulations, which are currently effective, with respect to §§ 682.202(b)(1), 682.405, and 682.410(b)(4) because the 2016 final regulations effectively accomplish the same policy objective as the proposed amendatory language in the 2018 NPRM. The Department will proceed to revise § 682.410(b)(2) as proposed in the 2018 NPRM.

The Department also retains the change made in § 682.402(e)(6)(iii) as a result of the 2016 final regulations.

*Comments:* A group of commenters stated that the preamble to the 2018 NPRM specified that collection costs are not assessed if the borrower enters into a repayment agreement with the guaranty agency within 60 days from "receipt" of the initial notice, while the regulatory language was less specific about when the 60-day time period would commence. These commenters requested a change to the regulatory language to make clear that the 60-day period begins when the guaranty agency "sends" the initial notice described in paragraph (b)(6)(ii), since this is the only date that can be determined by the guaranty agency.

*Discussion:* We agree with the commenters who noted that that it is appropriate that the 60-day period be determined from the date the guaranty agency sends the notice to the borrower, because the guaranty agency cannot reasonably establish when a borrower receives the notice.

*Changes:* We have modified § 682.410(b)(2)(i) by replacing the word "following" with "after the guaranty agency sends".

---

[160] 799 F.3d. 633 (7th Cir. 2015).

[161] 34 CFR 682.410(b)(2).

[162] 34 CFR 682.410(b)(5)(ii).

**49926** **Federal Register** / Vol. 84, No. 184 / Monday, September 23, 2019 / Rules and Regulations

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 10. The authority citation for part 682 is revised to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

Section 682.410 also issued under 20 U.S.C. 1078, 1078–1, 1078–2, 1078–3, 1080a, 1082, 1087, 1091a, and 1099.

■ 11. Section 682.410 is amended by revising paragraph (b)(2) and removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

### § 682.410  Fiscal, administrative, and enforcement requirements.

\*    \*    \*    \*    \*

(b) \* \* \*

(2) *Collection charges.* (i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim unless, within the 60-day period after the guaranty agency sends the initial notice described in paragraph (b)(6)(ii) of this section, the borrower enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrower any collection costs.

(ii) An acceptable repayment agreement may include an agreement described in § 682.200(b) (Satisfactory repayment arrangement), § 682.405, or paragraph (b)(5)(ii)(D) of this section. An acceptable repayment agreement constitutes a repayment arrangement or agreement on repayment terms satisfactory to the guaranty agency, under this section.

(iii) The costs under this paragraph (b)(2) include, but are not limited to, all attorneys' fees, collection agency charges, and court costs. Except as provided in §§ 682.401(b)(18)(i) and 682.405(b)(1)(vi)(B), the amount charged a borrower must equal the lesser of—

(A) The amount the same borrower would be charged for the cost of collection under the formula in 34 CFR 30.60; or

(B) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

\*    \*    \*    \*    \*

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 12. The authority citation for part 685 is revised to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

Section 685.205 also issued under 20 U.S.C. 1087a *et seq.*

Section 685.206 also issued under 20 U.S.C. 1087a *et seq.*

Section 685.212 also issued under 20 U.S.C. 1087a *et seq.;* 28 U.S.C. 2401.

Section 685.214 also issued under 20 U.S.C. 1087a *et seq.*

Section 685.215 also issued under 20 U.S.C. 1087a *et seq.*

Section 685.222 also issued under 20 U.S.C. 1087a *et seq.;* 28 U.S.C. 2401; 31 U.S.C. 3702.

Section 685.300 also issued under 20 U.S.C. 1087a *et seq.,* 1094.

Section 685.304 also issued under 20 U.S.C. 1087a *et seq.*

Section 685.308 also issued under 20 U.S.C. 1087a *et seq.*

### § 685.205   [Amended]

■ 13. Section 685.205 is amended:
■ a. In paragraph (b)(6)(i), by removing the citation "§ 685.206(c)" and adding, in its place, the citation "§ 685.206(c), (d) and (e)"; and
■ b. By removing the parenthetical authority citation at the end of the section.

■ 14. Section 685.206 is amended:
■ a. In paragraph (c), by revising the subject heading;
■ b. By adding paragraphs (d) through (e); and
■ c. Removing the parenthetical authority citation at the end of the section.

The revision and additions read as follows:

### § 685.206   Borrower responsibilities and defenses.

\*    \*    \*    \*    \*

(c) *Borrower defense to repayment for loans first disbursed prior to July 1, 2017.* \* \* \*

\*    \*    \*    \*    \*

(d) *Borrower defense to repayment for loans first disbursed on or after July 1, 2017, and before July 1, 2020.* For borrower defense to repayment for loans first disbursed on or after July 1, 2017, and before July 1, 2020, a borrower asserts and the Secretary considers a borrower defense in accordance with § 685.222.

(e) *Borrower defense to repayment for loans first disbursed on or after July 1, 2020.* This paragraph (e) applies to borrower defense to repayment for loans first disbursed on or after July 1, 2020.

(1) *Definitions.* For the purposes of this paragraph (e), the following definitions apply:

(i) A "Direct Loan" means a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct PLUS Loan.

(ii) "Borrower" means

(A) The borrower; and

(B) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(iii) A "borrower defense to repayment" includes—

(A) A defense to repayment of amounts owed to the Secretary on a Direct Loan, or a Direct Consolidation Loan that was used to repay a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act; and

(B) Any accompanying request for reimbursement of payments previously made to the Secretary on the Direct Loan or on a loan repaid by the Direct Consolidation Loan.

(iv) The term "provision of educational services" refers to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.

(v) The terms "school" and "institution" may be used interchangeably and include an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services.

(2) *Federal standard for loans first disbursed on or after July 1, 2020.* For a Direct Loan or Direct Consolidation Loan first disbursed on or after July 1, 2020, a borrower may assert a defense to repayment under this paragraph (e), if the borrower establishes by a preponderance of the evidence that—

(i) The institution at which the borrower enrolled made a misrepresentation, as defined in § 685.206(e)(3), of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan, and that directly and clearly relates to:

(A) Enrollment or continuing enrollment at the institution or

(B) The provision of educational services for which the loan was made; and