# EXHIBIT A

9/22/2021 Expansion of Collections Pause to Defaulted FFEL Program Loans Managed by Guaranty Agencies (Updated May 24, 2021) | Knowledge Center

Case 1:19-cv-03674-CJN Document 19-1 Filed 09/22/21 Page 2 of 5



Published on [https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2021-05-12/expansion-collections-pause-defaulted-ffel-program-loans-managed-guaranty-agencies-updated-may-24-2021](https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2021-05-12/expansion-collections-pause-defaulted-ffel-program-loans-managed-guaranty-agencies-updated-may-24-2021)

PUBLICATION DATE: May 12, 2021
DCL ID: GEN-21-03
SUBJECT: Expansion of Collections Pause to Defaulted FFEL Program Loans Managed by Guaranty Agencies (Updated May 24, 2021)
SUMMARY: This letter informs Guaranty Agencies (GAs) of their obligations regarding Federal Family Education Loan (FFEL) Program loans that are in default.

>  **Note**
>
> On May 24, 2021, we updated the description for Population 2 in the second paragraph of the announcement.

Dear Colleague:

On March 30, 2021, the U.S. Department of Education (Department) announced an expansion of the pause on federal student loan interest and collections on all defaulted loans in the FFEL Program that are managed by GAs. These flexibilities will be in place for the same period of time as the pause for loans held by the Department, which is currently slated to run through September 30, 2021.

There are three populations of FFEL Program loans covered by the announcement:

- Population 1 includes outstanding loans on which a default claim was paid prior to March 13, 2020, that are not subject to an active bankruptcy filing, and are still in default as of the date of this letter;

- Population 2 includes outstanding loans on which a default claim was paid on or after March 13, 2020 and on or prior to the end date for the pause for loans held by the Department, that are not subject to an active bankruptcy filing, and are in default on or after the date of this letter; and

- Population 3 includes outstanding loans that were in default during the pandemic (regardless of when the claim was paid) and for which that default was resolved through rehabilitation or consolidation prior to the date of this letter.

## Actions Required to be Taken for Population 1

GAs must take the following actions for loans in Population 1:

- Interest rates must be set to 0%;

- Payments received through Administrative Wage Garnishment (AWG), the Treasury Offset Program (TOP), and other forms of involuntary collection since March 13, 2020, must be refunded;

- Borrowers who made voluntary payments must be given the option for a refund of those payments;

- All forms of involuntary collection must be suspended;

- All collection attempts (including billings) must cease; and

- Borrowers with active rehabilitation agreements must be notified they are not required to make further payments to receive credit toward rehabilitation.

## Actions Required to be Taken for Population 2

GAs must take the following actions for loans in Population 2:

- All actions required for Population 1 loans;

9/22/2021, Expansion of Collections Pause to Defaulted FFEL Program Loans Managed by Guaranty Agencies (Updated May 25, 2021) | Knowledge Center

Case 1:19-cv-03674-CJN Document 19-1 Filed 09/22/21 Page 3 of 5

- Deleting the GA's trade line from a borrower's credit report entirely; and
- Mandatory assignment of these loans to the Department.

## Actions Required to be Taken for Population 3

- All actions required for Population 1 loans; and
- Sending financial adjustments and associated money to purchasing lenders (for loan rehabilitations) or the Department (for loan rehabilitations or consolidations).

Below, we explain in more detail each action that GAs must take and waivers of the Higher Education Act of 1965, as amended (HEA), and the Department's implementing regulations that the Department will exercise to facilitate these actions.

## Borrower Communications

GAs must notify affected borrowers of the actions taken pursuant to this letter, of their right to request a refund of voluntary payments, and how the pause on collections and flexibility related to loan rehabilitation and other repayment agreements impacts their loans. In addition, GAs must notify borrowers if their loans will be assigned to the Department for removal from default.

In addition, in a reasonable time frame after the Department announces that the payment pause will end and before it in fact does end, GAs must notify affected borrowers whose loans are still with the GA that the pause will be ending and how to prepare for repayment or collections to resume. The Department will notify GAs about the requirements for notifying borrowers about the end of the pause at a later date.

## Interest Rates

GAs charge a rate of interest that is defined by law, the borrower's promissory note, and any modifications to the loan agreement agreed to by the GA (e.g., through an incentive program).

In accordance with the Department's announcement of March 30, 2021, the interest rate on all loans managed by a guaranty agency must be reduced to 0% retroactively effective to March 13, 2020, but only for the period that the GA held the loan, and all transactions since that date must be reapplied using this rate. This requirement includes loans that were subject to a voluntary repayment agreement or a rehabilitation agreement. To the extent that the loan must be assigned to the Department because it is in Population 2, all adjustments that need to be made to the loan should be made prior to assignment.

