## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASCENDIUM EDUCATION SOLUTIONS,
INC.,

       *Plaintiff*,

    v.

MIGUEL CARDONA, Secretary of
Education, et al.,

       *Defendants*.

Civil Action No. 1:19-cv-03831 (CJN)

## <u>MEMORANDUM OPINION</u>

This case concerns the validity of a federal rule that restricts the holders of defaulted student loans from recouping certain collection costs from borrowers.  Defendants have moved to dismiss, *see* ECF No. 10, and Plaintiff has moved for summary judgment, *see* ECF No. 13.  For the reasons discussed below, the Court grants in part and denies in part both motions.

### I.  Background

### *FFEL Program and Guaranty Agencies*

The Federal Family Education Loan Program was designed to incentivize lending to postsecondary students and their parents who had a lack of collateral or poor credit history.[1] Private and public lenders made loans to students or their parents who had low incomes or poor credit histories and would otherwise be priced out of student loans.  *See* 20 U.S.C. § 1078.  Instead of those loans undergoing a typical underwriting process, the Program authorized certain nonprofit

---

[1] The FFEL program has been discontinued for new loans since 2010.  *See* 20 U.S.C. § 1071(d).

entities—so-called "guaranty agencies"—to insure the lenders against the risk of default. The Department of Education, in turn, reinsured the guaranty agencies. *See* 20 U.S.C. § 1078; Compl. ¶ 19.

Guaranty agencies are state or private nonprofit institutions that entered into agreements with the Department to serve as the intermediate guarantors. 20 U.S.C. § 1078(j). Guaranty agencies often have independent educational missions, but under the FFEL Program their role is to partner with the federal government to administer the Program, not to profit from their administration of the program. *See Ohio Student Loan Com'n v. Cavazos*, 900 F.2d 894, 899 (6th Cir. 1990).

At issue in this case are the activities that guaranty agencies are required or are permitted to engage in when a loan made under the FFEL Program enters default. A loan enters default when the borrower fails to make a required payment for 270 days. 20 U.S.C. § 1085(l). At that point, the guaranty agency is required to purchase the loan from the lender, assuming that the lender has satisfied its own various statutory and regulatory obligations. 20 U.S.C. § 1078(c); 34 C.F.R. § 682.406(a). Thereafter, the guaranty agency must engage in a number of activities to attempt to collect on the loan, such as notifying the borrower of the debt, offering loan repayment plans, and, at times, reporting the default to credit agencies and commencing litigation. *See, e.g.*, 20 U.S.C. §§ 1078(c)(2)(A), (G); 34 C.F.R. § 682.410(b)(6). A guaranty agency's collection activities must be "at least as extensive and forceful as those generally practiced by financial institutions for the collection of consumer loans." 20 U.S.C. § 1085(f). If the guaranty agency is ultimately unable to recover money from the borrower, the government reimburses the guaranty agency for paying the lender's default claim. 20 U.S.C. § 1078(c)(1)(A); 34 C.F.R. § 682.406.

*Collection Activities*

As noted above, a guaranty agency is required to engage in various activities to collect on a defaulted loan that it has purchased from a lender.  *See, e.g.*, 34 C.F.R. § 682.410(b)(6)(i).  In particular, within 45 days of paying a lender's default claim, "but before it . . . assesses collection costs against a borrower," *id.* § 682.410(b)(5)(ii), the guaranty agency must, *inter alia*, send the borrower a written notice stating that the guaranty agency has paid the default claim and that the borrower may request access to the guarantor's records; may seek administrative review of the legal enforceability or past due status of the loan; and may "enter into a repayment agreement on terms satisfactory to the agency," *id.* §§ 682.410(b)(5)(ii)(A)–(D).  The guaranty agency must allow the borrower "at least 60 days from the date the notice . . . is sent" to exercise these options. *Id.* § 682.410(b)(5)(iv)(B).

The guaranty agency is also required to engage in particular "[c]ollection efforts on defaulted loans."  34 C.F.R. § 682.410(b)(6).  These efforts include locating the borrower and determining if she has the means to repay the debt, *see id.* at 682.410(b)(6)(i), and sending the informational notice to the borrower, *see id.* at § 682.410(b)(6)(ii).  Beginning sixty days after the guaranty agency mails the notice to the defaulted borrower, the agency may engage in certain additional activities, such as administratively garnishing the borrower's wages, filing a civil suit to compel repayment, offsetting state or federal tax refunds, and "other lawful collection means to collect the debt."  *Id*. § 682.410(b)(6); *see also* 20 U.S.C. § 1072b(d)(3)(A) (defining "default collection activities" as activities that are "directly related to the collection of the loan on which a default claim has been paid to the participating lender, including the due diligence activities required pursuant to regulations of the Secretary.").  A guaranty agency may assign some of these

more involved and costly activities to a collection agency. *See, e.g.*, 34 C.F.R. § 682.410(b)(9)(i)(T)(1).