## Involuntary Collections (e.g., AWG and TOP)

For all three populations, all payments on loans made through involuntary collection methods (including administrative wage garnishment, Treasury offset, and state offset methods) received on or after March 13, 2020, or applied to the borrower's account with an effective date on or after March 13, 2020, must be refunded to the borrower, including any portion of the payment that the GA retained for collection costs. These payments must be directly refunded to the borrower by the GA. Should the refund be returned as undeliverable, the GA must reapply the funds to the borrower's account to avoid escheatment. For loans in Population 2, refunds that are returned after the loan has been assigned to the Department must be forwarded to the Department for application to the borrower's account following normal procedures. These refunds must include any collection costs charged to the borrower. The GA may reimburse itself for these lost collection costs out of its Federal Fund as discussed below.

Please note that the Department has instructed the U.S. Department of Treasury (Treasury) to suspend offset against all borrowers whose loans are managed by the GAs, regardless of when the GA certified the borrower for the Treasury Offset Program. Unfortunately, we cannot obtain address information for borrowers from Treasury.

## Voluntary Payments

For all three populations, borrowers must be given the option to request a refund of any voluntary payments made on or after March 13, 2020, including payments made pursuant to a rehabilitation or other repayment agreement. The refund must include the portion of the payment that the GA retained for collection costs. GAs must document that they informed the borrowers of their right to request a refund. For loans in Population 2, after the loan is assigned to the Department, the borrower will only be able to request a refund from the Department by making the request to the borrower's new federal loan servicer. GAs must allow borrowers to request a refund as long as these flexibilities remain in place.

## Collection Attempts

All collection attempts on defaulted loans owed by Population 1 and Population 2 borrowers must cease, including notice or welcome letters that a GA would send when it receives a defaulted FFEL Program loan from a FFEL Program lender or the notice in 34 CFR 682.410(b)(6)(ii), and all other actions otherwise required by 34 CFR 682.410(b)(6) and (b)(9) must cease. This prohibition does not prevent a GA from counseling borrowers about the terms of their loans, such as repayment plans that may

9/22/2021, Expansion of Collections Pause to Defaulted FFEL Program Loans Managed by Guaranty Agencies (Updated May 25, 2021) | Knowledge Center

Case 1:19-cv-03674-CJN Document 19-1 Filed 09/22/21 Page 4 of 5

prohibition does not prevent a GA from counseling borrowers about the terms of their loans, such as repayment plans that may be available if their loan is removed from default, processing voluntary payments, etc. Indeed, we encourage such actions. However, it does prohibit a GA from requesting or demanding payment from a borrower, or billing a borrower, while the "payment pause" is ongoing.

## Loan Rehabilitation & Eligibility Reinstatement

Loan rehabilitation is not automatic, and a borrower must have a rehabilitation agreement with the guaranty agency to rehabilitate a defaulted loan during the pandemic. However, for borrowers who have entered into a rehabilitation agreement, the months following the entry into the agreement in which payments are not required, made, or made and then refunded per a borrower request will be counted as a payment toward the required nine payments within 10 months. In addition, any payments missed on a rehabilitation agreement on or after March 13, 2020, must now be treated by the GA as if they were made. To provide parity with the treatment of loans held by the Department, a GA may not add collection costs to the loan when it is successfully rehabilitated but may reimburse itself for those costs as discussed below. Additionally, any borrower who was seeking to reestablish eligibility for Title IV aid by making satisfactory repayment arrangements (either through or independent of a rehabilitation agreement) must be given credit toward the six required payments to reestablish eligibility for payments which would have been owed except for the suspension. However, credit for these suspended payments will not apply to borrowers seeking to make satisfactory repayment arrangements for the purposes of establishing eligibility for loan consolidation.

## Credit Reporting

Loans in Population 2 will be returned to good standing. GAs must assign these loans to the Department and request that credit reporting agencies delete the GA's entire tradeline and all history from the borrower's credit report.

For loans in Population 1, no changes should be reported to credit bureaus. The Department, for its portfolio, is continuing to report these loans as "defaulted," and a GA should do the same.

## Default Aversion & Default Claims

We strongly encourage FFEL Program lenders to offer borrowers the maximum repayment flexibility authorized by law and regulation during the pandemic, and specifically recommend counseling borrowers who are struggling to repay their FFEL Program loans about loan consolidation options and the Income-Based Repayment (IBR) Plan in simple terms. However, loans that become delinquent must be submitted by a lender to the GA for default aversion, and loans that default during this time must be submitted by a lender to the GA for claim payment. GAs must continue to pay default claims on such loans if the applicable statutory and regulatory criteria are met and then promptly assign those loans to the Department.

To focus GA resources on ensuring that such loans are promptly assigned to the Department, GAs will not be required to treat these loans any differently from any other loan on which a GA would have suspended collection immediately after claim payment.