Under the rule challenged here, within the initial sixty-day period following the notice of default, borrowers have two ways to avoid the need for guaranty agencies to undertake additional steps once the sixty days are up. 34 C.F.R. § 682.410(b)(2). First, the borrower can enter into a "repayment agreement" on terms negotiated by the guaranty agency. *Id*. § 682.410(b)(5)(ii)(D). If a borrower enters into such an agreement within the first sixty days and meets her obligations under the agreement, additional collection activities are unnecessary. *See id.* § 682.410(b)(5)–(9). Second, a borrower may enter into a "loan rehabilitation agreement," the terms of which are largely dictated by statute and regulation. *See* 20 U.S.C. § 1078-6; 34 C.F.R. § 682.405. Such agreements require the borrower to make nine "reasonable and affordable" monthly payments on the loan within a ten-month period. 20 U.S.C. § 1078-6(a)(1). Once the payments are made, the agency must either "sell the loan to an eligible lender" or, if unable to do so, assign the loan to the Secretary. *Id.* § 1078-6(a)(1)(A). At that point the loan is "rehabilitated." The loan exits default and the borrower is once again subject to the same terms and conditions on the loan as if he or she had never defaulted. *Id.* § 1078-6(a)(4).

*Collection Costs*

The statute mandates that "a borrower who has defaulted on a loan made under [the FFEL Program] shall be required to pay, in addition to other charges specified in this subchapter[,] reasonable collection costs[.]" 20 U.S.C. § 1091a(b)(1). Prior to the issuance of the rule challenged here, the Department's regulations explained that:

> [T]he guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim. These costs may include, but are not limited to, all attorney's fees, collection agency charges, and court costs.

34 C.F.R. § 682.410(b)(2) (2018).  With respect to borrowers who enter into loan rehabilitation agreements, the statute provides that when a guaranty agency has secured all of the nine required payments and sells the loan to a lender, it "may . . . in order to defray collection costs . . . charge to the borrower an amount not to exceed 16 percent of the outstanding principal and interest at the time of the loan sale."  20 U.S.C. § 1078-6(a)(1)(D)(i)(II).  Here, both parties assert that, provided a guaranty agency is permitted to charge any collection costs under this provision, the guaranty agency may charge the full 16 percent on rehabilitated loans.

### The Rulemaking

Although the FFEL Program was discontinued for new loans beginning in 2010, student borrowers remain obligated under loans made before 2010, and lenders, guaranty agencies, and the government continue to service such loans.  In 2015, the government filed an amicus brief in the Seventh Circuit addressing the question of whether a guaranty agency can assess collection costs against a defaulted borrower who timely enters into a rehabilitation agreement and complies with that agreement.  In that brief, the government explained its view that guaranty agencies could not charge collection costs in these circumstances because the regulations did not allow guaranty agencies to engage in collection activities against such borrowers.  *See* Brief of the United States as *Amicus Curiae* in Support of the Appellant and Reversal, *Bible v. United Student Aid Funds, Inc.*, No. 14-1806 (7th Cir.), Dkt. 34, at 9.[2]  The Secretary subsequently issued a "Dear Colleague"

---

[2] The government argued that 34 C.F.R. § 682.410(b)(5)(ii) interpreted the statute's use of "reasonable collection costs" and created a safeharbor for defaulting borrowers not to be assessed collection costs.  Specifically, the regulation required the guaranty agency to offer an opportunity to enter into a repayment agreement "after [the agency] pays a default claim on the loan but before [the agency] . . . assesses  collection costs."  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015).  The Seventh Circuit concluded that the Secretary's interpretation of its regulations and the statute were entitled to deference. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015); *see also id.* at 661 (Flaum, J., concurring in

letter taking the same position.  *See* "Dear Colleague" Letter from Lynn B. Mahaffie, Assistant Secretary for Policy, Planning, and Innovation, Office of Postsecondary Education, U.S. Dep't of Education, July 10, 2015 ("2015 Letter").

Two years later, the Secretary rescinded its 2015 Letter, finding that the "position set forth" in that letter "would have benefitted from public input on the issues discussed."  The Department committed not to require compliance with the 2015 Letter's interpretation "without providing prior notice and an opportunity for public comment." "Dear Colleague" Letter from Lynn B. Mahaffie, Acting Assistant Secretary, Office of Postsecondary Education, U.S. Dep't of Education, March 16, 2017.