## NSLDS Reporting

When reporting on these loans to the National Student Loan Data System (NSLDS), loan statuses, effective dates, and interest rates should stay as they are in NSLDS. To the extent that AWG or TOP payments were reported that were subsequently refunded to the borrowers, GAs should follow existing procedures for reporting such changes to NSLDS.

## Mandatory Assignment

The Department will exercise its discretion in 34 CFR 682.409(c)(6) to permit GAs to assign loans to the Department without the documentation that is typically required. The Department will request documentation from the GA at a later date. Loans that are currently subject to a bankruptcy filing must remain in their current status to avoid violating the automatic stay that applies to loans in bankruptcy. Once the bankruptcy case is resolved, the loan should be assigned to the Department, or whatever other action is appropriate should be taken depending on the result of the bankruptcy case. If a loan defaulted during the pandemic and the borrower is working toward rehabilitation, those loans should also be assigned to the Department.

Effective immediately, a GA must pause assigning loans that it would have otherwise assigned until it receives instructions from the Department to resume those assignments. To expedite the removal from default of loans in Population 2, and once GAs are instructed to begin assigning those loans, only the Population 2 loans should be assigned until the Department instructs GAs otherwise. Once "regular" mandatory assignments resume, the Department will again exercise its discretion in 34 CFR 682.409(c)(6) to permit assignment of loans to the Department without the documentation that is typically required.

If the GA has received a claim on a loan from the lender and has paid the claim but has not yet submitted the request for reinsurance to the Department, the GA should request reinsurance and assign the loan to the Department for removal of the loan from default.

## Consolidations

9/22/2021, Expansion of Collections Pause to Defaulted FFEL Program Loans Managed by Guaranty Agencies (Updated May 25, 2021) | Knowledge Center

Case 1:19-cv-03881-CJN Document 19-1 Filed 09/22/21 Page 5 of 5

## Consolidations

For any borrower in the process of consolidating a loan in Population 1, the GA should continue to process any Loan Verification Certificates (LVCs). Furthermore, the GA must complete all retroactive transactions, such as refunds and interest re-accrual, before responding to the LVC. Payoffs that occur based on an LVC submitted to a GA on or after March 30, 2021, and for which a GA could not complete retroactive transaction processing prior to payoff, should be submitted through the over-/under-payment process for consolidation loans. A GA may add collection costs to the payoff amount, up to 2.8% of the loan balance consolidated to match what is currently charged to similarly situated borrowers in Direct Lending. A GA may then seek reimbursement from the Federal Fund for up to 7.2% of the loan balance consolidated.

## Order of Transactions

The Department understands that many financial transactions and adjustments will be required to implement these actions and that such actions will take some time. We will not specify the order in which transactions occur so long as, when all adjustments are completed, the borrower's loan is correctly reconstituted. For example, a GA could refund payments before setting rates to 0% or could set rates to 0% and then refund payments. However, as a reminder, for loans in Population 2, all financial adjustments must be completed before loans are assigned to the Department.

## Reimbursement of Lost Revenue

The Department is authorizing a GA to reimburse itself from the Federal Fund for lost revenue that it will realize because of these actions. However, that reimbursement will only cover the share of what a GA might have reasonably collected during the pandemic but for the suspension. Lost revenue calculations will need to be submitted to Federal Student Aid's Office of Partner Participation and Oversight's Financial Oversight Service Group.

GAs may reimburse themselves for this lost revenue from the Federal Fund on a quarterly basis based on their good-faith estimates, and without the requirement for prior approval from Federal Student Aid as to lost revenue. When the suspension ends, the Department will compare the total amount reimbursed to the amount of lost revenue as submitted by the GA, with an attendant over-/under-payment process.

The Department is not setting specific requirements for the GA's estimate of its lost collection revenues for the purposes of seeking reimbursement from the Federal Fund, but the estimate must be made in good faith and supported by the GA's records.

## Waivers

In addition to those waivers that will be necessary to facilitate the above actions, which will be in a forthcoming HEROES Act Federal Register Notice, the Department will waive the following statutory and regulatory provisions for federal fiscal years at least partially overlapping with the national emergency:

- Minimum Reserve Ratio (34 CFR 682.410)

- Limits on Loan Consolidation Volume (34 CFR 682.401(b)(18))

- Reinsurance Trigger Rate (34 CFR 682.404(b))

## Conclusion

We thank the Guaranty Agencies for their interest and cooperation in helping borrowers during the uncertainty of the pandemic. If a GA has questions about implementing the provisions in this letter, please contact both Michael Sutphin at Mike.Sutphin@ed.gov and Jennifer.Hong@ed.gov.

Sincerely,

Annmarie Weisman  
Deputy Assistant Secretary  
  for Policy, Planning, and Innovation  
Office of Postsecondary Education

Richard Cordray  
Chief Operating Officer  
Federal Student Aid