In June 2017, the Department began a negotiated rulemaking process to consider a number of topics relating to FFEL loans, including the issue of guaranty agency collection costs.  *See* 82 Fed. Reg. 27640 (June 16, 2017); *see also* 82 Fed. Reg. 41194, 41196 (Aug. 30, 2017).  The relevant committee held public hearings; at one hearing, Plaintiff Ascendium Education Solutions, Inc., provided an oral comment opposing the committee's collection costs proposal.  *See* Compl. ¶ 13; Transcript, United States Dep't of Education Borrower Defense and Financial Responsibility Negotiated Rulemaking Committee 2017–2018, Session 2, Thursday January 11, 2018, at 202; Def. Mot. at Exhibit A, ECF No. 10–1.  The Department thereafter issued a notice of proposed rulemaking that included a proposal "to prohibit guaranty agencies from charging collection costs to borrowers who, within sixty days of receiving notice of default, enter into an acceptable repayment arrangement, including a loan rehabilitation plan."  83 Fed. Reg. 37242, 37282 (July 31, 2018).  The Department stated that the proposed rule was consistent with the position it had

---

part and concurring in the judgment) (deferring to the agency because "the regulatory landscape [is] sufficiently complex to merit deference").

taken in the 2015 "Dear Colleague" Letter. *Id.* Ascendium submitted a written comment opposing the proposed rule. *See* Compl. ¶ 52; Letter from Great Lakes Higher Education Guaranty Corp. to U.S. Dep't of Education, Aug. 30, 2018.[3]

The Secretary issued a Final Rule on September 23, 2019, primarily dealing with borrower defenses to repayment claims. 84 Fed. Reg. 49788. As part of that Rule, the Secretary amended the regulations governing guaranty agencies to expressly prohibit them from charging collection costs to defaulting borrowers who have entered a repayment or rehabilitation agreement within the first sixty days after the notice of default. The relevant regulation, as amended, provides:

> (i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim unless, within the 60-day period after the guaranty agency sends the initial notice described in [34 C.F.R. § 682.410(b)(6)(ii)], the borrower enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrow any collection costs.
> . . .
> (iii) The costs under this paragraph . . . include, but are not limited to, all attorneys' fees, collection agency charges, and court costs. Except as provided in [other regulations], the amount charged a borrower must equal the lesser of—
>
> > (A) The amount the same borrower would be charged for the cost of collection under the formula in 34 CFR 30.60; or
> >
> > (B) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

34 C.F.R. § 682.410(b)(2).

---

[3] Ascendium was formerly known as Great Lakes Higher Education Guaranty Corporation.

*Procedural Background*

Plaintiff Ascendium is one of the nation's largest higher-education non-profits. It acts as a guaranty agency in the FFEL program, and it uses some of the proceeds obtained from its guaranty operations to fund its philanthropy. Compl. ¶ 11.

Ascendium asserts two claims in its Complaint. First, it argues that the Rule is inconsistent with the Higher Education Act, which, Ascendium argues, authorizes the recovery by guaranty agencies of their reasonable collection costs and gives guarantors an unqualified right to charge a 16 percent fee upon a loan's rehabilitation. *See* Compl. ¶ 60; 20 U.S.C. § 1091a(b)(1); 20 U.S.C. § 1078-6(a)(1)(D)(i)(II)(bb). Second, Ascendium argues that the Rule is arbitrary and capricious because it affects *when* costs may be recovered rather than *whether* the costs are reasonable, creates perverse incentives, and treats repayment and rehabilitation agreements the same despite significant differences. Compl. ¶ 65. Ascendium seeks declaratory and injunctive relief, including vacatur of the Rule and an injunction precluding its enforcement with respect to repayment agreements and rehabilitation agreements. *Id.* at ¶ 67.

The Parties filed dispositive motions. Def. Mot. to Dismiss, ECF No. 10; Pl. Mot. for Summ. J., ECF No. 13. On October 13, 2021, the Court heard argument on those Motions.

## II. Legal Standards

*Dispositive Motions in APA Cases*

When assessing a dispositive motion on the merits in an Administrative Procedures Act case, this Court's standard of review is the same whether on summary judgment or a motion to dismiss. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law, and only a question of law," and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221,

1226 (D.C. Cir. 1993).  That is because neither the traditional motion to dismiss nor summary judgment standards apply for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the Administrative Procedures Act. *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Stuttering Found. of America v. Springer*, 498 F. Supp.2d 203, 207 (D.D.C. 2007) (*citing Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).  Thus, the Court "sits as an appellate tribunal," *Am. Bioscience, Inc.*, 269 F.3d at 1083, and its review "is based on the agency record and limited to determining whether the agency acted" in violation of the Administrative Procedures Act.  *Rempfer*, 583 F.3d at 865.

### *Deference*

Evaluating whether an agency has exceeded its statutory authority is a question of statutory interpretation.  Judicial deference is never afforded to an agency's interpretation of unambiguous statutes.  *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).  Nor are agencies entitled to judicial deference when interpreting unambiguous rules. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  To determine whether a statute or rule is ambiguous, a court must use all available tools of construction.  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 447-48 (1987); *Kisor*, 139 S. Ct. at 2416.  If a statute or rule is ambiguous, an agency's interpretation is entitled to deference to the extent the interpretation is based on a "permissible construction" given the ordinary tools of construction.  *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1245 (D.C. Cir. 2018) (quoting *Chevron*, 467 U.S. at 843).  Even absent a considered interpretation as to which *Chevron* or *Auer* deference is appropriate, an agency's position should serve as persuasive authority depending on "the thoroughness evident in [the interpretation's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all factors which give it

power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

### *Arbitrary & Capricious Review*

When reviewing an agency's action to determine whether it was arbitrary and capricious, a court may not substitute its policy judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974). Nevertheless, a court must ensure that an agency has engaged in reasoned decision-making. *Allentown Mack Sales and Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374–75 (1998); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983). Agency action is arbitrary and capricious when, for example, the agency (i) relies on factors that Congress did not intend it to consider; (ii) fails to consider an important aspect of the problem; (iii) offers an explanation for its decision that runs counter to the evidence before the agency, or (iv) acts in a manner so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). Likewise, an agency action is arbitrary and capricious where it fails to "state its reasoning." *Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014).

## III.  Analysis

### *Justiciability*

The government argues that the Court lacks jurisdiction over Ascendium's challenge to the Rule's limitation on collection fees for borrowers who enter "repayment agreements." Ascendium concedes that it does not charge collection costs to borrowers who enter such agreements within sixty days, nor does not assert it would in the absence of the Rule. *See* Pl.'s Opp. to Def's Mot. to Dismiss & Mot. for Summ. J., ECF 12, at 35. Thus, the government contends, Ascendium cannot

establish Article III standing with respect to the Rule's impact on collection costs in the context of repayment agreements.

Ascendium has two responses. First, it argues that the Rule's limitation on its ability to charge collection fees is itself an injury sufficient for Article III standing. Relying on *Sierra Club*, Ascendium argues that this is a situation in which "the complainant is 'an object of the action (or forgone action) at issue' . . . [and thus] there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" 292 F.3d at 899–900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561–62). Second, Ascendium argues there is only one rule, not two. Even if it does not have standing in the context of *repayment* agreements, it argues, it is indisputably injured with respect to the limitation on its ability to charge fees in the context of *rehabilitation* agreements, and thus has standing to challenge the entire Rule.

The Court disagrees. Ascendium has failed to show that it is injured with respect to the Rule's prohibition on charging of collection costs with respect to *repayment* agreements. Ascendium does not charge collection costs to borrowers who enter such agreements, nor does not assert it would do so absent the Rule. Losing the ability to someday consider charging fees to such borrowers—without any intention ever to do so—is insufficient for Article III standing. *See Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions—without any description of concrete plans, or indeed any specification of *when* some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require."). To be sure, when a government action directly affects one's legal rights, "there is ordinarily little question that the action or inaction has caused him injury." *Lujan*, 504 U.S. at 561–62. But here, the government action affects only a long-

unused legal right.[4]  As it relates to repayment agreements, the Rule does not require Ascendium to act differently, does not prohibit Ascendium from acting in the same way it has acted, and does not interfere with any plans that Ascendium has established for future action.

Ascendium's second argument fares no better.  Ascendium is suffering an injury because the Rule prevents it from charging collection costs in the context of *rehabilitation* agreements, but that injury does not create standing to challenge the entire Rule.  The Court may "set aside" unlawful agency action, *see* 5 U.S.C. § 706(2), and Ascendium contends that the relevant agency action is the Rule's entire amendment to 34 C.F.R. § 682.410.  *See* Oral Argument Transcript at 33–34.  But the Court of Appeals has strictly interpreted the "agency action" that a Court can "set aside" under § 706 to be only that narrow portion of a rule that is unlawful.  *See Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994); *see also* 5 U.S.C. § 551(13) (defining "Agency action" to "include[] the whole *or a part* of an agency rule[.]") (emphasis added).  Because the Court may "'set aside' only the part of a rule found to be invalid," *Cath. Soc. Serv.*, 12 F.3d at 1128, so too must a plaintiff demonstrate standing as to every portion of a rule that it challenges.  Because Ascendium has not demonstrated an injury with respect to repayment agreements, it lacks standing to challenge the Rule as it pertains to such agreements.[5]

---

[4] Ascendium also did not argue that it does or would exercise the right to charge collection fees in the context of repayment agreements by leveraging that right in negotiations with debtors entering such agreements.

[5] The government argues that Ascendium forfeited its right to challenge the Rule with respect to repayment agreements because Ascendium did not raise the issue in its comments during the rulemaking.  Not so.  The exhaustion requirement is met if the record reveals the agency had "the opportunity to consider" "the very argument pressed" by the petitioner.  *Office of Communication of the United Church of Christ v. FCC,* 465 F.2d 519, 523 (D.C. Cir. 1972).  Here, the Rule's written explanation discusses the issue.  *See* Rule, 84 Fed. Reg. at 49877 (noting Section 484A(b) of the statute requires all borrowers pay reasonable collection costs).  And, in any event, while Ascendium's comments were primarily directed towards rehabilitation fees, the statutory

### *Statutory Authority*

Despite the seeming complexity of the statutory and regulatory scheme, this case can be boiled down to a simple question: is the Rule permissible in light of the statutory command that a defaulting borrower "shall be required to pay . . . reasonable collection costs"?  20 U.S.C. § 1091a(b)(1).  The Court concludes that the answer is no.  To be sure, a statute's use of the term "reasonable" is typically an indication that Congress intended to grant an agency a substantial amount of deference on a particular issue.  But this case turns principally on the definition of "collection costs," not the reasonableness of the charges.[6]

This section first addresses Plaintiff's argument that the Rule is inconsistent with the statute by limiting costs based on timing, not reasonableness.  The Court concludes that that question merges with the issue of the definition of collection costs, to which the Court next turns.

\* \* \*

Ascendium argues that the Rule is unlawful because it prohibits—by its own words—a guaranty agency from recouping costs based on *when* the costs are incurred, not *whether* such costs are *reasonable*.  Recall that the statute mandates that "a borrower who has defaulted on a loan made under [FFEL loans] *shall be required to pay . . . reasonable collection costs*[.]" 20 U.S.C. § 1091a(b)(1) (emphasis added).   The Rule allows a guaranty agency to charge a borrower reasonable collection costs "*unless*, within the sixty-day period after the guaranty agency sends the initial notice . . . the borrower enters into an acceptable repayment agreement, including a

---

section applies to repayment agreements and rehabilitation fees. 20 U.S.C. § 1091a(b).  Forfeiture is not an additional bar to justiciability.

[6] The government does not assert that it is unreasonable to charge collection costs that are incurred as a result of permitted collection activities. In any event, such an argument is plainly foreclosed by any reading of the statute.

rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrower any collection costs." 34 C.F.R. § 682.410(b)(2)(i) (emphasis added). Thus, Ascendium contends, the regulation addresses *when* reasonable collection costs may be assessed, not *whether* certain kinds of collection costs are reasonable.

The government disagrees. It argues that the Rule is essentially a tautology: guarantors may recover collection costs, except in cases that do not involve any collection costs, in which case they may not. The government also argues that other regulations prohibit guaranty agencies from charging collection costs or assessing fees within the first sixty-day period.[7]

On first glance, Ascendium's argument is persuasive. Rather than defining what collection costs are reasonable, the Rule places a condition precedent on a guaranty agency charging such costs: it cannot do so if the borrower enters an agreement within the sixty-day window. This, Ascendium contends, contradicts the statute, which provides that defaulting borrowers "shall be required to pay . . . reasonable collection costs." 20 U.S.C. § 1091a(b)(1).

But the government's response, if correct, would resolve the apparent contradiction. The Rule's *function* (if not the way it is framed) would not be inconsistent with the statute if the universe of "reasonable collection costs" does not include any costs incurred by guaranty agencies when defaulted borrowers enter an agreement within the sixty-day period and stick to it. If "reasonable collection costs" are so-defined (or at least could permissibly be so-defined) then the Rule does not condition the collection of such costs based on when they are incurred, but rather it implicitly defines which collection costs are reasonable, or it is a summary of the effect of other regulations. In other words, if there are no "reasonable costs incurred by the agency in collecting

---

[7] It may initially appear odd that the government understands the Rule to do so little. But recall that the Rule began as a mere interpretation of existing regulations, which the agency subsequently determined should go through notice and comment.

a loan" when a defaulted borrower enters an agreement in the sixty-day period, then the Rule is wholly consistent with the statute.

The Court therefore agrees with the government to the extent that it moves the goalposts—Ascendium's timing argument merges with the "collection costs" issue. That is, whether the Rule is consistent with the statute depends on the definition of reasonable collection costs.

* * *

Ascendium contends that the most natural definition of "collection costs" is those costs associated with default collection activities. *See* 20 U.S.C. § 1072b(d)(3)(A). In its view, such default collection activities include the initial notice of default, among other actions, which necessarily occurs before the sixty-day period is up. *See* 34 C.F.R. § 682.410(b)(6). As a result, Ascendium argues, guaranty agencies incur collection costs every time a loan is in default. And, Ascendium contends, it cannot be unreasonable to *incur* such costs; after all guaranty agencies are *required* by regulation to take many of these steps, including the initial notice of default. *Id.*

The government agrees that collection costs are those costs that relate to "collection activities," but argues that "collection activities" are only those coercive actions relating to directly collecting on a loan, such as wage garnishment, administrative offsets, and civil litigation. Def. Reply at 12–13. Accordingly, the government concedes that guaranty agencies reasonably incur costs in the first sixty days following default, but contends that those costs are not *collection* costs. Def. Reply at 1; Transcript of Hearing on October 13, 2021 at 21–22 (hereinafter "Transcript").

The government's definition of "collection activities" as exclusively "coercive" activities has obscure foundations. To begin, the government contends that the statute uses the terms "collections, collected or collect" inconsistently and so it is left to the Secretary to interpret what "collection activities" are. Def. Reply at 20; Transcript at 44. And the government argues that it

has already defined "collection activities" in other regulations that predate the Rule here. Def. Reply at 12. The government points, for example, to a regulation that requires the Initial Notice include the warning "that if [the borrower] does not make repayment arrangements acceptable to the agency, the agency *will* promptly initiate procedures to collect the debt[,]" 34 C.F.R. § 682.410(b)(6)(ii) (emphasis added); Def. Rep. at 13; Transcript at 42–43. Other regulations prohibit guaranty agencies from engaging in coercive activities (including those warned of in the Initial Notice 34 C.F.R. § 682.410(b)(6)(ii)) until sixty days after the Initial Notice. *See, e.g.*, 34 C.F.R. § 682.410(b)(5)(ii), (iv)(B). According to the government, the "procedures to collect the debt" referenced in § 682.410(b)(6)(ii) must be coercive activities, so "collection activities" must therefore refer exclusively to coercive activities—and thus "collection costs" must also be limited to the costs of coercive activities.

This position is strained. To begin, even if the statute sometimes uses the word "collection" to refer to coercive activities and at other times uses it to refer to noncoercive activities, that does not mean that the statute is ambiguous, but rather suggests a broader definition of "collection activity." And even if the "procedures to collect the debt" that the guaranty agencies "*will . . . initiate*" are coercive procedures, that does not mean that "collection" refers exclusively to coercive activities. Coercive procedures are collection activities, but the inverse—that collection activities are only coercive actions—does not follow.

Returning to the statute, it defines "default collection activities" as "activities of a guaranty agency that are directly related to the collection of the loan on which a default claim has been paid to the participating lender, including the due diligence activities pursuant to regulations of the

Secretary." 20 U.S.C. § 1072b(d)(3)(A).[8]  The government argues that only coercive collection activities "directly relate" to loan collection because such activities result in payment without intermediate steps or further efforts to collect on the loan.  Ascendium argues that collection activities cannot be so narrowly defined.  It points to the statute's uses of the term "collection" in other contexts in which coercive activity cannot be the only meaning.  For example, the statute defines "default aversion activities" as "activities of a guaranty agency that are directly related to providing *collection* assistance to the lender on a delinquent loan, prior to the loan's being legally in a default status . . ." 20 U.S.C. § 1072b(d)(3)(B) (emphasis added).  By statute, such collection assistance cannot be coercive—before default, lenders are prohibited from engaging in the kinds of the coercive activities that the government contends are the extent of "collection activity."  *See* 20 U.S.C. § 1091a(a)(2) (identifying entities which may perform coercive collection actions without limitations; including guaranty agencies but not lenders).  And the statute provides that even monthly payments are "amounts *collected* on behalf of the obligation of a defaulted borrower." 20 U.S.C. § 1072a(c)(2) (emphasis added).[9]  The statute thus identifies as collection activities various types of acts that are not coercive.

---

[8] The government argues that this language expressly delegates authority to the Secretary to define "default collection activities."  Def. Mot. at 17; Def. Reply at 11–12.  That is true only in part—the provision allows the Secretary to define "default collection activities" to the extent the Secretary implements "due diligence" regulations, but that is just part of the broader definition of "default collection activities."  The provision does not expressly delegate to the Secretary the authority to define those activities "directly related to the collection of the loan."

[9] The government also attempts to show that the statute's use of "collection" is narrow.  For example, the government asserts that Congress "expressly distinguished" loan servicing from loan collection in the statute, citing 20 U.S.C. § 1085(a)(4)(C) and (m)(1)(A).  See, e.g., Def. Reply at 20.  To be sure, those provisions address loan servicing, but the government left unexplained how such provisions cast any doubt on loan servicing being a subset of collection activity.

Even if one thought the statute left the definition of "collection activities" sufficiently open for the agency to define them as limited to "coercive" collective activities, the regulations do not do so. *But see* Def. Reply at 11–13. To be sure, the Rule does state that the relevant costs "include, but are not limited to, all attorneys' fees, collection agency charges, and court costs"—that is, the primary coercive collection activities. 34 C.F.R. § 682.410(b)(2)(iii). But this is obviously an inclusive, not an exclusive, list. And the Rule goes on to say that the amount of collection costs charged "must equal the lesser of . . . the cost of collection under the formula in 34 C.F.R. § 30.60; or the amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education." 34 C.F.R. § 682.410(b)(2)(iii). While the costs under the referenced regulation include attorneys' fees, collection agency costs, and court fees, they also include:

> (1) Salaries of employees performing Federal loan servicing and debt collection activities;
> (2) Telephone and mailing costs;
> (3) Costs for reporting debts to credit bureaus;
> (4) Costs for purchase of credit bureau reports;
> (5) Costs associated with computer operations and other costs associated with the maintenance of records;
> (6) Bank charges; [and]
> …
> (9) Costs charged by other Governmental agencies.

Such costs are not limited to the coercive activities that the government identifies as collection activities. *Contra* Def. Reply at 12–13. And like the statute, this list is also inclusive, not exclusive. 34 C.F.R. § 30.60 ("These costs include, but are not limited to:").

The government argues that the foregoing list refers to both loan servicing and debt collection, and thereby implies that the delineated costs include more than just collection costs. *See id.* § 30.60(a)(1) ("Salaries of employees performing Federal loan servicing and debt collection

activities."). But the regulation itself states that all of the listed costs are "associated with the *collection* of a particular debt." *Id.* at § 30.60(a) (emphasis added). The government highlights the distinction between "loan servicing" and "debt collection activities" in connection with salaries. *See* Def. Reply at 19–20. But that says nothing about whether collection activities are only coercive activities. And the salaries of loan servicing employees are costs that may be charged as *collection* costs. If anything, the Rule supports the reading that loan servicing is a subset of collection activity because it cross-references this regulation as the maximum amount of collection costs that a guaranty agency may charge.[10]

The Department's other regulations also imply a broad definition of "collection" and "collection activity," certainly one that covers more than just coercive activities. Like the statute, those regulations classify a variety of non-coercive lender activities as "collection" when a borrower is delinquent—even before default. *See, e.g.*, 34 C.F.R. § 682.411 (mandating that *lenders* perform "collection efforts" including telephone contacts and frequent mail notices).[11] And Department regulations require guaranty agencies to "engage in reasonable and documented *collection activities*" on loans for which it has paid a default claim. 34 C.F.R. § 682.410(b)(6)(i) (emphasis added). Such collection activities are most naturally read to include the initial notice

---

[10] The government also argues that 34 C.F.R. § 30.60 permits the collection of these types of costs, but only to the extent that they are related to coercive procedures. It's not clear that all delineated costs would occur in coercive procedures. But whether § 30.60 is so limited largely turns on the same issues discussed above because § 30.60 defines its own scope as related to costs associated with "*collection* of a particular debt." *Id.* (emphasis added). Because the statute and other regulations regularly use "collection" to include non-coercive procedures, the government's argument is unpersuasive.

[11] Guaranty agencies are required to perform these same types of activities on all of their defaulted loans. *See, e.g.*, 34 C.F.R. § 682.401(b)(4) (mandating guaranty agencies be able to respond to written, electronic, and phone inquiries); *id.* §§ 682.410(b)(5)(ii), (vi); *id.* § 682.410(b)(6)(ii) (requiring mailing notices demanding repayment).

that triggers the sixty-day window, as well as a variety of other non-coercive actions.  *See* 34 C.F.R. § 682.410(b)(6)(ii).

In sum, the Court concludes that "collection activity" necessarily includes more than just the limited set of coercive actions argued by the government.  And, given the link between "collection activity" and "collection costs," "collection costs" are also broader than just the costs associated with coercive activity.  It is therefore impermissible for the agency to construe "collection activity" or "collection costs" as only relating to coercive activities.  Rather, under the statute and the Department's own regulations, "collection activities" include non-coercive activities, including, for example, the mailing of the initial notice; and "collection costs" includes the cost of such non-coercive activities.

Given this conclusion, the portion of the Rule prohibiting a guaranty agency from charging even "reasonable costs incurred by the agency in collecting a loan" if the borrower enters an agreement within the sixty-day window is unlawful.  Rule, 84 Fed. Reg. at 49926.  Guaranty agencies engage in collection activities, and therefore reasonably incur collection costs, during that period.

\* \* \*

Ascendium also argues that the statute's rehabilitation fee provision provides an additional basis for setting aside the Rule.  That provision reads:

> With respect to a loan sold under [the loan rehabilitation program]—(i) the guaranty agency—
>
> > (I)     shall, in the case of a sale made on or after July 1, 2014, repay the Secretary 100 percent of the amount of the principal balance outstanding at the time of such sale, multiplied by the reinsurance percentage in effect when payment under the guaranty agreement was made with respect to the loan; and

> (II)   *may*, in the case of a sale made on or after July 1, 2014, *in order to defray collection costs—(aa) charge to the borrower an amount not to exceed 16 percent of the outstanding principal and interest at the time of the loan sale; and (bb) retain such amount from the proceeds of the loan sale . . .*

20 U.S.C. § 1078-6(a)(1)(D) (emphasis added). As Ascendium sees it, this provision unambiguously provides it the authority to charge a 16 percent fee on rehabilitated loans even if it incurs no collection costs at all. Ascendium argues that the "prefatory clause" ("in order to defray collection costs") describes the purpose of the fee, but it does not limit the operative clause ("may . . . charge to the borrower an amount not to exceed 16 percent . . ."). *See D.C. v. Heller*, 554 U.S. 570, 577 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

The government argues that Congress limited this fee to instances in which guaranty agencies incur at least some collection costs. They argue that Ascendium's contrary reading renders the phrase "in order to defray collection costs" superfluous. In the government's view, the purpose provision *informs* the operative clause. The government does not argue *Chevron* deference is appropriate here, nor do they point to any administration action that would render deference appropriate.

Even under the government's view of the statute, however, Ascendium's challenge would prevail. After all, for the reasons discussed above, guaranty agencies do incur collection costs from at least the mailing of the initial notice and certainly before the sixty-day period is up. Thus, even under the government's interpretation, the Rule must be set aside because it prohibits the charging of fees to which guaranty agencies are entitled.[12]

---

[12] The Court does not endorse either party's interpretation of 20 U.S.C. § 1078-6(a)(1)(D). An alternative reading not raised by the parties would read the "prefatory clause" as an adverbial clause, not a separate purpose statement. The clause's placement between the verbs (between

*Arbitrary & Capricious*

Ascendium also argues that there are several ways in which the Rule is arbitrary and capricious, but none is persuasive beyond the reasons already discussed.

First, Ascendium argues that it is arbitrary to condition fees on the timing of a borrower's entry into a repayment or rehabilitation agreement, rather than whether the costs themselves are reasonable. The Court agrees with this argument for the same reasons stated above, but it is not a separate ground for setting aside the Rule.

Second, Ascendium contends that the Secretary did not sufficiently consider its comment that the Rule would create perverse incentive for guarantors to minimize their borrower outreach. Specifically, Ascendium argues, by preventing cost recovery only for those borrowers who entered into a repayment or rehabilitation agreement within the first sixty days after mailing the notice, the Rule incentivizes guaranty agencies to delay and deter such agreements until at least day 61. The government contends that it considered and rejected Ascendium's argument, concluding that the recoupment of costs wasn't intended as an "incentive to offer loan rehabilitation," particularly because guaranty agencies are "statutorily required" to offer an opportunity for borrowers to enter such an agreement. 84 Fed. Reg. at 49877. As the Secretary pointed out, the statute requires guaranty agencies to offer borrowers the option of loan rehabilitation. *See* 20 U.S.C. § 1078-6. And guaranty agencies are obliged by regulation to inform borrowers of that option in the initial notice of default. *See* 34 C.F.R. § 682.410(b)(5)(vi)(M).

---

"may" and "charge") may modify the manner in which the party "may . . . charge" the fee rather than the mere purpose for the operative clause. That is, another reading is that the fee may be charged but only to the extent necessary to defray collection costs. Under this reading, a guaranty agency would not have an unconditional entitlement to a 16 percent fee, but its recovery would be limited by the amount of collection costs it actually incurred. *See* Transcript at 5.

The Court agrees with the government.  The Secretary gave only a few words to address Ascendium's comment.  84 Fed. Reg. at 49877.  But the Court will not substitute its judgment about the wisdom of this Rule for the agency's, which considered the issue and explained why it thought the "incentive" to offer loan rehabilitation was unnecessary.  Whether guaranty agencies are sufficiently incentivized by the statutory requirement to offer high-quality customer service is an open question, but that tradeoff is one for the agency to make, not the Court.

Third, Ascendium asserts the Rule is arbitrary and capricious because it ignores significant differences between rehabilitation agreements on terms satisfactory to the agency.  The government responds that the differences do not result in a difference in the reasonableness of collection costs within the first sixty days.  The Court again agrees with the government.  The Rule concerns when charging collection costs is appropriate, not the substance of the programs.  It is not unreasonable to treat the two programs alike for this limited purpose.

### IV.  Conclusion

For all of the above reasons, the Court grants in part and denies in part Defendant's Motion to Dismiss and grants in part and denies in part Plaintiff's Motion for Summary Judgment.

An order will be issued contemporaneously with this opinion.


DATE:  February 24, 2022

CARL J. NICHOLS
United States District Judge